IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Tamera Brown
c/o Zachary Gottesman, Esq.
36 E 7th Street, Suite 1650
Cincinnati, OH 45202-4452,

and

Joy Ludgatis
c/o Zachary Gottesman, Esq.
36 E 7th Street, Suite 1650
Cincinnati, OH 45202-4452,

      Plaintiffs,

 vs.

City of Cincinnati, Ohio
801 Plum Street
Cincinnati, OH 45202-5705,

 and

John J. Cranley
(Individually and in his official capacity
as Mayor of the City of Cincinnati)
801 Plum Street
Cincinnati, OH 45202-5705,

 and

Danita Pettis
(Individually and in her official capacity
as a Police Lieutenant for the City of Cincinnati)
801 Plum Street
Cincinnati, OH 45202-5705,

and

Patrick A. Duhaney
(Individually and in his official capacity
as City Manager for the City of Cincinnati)
801 Plum Street

Case No. 1:18-cv-00412

Judge Susan J. Dlott

Magistrate Karen L. Litkovitz

SECOND AMENDED COMPLAINT

Cincinnati, OH 45202-5705,

and

Harry E. Black
(Individually and in his official capacity
as Former City Manager for the City of Cincinnati)
801 Plum Street
Cincinnati, OH 45202-5705,

and

Eliot K. Isaac
(Individually and in his official capacity
as Chief of Police for the City of Cincinnati)
801 Plum Street
Cincinnati, OH 45202-5705,

and

Sentinel Police Association
1889 Central Parkway
Cincinnati, OH 45214-2318,

Defendants.

Plaintiffs, Tamera Brown and Joy Ludgatis, by and through counsel, for their Complaint

against Defendants state as follows:

## I.    The Parties

1.      Plaintiff, Tamera Brown ("Brown"), is a white female, a U.S. citizen, a resident

of Hamilton County, Ohio, and is employed as a Police Officer by the City of Cincinnati with

over 15 years of service.

2.      Plaintiff, Joy Ludgatis ("Ludgatis"), is a white female, a U.S. citizen, a resident

of Hamilton County, Ohio, and is employed as a Police Specialist by the City of Cincinnati with

over 27 years of service.

3.      Plaintiffs are employees of the City of Cincinnati as defined in 42 U.S.C. §

2000e(h) and do not fall within any exemption contained in that section.

4.        Defendant, City of Cincinnati ("the City"), is a municipality organized under the laws of the State of Ohio.

5.        The City is a government agency, is an employer as defined in 42 U.S.C. § 2000e(b) and does not fall within any exemption of the term "employer" contained in that section.

6.        Defendant, John J. Cranley ("Cranley"), is a U.S. citizen, a resident of Hamilton County, Ohio, and is the Mayor of the City of Cincinnati. Suit is brought against Cranley individually and in his official capacity.

7.        Defendant, Danita Pettis ("Pettis"), is a U.S. citizen, a resident of Hamilton County, Ohio, and is employed as a police lieutenant by the City of Cincinnati.  Suit is brought against Pettis individually and in her official capacity.

8.        Defendant, Patrick A. Duhaney ("Duhaney"), is a U.S. citizen, a resident of Hamilton County, Ohio, and is the City Manager for the City of Cincinnati. Suit is brought against Duhaney individually and in his official capacity.[1]

9.        Defendant, Harry E. Black ("Black"), is a U.S. citizen, a resident of Hamilton County, Ohio, and is the former City Manager of the City of Cincinnati.  Suit is brought against Black individually and in his official capacity.

10.        Defendant, Eliot K. Isaac ("Isaac"), is a U.S. citizen, a resident of Hamilton County, Ohio, and is the Chief of Police for the City of Cincinnati. Suit is brought against Isaac individually and in his official capacity.

---

[1] When Plaintiffs filed their initial Complaint in this matter, Duhaney was Acting City Manager.

11.     Defendant, Sentinel Police Association, is a not-for-profit Ohio corporation that is a necessary party pursuant to F.R.C.P. 19.

## II.     Plaintiffs' Standing and Nature of Claims

12.     Plaintiffs bring this action based on Defendants' past, present, and continuing violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e, *et seq.*), 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Ohio Revised Code Chapter 4112.

## III.     Jurisdiction and Venue

13.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343 (2), (3), and (4).

14.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the claims derive from the same operative facts and are so related to Plaintiffs' federal claims that they form a part of the same case or controversy.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants are residents of this District and are residents of Ohio. Further, the acts or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV.     Facts

### A.  Introduction

16.     During the time that the events giving rise to this Complaint occurred, Plaintiffs were directly supervised by Defendant Pettis, who controlled discipline, work assignments, employee reviews and evaluations, and the general working conditions of Plaintiffs.

17.     At all times relevant to this Complaint, Plaintiffs were employed by the City, and were supervised by Defendants Cranley, Duhaney, Black, and Isaac, all of whom had

control and influence over discipline, work assignments, employee reviews and evaluations, and the general working conditions of Plaintiffs.

18.     The City, Cranley, Duhaney, Black, and Isaac have instituted and perpetuated unconstitutional race-based policies for hiring, promotion, discipline, and conferring benefits of employment among and upon the ranks of the Cincinnati Police Department.

19.     Specifically, the City, Cranley, Duhaney, Black, and Isaac have implemented and continue to implement an unconstitutional race-based State Consent Decree[2] and an unconstitutional race-based Federal Consent Decree[3] that predicate promotions among qualified candidates based solely and exclusively on racial criteria.

20.     The aforementioned State and Federal Consent Decrees are facially defective and fail to comply with applicable law.

21.     Specifically, the relief the State and Federal Consent Decrees purport to provide is not warranted by a strong state interest.

22.     Specifically, the Decrees are not narrowly tailored and are not limited in duration, resulting in continuing racial discrimination against white police officers in perpetuity.

23.     Specifically, there is an unconstitutional race-based double standard for discipline among the Cincinnati Police Department that permissively condones misconduct for certain officers that would subject others to discipline.

24.     Specifically, there is an unconstitutional race-based policy for detail assignment that confers benefits of employment through preferred detail assignments on

---

[2] Attached as Exhibit 1.
[3] Attached as Exhibit 2.

some officers based solely on their race and excludes other equally qualified officers based solely on their race.

25.     Specifically, there is an unconstitutional race-based policy permitting black officers to speak with media outlets and exercise their First Amendment rights while denying the same to white officers.

26.     Specifically, there is an unconstitutional race-based policy for permitting insubordination and violation of the rules for chain of command by black officers, including specifically Pettis, that would subject others to discipline or termination.

27.     Specifically, there is an unconstitutional race-based policy for permitting theft in office and fraudulent and excessive claims for overtime compensation by black officers, including specifically Pettis, that would subject others to discipline or termination.

28.     Specifically, there is an unconstitutional policy that creates a hostile work environment by predicating overtime income and benefits on submission to sexual advances made by the chief of police.

29.     The specific policies outlined above have had an aggregate effect of creating an atmosphere of racial tension and in some cases open hostility between officers of different races.

30.     The implementation of race-based policies for hiring, promotion, discipline, and conferring benefits of employment has unnecessarily created increased racial tension and division among the ranks of the Cincinnati Police Department and there are certain officers, including specifically Pettis, who view everything through a racial prism.

31.     The increased racial tension and division among the ranks of the Cincinnati Police Department has jeopardized officer safety.

6

### B. Danita Pettis

32.    Plaintiffs and Pettis were all previously assigned to District 4 of the Cincinnati Police Department and worked together until Plaintiffs were transferred in December 2017.

33.    Pettis is a vindictive, openly racist police officer who is unfit and lacks the character and integrity to serve as a police officer.

34.    Pettis has engaged in conduct as a police officer that, but for her race, would have resulted in discipline and /or criminal charges against her including, but not limited to, allegedly stealing money from a 5/3rd bank during a detail; falsely representing her credentials to gain access to the Hamilton County Justice Center so that she could advise a rape suspect/family member how to avoid prosecution; making false and excessive claims for overtime compensation[4]; using city property for personal use; committing theft in office; sleeping while on duty;  and abusing her role as a Sentinels Police Association Union Representative to obstruct justice and suborn false testimony by officers accused of misconduct.

35.    Pettis has avoided repercussions for her illegal conduct referenced in the preceding paragraph because of the race-based double standard for officer discipline.

36.    Pettis' de facto immunity from disciplinary action has manifested in her racist, abusive, and lawless demeanor that threatens the morale and safety of the officers assigned to work with her.

### C. Plaintiffs' Internal Complaints and EEOC Charges of Discrimination

37.    On 13 and 14 March 2018, Plaintiffs filed charges of discrimination[5] with the

---

[4] Attached as Exhibit 3.
[5] Attached as Exhibits 4 and 5.

Cincinnati Area Office of the EEOC and were given notice of their right to file suit.

38.      Plaintiffs charged that they were subjected to discriminatory and retaliatory treatment by the City generally and by Pettis specifically based on their sex and race.

39.      Specifically, Plaintiffs charged that they have been repeatedly subjected to a hostile work environment by their immediate supervisor, Pettis.

40.      Prior to filing her charge of discrimination with the EEOC, Brown filed an internal complaint[6] via email against Pettis with Captain Martin Mack, on 26 November 2017.

41.      Brown's complaint references an incident on 16 November 2017 during which Pettis held 3rd shift officers in roll call while white 2nd shift officers were calling for assistance because of shots fired at them. Pettis did not release officers from roll call to render assistance.

42.      Brown also describes in her complaint another roll call conducted by Pettis on 24 November 2017 during which Pettis' behavior was so hostile, demeaning, and unprofessional that the entire 3rd Shift of District 4 sent a memo to Isaac requesting a conference regarding Pettis' practices of verbal abuse and emotional intimidation and their collective fear of unfair retaliation[7].

43.      On 26 November 2017, Police Sgt. Dan Hils visited District 4 during 3rd shift roll call and advised the officers present of their rights to file complaints against Pettis for her unprofessional, abusive, demeaning, and hostile conduct.

44.      On 28 November 2017 (prior to filing her charge of discrimination with the EEOC), Ludgatis filed an internal complaint[8] via email with Captain Martin Mack stating that she was subjected to humiliating, demeaning, and unprofessional verbal abuse by Pettis.

---

[6] Attached as Exhibit 6.
[7] Attached as Exhibit 7.
[8] Attached as Exhibit 8.

45.     On 28 November 2017, Pettis requested an internal investigation regarding the conduct of Sgt. Dan Hils during his visit to District 4 roll call on 26 November 2017[9].

46.     As a result of all the foregoing, command staff initiated an investigation which angered Pettis, who, in apparent reaction to the investigation, made the aforementioned hostile, negative, and discrediting comments about Plaintiffs Brown and Ludgatis during 3rd shift roll call on at least two occasions[10].

### D.  Transfer of Plaintiffs and Continuing Discrimination

47.     On 1 December 2017, after making the hostile, demeaning, and abusive comments about Brown and Ludgatis, Pettis formally requested that Brown and Ludgatis be transferred to another district[11].

48.     As a result of Pettis' actions, Brown and Ludgatis were both transferred to other districts and shifts later in December 2017.

49.     Although this did not result in any loss of pay, it was a material change in the terms, conditions, and privileges of Plaintiffs' employment.

50.     The report generated as a result of the aforementioned investigation[12] found Pettis engaged in various misconduct, but the City has failed to impose meaningful discipline or otherwise address the continuing racial tensions and hostile environment created by Pettis.

51.     The City's attempts to remediate the hostile work environment have been ineffective, and Pettis continues to direct aggressive, hostile, demeaning, abusive, and

---

[9] Attached as Exhibit 9
[10] See 5 December 2017 email from Lt. Colonel Dave Bailey to Isaac attached hereto as Exhibit 10.
[11] See Attached Exhibit 11.
[12] Attached as Exhibit 12.

9

unprofessional comments toward Ludgatis.[13]

52.     Pettis also continues to spread inaccurate information and disparaging remarks about Ludgatis to fellow officers, creating a hostile and disruptive environment (see Exhibit 11).

53.     Pettis' conduct was and is willful, wanton, intentional, and specifically designed to cause duress, humiliation, stress, and anxiety in Plaintiffs.

54.     The City's failure to remedy the hostile environment created by Pettis has caused Plaintiffs' physical, mental, and emotional distress.

55.     Specifically, Brown has developed physical manifestations of the stress, including stomach ulcers for which she is undergoing continuing medical treatment.

56.     Specifically, Ludagits experiences stress and anxiety daily which affects her ability to perform her job responsibilities and disrupts her sleep schedule and domestic life.

57.     Since the initial filing of this lawsuit, Defendants have denied Plaintiffs the right and opportunity to speak publicly about their allegations of discrimination and disparate treatment based on race and sex.

58.     Specifically, pursuant to Cincinnati Police Department policy, Plaintiffs submitted requests to Isaac for permission to speak to the media about this lawsuit.

59.     Isaac denied Plaintiffs' requests without explanation.

60.     Pettis, on the other hand, participated in a press conference held by the Sentinel Police Association and its attorney, Alphonse A. Gerhardstein, on 19 June 2018.

### E.  Routine Race-Based Discipline

61.     The implementation of race-based policies and double standards for discipline

---

[13] Attached as Exhibit 13.

among Cincinnati police officers and the resulting disparities is exemplified by the discipline meted out to police officer Donte Hill and police officer Dennis Barnette for nearly identical conduct.

62.     On 26 September 2018, P.O. Hill, who is black, was dispatched to 3097 McHenry Avenue for a domestic disturbance.

63.     According to the Form 17[14], Request for Official Reprimand, during the run and his encounter with various involved citizens, P.O. Hill used profane language, including a statement directed to an arrestee "that god damn alcohol out here got you niggers[15] acting stupid".

64.     That comment and others were recorded on P.O. Hill's body camera.

65.     P.O. Hill's language was similar to the language being used by the citizens with whom he was engaged and his language did not cause any noticeable reaction or offense.

66.     There was no complaint filed by a citizen regarding P.O. Hill's conduct.

67.     Following a review of P.O. Hill's body camera recording, District 3 Sgt. Putnick requested that P.O. Hill be issued a Notice of Official Reprimand for violating §1.06B of the Cincinnati Police Department Rules and Regulations.

68.     Sgt. Putnick's recommendation was reviewed and approved on 22 October 2018 by District 3 Capt. Broxterman, who found that the written reprimand was warranted because he determined P.O. Hill's unprofessional language to be excessive.

69.     On 23 October 2018, the recommended discipline was reviewed and approved by Capt. Neudigate and Chief Isaac.

---

[14] Attached as Exhibit 14.
[15] Officer Hill states that he used the more colloquial term "niggas".

70.     On 23 December 2018, just 3 months later, in a completely unrelated event, Cincinnati Police Officer Dennis Barnette, who is white, stated "that nigger slapped me in the face" while engaged in a physical arrest of a female subject outside Brownstown Bar in the Roselawn area.

71.     That comment was recorded on P.O. Barnette's body camera.

72.     P.O. Barnette's police powers were immediately suspended and the matter was referred to the Internal Investigative Section (IIS) for investigation.[16]

73.     At some point shortly after the suspension of P.O. Barnette's police powers, an unknown individual within the Cincinnati Police Administration recalled that P.O. Hill had merely received an official reprimand for similar conduct.

74.     In an effort to address the obvious disparity in the discipline imposed on the two officers and conceal the obvious double standard, Isaac claimed that the prior approval of P.O. Hill's discipline was an oversight despite being signed off on and approved by Capt. Broxterman, Capt. Neudigate, and Chief Isaac.

75.     As a result, on 27 December 2018, P.O. Hill's police powers were suspended and the 26 September 2018 incident was referred to IIS for further investigation and potential discipline.

76.     The immediate suspension of P.O. Barnette's police powers for uttering a similar epithet as P.O. Hill reveals the Cincinnati Police Department's double-standard and hypocrisy in disciplining officers based on race.

77.     For any behavior that may subject an officer to discipline, the ethnicity of the

---

[16] As of the filing of this Second Amended Complaint, P.O. Barnette remains on desk duty with no police powers while the IIS continues its inquiries into the matter under Case No. 18153.

officer involved is the controlling factor in determining the discipline imposed.

78.     This systemic flaw in the Cincinnati Police Department's disciplinary system violates the Fourteenth Amendment to the U.S. Constitution.

79.     To cover up this systemic flaw and compounding it, the random and counterintuitive suspension of P.O. Hill pending the reopened investigation makes obvious that the discipline system is prone to manipulation for political purposes.

80.     In another prime example of the routine uneven imposition of discipline by the Cincinnati Police Department and the City based on race, Sgt. Jacob Hicks and Sgt. Eric Schank, who are white, complained internally that Lt. Joseph Williams routinely refers to Sgt. Hicks and other white officers as "white devils."[17]

81.     After an extensive investigation by the IIS, no discipline was imposed on Lt. Williams for the use of the racially charged term "white devil" in reference to white officers.

### First Cause of Action-42 U.S.C. § 2000e-2(a)

82.      Plaintiffs incorporate the preceding paragraphs as if fully restated here.

83.     In violation of 42 U.S.C. § 2000e-2(a), Plaintiffs have been subjected to illegal discrimination in the terms, conditions, and privileges of their employment because of their race and sex.

84.     Specifically, Plaintiffs have been subjected to a hostile work environment, abusive and demeaning verbal attacks, and have been transferred or otherwise suffered adverse employment decisions because they are white females.

85.     Plaintiffs' workplace was permeated with discriminatory intimidation, ridicule, and insult so severe as to alter the conditions of Plaintiffs' employment and created

---

[17] See attached Exhibit 15.

an abusive working environment.

86.     Specifically, while both were assigned to District 4, Defendant Pettis bullied and made inappropriate inquiries of Tamera Brown regarding the nature and extent of Ms. Brown's time off under provisions of the FMLA.

87.     Specifically, while both were assigned to District 4, Defendant Pettis publicly humiliated Joy Ludgatis by insinuating that Ms. Ludgatis would not risk her personal safety to aid fellow officers because Ms. Ludgatis was a desk officer, and by threatening retaliation if Ms. Ludgatis did not "watch" herself.[18]

88.     Plaintiffs were routinely subjected to criticism, review, and counseling by Defendant Pettis for conduct that was not subject to criticism, review, or counseling by Pettis when engaged in by officers who were not white females.

89.     The discriminatory intimidation, ridicule, and insult were directed to Plaintiffs because of their sex and race and were not directed to other employees who were not white females.

90.     The retaliatory transfers suffered by Plaintiffs were to Districts that were less prestigious, more difficult and dangerous to work, and involved changes in hours that upset Plaintiffs' work and personal schedules.

91.     Pursuant to 42 U.S.C. § 2000e-2(m), despite the existence of other motivating factors, Plaintiffs have been subjected to unlawful employment practices because their race and sex were primary considerations affecting decisions regarding the terms, conditions, and privileges of their employment.

92.     As a direct and proximate result of Defendants' unlawful, discriminatory, and

---

[18] See Exhibit 8.

retaliatory conduct, Plaintiffs have suffered injuries and damages and are entitled to judgment and relief.

93.     Under 42 U.S.C. § 2000e-5(g)(2)(B)(i) and § 2000e-5(k), Plaintiffs are entitled to reasonable attorneys' fees and costs incurred in the prosecution of this action.

### Second Cause of Action-42 U.S.C. § 2000e-3

94.     Plaintiffs incorporate the preceding paragraphs as if fully restated here.

95.     42 U.S.C. § 2000e-3(a) provides in pertinent part that "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

96.     Defendants have discriminated and retaliated against Plaintiffs because Plaintiffs have opposed practices made unlawful, have filed complaints, and have participated in investigations and proceedings provided for under 42 U.S.C. § 2000e and its subchapters.

97.     As a direct and proximate result of Defendants' unlawful, discriminatory, and retaliatory conduct, Plaintiffs have suffered injuries and damages and are entitled to judgment and relief.

### Third Cause of Action-42 U.S.C. § 1981

98.     Plaintiffs incorporate the preceding paragraphs as if fully restated here.

99.     Acting under color of state law and in their individual capacities, Defendants Cranley, Pettis, Duhaney, Black, and Isaac impaired Plaintiffs' federally protected rights in violation of 42 U.S.C. § 1981(c) by engaging in discriminatory practices and conduct.

100.    Specifically, Defendant Pettis discriminated against Plaintiffs by singling out

Plaintiffs for demeaning verbal abuse, criticism, review and counseling, and transfers because of Plaintiffs' race.

101.    The City has engaged in a custom and policy of permitting the retaliation and discriminatory conduct complained of herein.

102.    The City has ratified the conduct complained of herein by failing to take effective corrective and remedial actions and by failing to impose meaningful discipline or otherwise address the continuing racial tensions and hostile environment created by Pettis despite the documented complaints of Plaintiffs.

103.    The City has ratified the conduct complained of herein by continuing to adhere to the provisions of the illegal State and Federal Consent Decrees by implementing and perpetuating a race-based system for hiring, promotion, and discipline within the Cincinnati Police Department.

104.    As a direct and proximate result of Defendants' unlawful, discriminatory, and retaliatory conduct, Plaintiffs have suffered injuries and damages and are entitled to judgment and relief.

105.    Under 42 U.S.C. § 1981a(b), Plaintiffs are entitled to compensatory and punitive damages due to Defendants' reckless, malicious, and intentionally discriminatory practices in violation of Plaintiffs' federally protected rights.

### Fourth Cause of Action-42 U.S.C. § 1983-Free Speech

106.    Plaintiffs incorporate the preceding paragraphs as if fully restated here.

107.    Defendant, the City, is a state actor.

108.    Defendants, Cranley, Pettis, Duhaney, Black, and Isaac are state actors when acting in their official capacities.

109.    Plaintiffs engaged in constitutionally protected free speech and conduct when they complained about the aggressive, hostile, demeaning, abusive, and unprofessional conduct of Pettis.

110.    Acting under color of state law, Defendants, including the City, took adverse employment action employment action against Plaintiffs in direct retaliation for Plaintiffs' engagement in protected free speech.

111.    Specifically, Defendants' transfer of Plaintiffs to another district and other adverse employment decisions affecting the terms, conditions, and privileges of Plaintiffs' employment were in direct retaliation for Plaintiffs' protected speech and conduct on matters of public concern as guaranteed by the First and Fourteenth Amendments.

112.    Specifically, Defendants, using their office and acting under color of state law, have prevented Plaintiffs from speaking publicly about this lawsuit and the discrimination complained of herein by denying Plaintiffs' requests to speak with the media.

113.    Defendants' denial of Plaintiffs' requests to speak with various media outlets regarding pending litigation is the result of Defendants' unconstitutional race-based policy of permitting black officers to speak with media outlets and exercise their First Amendment rights while denying the same to Plaintiffs.

114.    The City actively maintains and perpetuates customs and policies permitting the retaliation and discrimination complained of herein.

115.    The City does so by consistently ratifying the discriminatory and retaliatory actions of the individual Defendants by failing to take effective corrective and remedial action.

116.    The City does so by consistently implementing and executing unlawful policies and decisions based on the unlawful Consent Decrees complained of herein.

117.    Defendants' conduct was intentional, malicious, willful, and wanton.

118.    As a direct and proximate result of Defendants' unlawful, discriminatory, and retaliatory conduct, Plaintiffs are entitled to prospective injunctive relief under 42 U.S.C. § 1983, and to declaratory relief under 28 U.S.C. §§ 2201 *et seq.*, and the Defendants are liable in their individual capacities for monetary damages sought herein.

119.    Under 42 U.S.C. § 1988, Plaintiffs are entitled to recover reasonable attorney fees incurred in the prosecution of this action.

### Fifth Cause of Action-R.C. §§ 4112.01, *et seq.*

120.    Plaintiffs incorporate the preceding paragraphs as if fully restated here.

121.    In violation of R.C. § 4112.02(A), Plaintiffs have suffered illegal discriminatory treatment affecting the terms, conditions, and privileges of their employment because of their sex and race.

122.    Specifically, Plaintiffs have been subjected to a hostile work environment, abusive and demeaning verbal attacks, and have been transferred or otherwise suffered adverse employment decisions because they are white females.

123.    In violation of R.C. § 4112.02(I), Defendants have discriminated against Plaintiffs because Plaintiffs have opposed practices made unlawful and have participated in investigations and proceedings provided for under R.C. Chapter 4112 and its subchapters.

124.    As a direct and proximate result of Defendants' unlawful, discriminatory, and retaliatory conduct, Plaintiffs have suffered injuries and damages and are entitled to judgment and relief.

125.    Under R.C. § 4112.99, Plaintiffs are entitled to recover damages and other appropriate relief through this civil action.

**Wherefore,** Plaintiffs demand relief as follows: Equitable relief enjoining Defendants from continuing to engage in illegal discriminatory employment practices, including termination of the herein referenced Consent Decrees; compensatory and punitive damages in an amount to be proven at trial; attorneys' fees and costs as determined by the Court; and such other relief as this Court deems just.

Respectfully submitted,

*/s/Zachary Gottesman*
Zachary Gottesman (0058675)
Gottesman & Associates, LLC
36 East 7th St., Suite 1650
Cincinnati, OH 45202-4452
T: 513-651-2121
F: 513-651-2131
zg@zgottesmanlaw.com

**Certificate of Service**

I hereby certify that on the 4th day of February 2019, a copy of the foregoing was filed electronically and notice of this filing will be sent to all parties entitled to receive notice by operation of the Court's electronic filing system.

*/s/Zachary Gottesman*
Zachary Gottesman (0058675)

COURT OF COMMON PLEAS
HAMILTON COUNTY



SENTINEL POLICE ASSOCIATION,     :     CIVIL ACTION NO. A8704567

                               :     (Niehaus, J.)

        and                    :

ARTHUR HARMON
BURNETT WILLIAMS
JERRY KYLES                     :
GEORGE EDMONDS
LONNIE MICHAEL COTTON
FREDDIE F. STONESTREET       :
RONALD TWITTY
       and                    :
LEYNORICE JOHNSON

                Plaintiffs       :

                               :

      vs.                         :

CITY OF CINCINNATI,           :     <u>CONSENT DECREE</u>

           Defendant          :

      and                      :

QUEEN CITY LODGE NO. 69,
FRATERNAL ORDER OF POLICE,      :
HAMILTON COUNTY, OHIO, INC.

        Defendant-Intervenor          :

---

       Plaintiffs in this action have alleged unlawful
discrimination against blacks and females within the Cincinnati
Police Division. In order to avoid time consuming and costly
litigation and in order to continue ongoing efforts to
insure equal promotional opportunity within the Cincinnati Police
Division, however, the parties have agreed to resolve all claims
raised in this case by entering into this consent decree
including claims for costs and attorney fees. This decree shall



not constitute an admission, adjudication, or finding on the merits of the case, and the defendants deny that any unlawful discrimination has occurred.

The following facts are stipulated :

a.  Twenty-six lieutenants or 67% of the total number of lieutenants in the Division were appointed from the latest police lieutenant promotion eligible list. Twenty-five of those promoted were white males and one a white female. That list expired June 25, 1987.

b.  All twenty-six promotions to the rank of lieutenant were made pursuant to the applicable provisions of R.C. 124.44, and in accordance with Section 10, Article XV, of the Ohio Constitution.

c.  Six qualified blacks were on the list but were not promoted to the rank of lieutenant by the time the list expired.

d.  The current promotion eligible list for police captain was to expire on July 11, 1987, but was extended by the court and is to expire at 12 o'clock noon on September 14, 1987.

e.  Nine captains or 64% of the total number of captains in the Division have been promoted from the current list and all of those promoted have been white males.

f.  All nine promotions to the rank of captain were made pursuant to the applicable provisions of R.C. 124.44, and in accordance with Section 10, Article XV, of the Ohio Constitution.

g.  Two qualified blacks are on the list but unlikely to be promoted to the rank of captain by the date the list will expire.

h.  No blacks or females have been promoted to the ranks of captain or lieutenant colonel and no blacks and only one female have been promoted to the rank of lieutenant since August 13, 1981. There are currently no black or female lieutenant colonels; no black or female captains; and only one female and two black lieutenants within the Cincinnati Police Division. Blacks and females have been underrepresented and currently remain underrepresented in the promoted ranks of the Cincinnati Police Division covered by this decree.

2



ENTERED
SEP 14 1987
IMAGE 158

i.  The large number of new promotions to the ranks of
    captain and lieutenant have reduced the possibility of
    openings in those ranks in the near future.  Unless
    affirmative action is practiced with respect to
    promotions in those ranks, the manifest imbalance
    existing with respect to blacks and females in those
    ranks and at the rank of lieutenant colonel will
    continue to be present.  There is a need for an
    affirmative action remedy.

j.  It is the purpose and intent of the decree to insure
    that blacks and females are not disadvantaged by
    promotion practices within the City of Cincinnati and
    that any disadvantage to blacks and females which may
    have resulted from any past discrimination be remedied,
    in accordance with the specific terms of this consent
    decree, so that equal promotional opportunity is provided
    to all.

k.  The double-fill system provided for herein is intended
    to be limited in duration; utilized only as set forth herein
    only when the normal promotional system does not result
    in sufficient promotions of blacks and females to the
    ranks affected; is statistically well-grounded; and has
    a minimal impact on the civil service and other rights
    of officers not benefiting from the double-fill system.

The long term goal of this decree is to achieve, subject to
the availability of qualified applicants, a proportion of
qualified blacks and females in the sworn ranks of police
lieutenant, police captain, and assistant police chief
(lieutenant colonel) in the Cincinnati Police Division equal to
the proportion of qualified blacks and females in the labor force
of the City of Cincinnati.

It is hereby ORDERED, ADJUDGED AND DECREED, with agreement
of all parties:

All positions to be filled in the ranks above
sergeant and below police chief in the Cincinnati
Police Division shall be filled by rank order
promotion from the applicable eligibility list with
the following exceptions:

In the event that the results of the grading of any
promotional examination results in the release of a



ENTERED
SEP 14 1987
IMAGE 159

3

promotion eligible list which fails to assure
promotions of qualified blacks and females at a level
consistent with an interim goal of approximately 25%
of the vacancies, then the City defendant shall
establish and fund such required additional positions
and promote such additional blacks and females in
rank order from the existing promotion eligible list
as are required to fulfill the interim goal.

Subsequent to the release of the next promotion eligible
lists for the ranks of police lieutenant, police captain and
assistant police chief (lieutenant colonel) in accordance
with the terms of this Decree, the required compliment for
those ranks shall be determined by the city defendant and a
"Notice of Complement" shall be prepared and posted on all
bulletin boards in all police locations, no later than one
hundred twenty (120) days prior to the expiration of the
existing promotion eligible list. Said "Notice of
Complement" shall set the authorized complement of each rank
effective the day after the expiration of the current
eligible list.

All positions in the ranks of specialist, lieutenant,
captain and assistant chief of police (lieutenant
colonel) that are established and funded pursuant to
the provisions of this decree in addition to those in
the established complement for that rank shall be
considered double-fill complement positions in
existence at the time of the release of the "Notice
of Complement" by the City defendants; provided,
however, that after the expiration of any existing
promotion eligible list, a vacancy for promotion
purposes shall not exist in the complement until such
time as the total number of persons holding the rank
of specialist, lieutenant, captain, or assistant police chief
(lieutenant colonel) falls below the complement
established by the "Notice of Complement".

Within the interim goal of promoting blacks and
females to approximately 25% of the vacancies in the
designated ranks above police sergeant, qualified
blacks and females shall be promoted first, in rank
order, and second, in a manner that reflects their
proportionate representation in the ranks eligible
for those positions in relation to each other. For
example, if among black and female candidates for
promotion the rank order is:

     1st, white female A
     2d,  black A
     3d,  white female B
     4th, black B
     5th, black C
     6th, black D
     7th, black E



ENTERED
SEP 1 4 1987
IMAGE /6D

4

and the proportion of blacks to females in the ranks
eligible for those positions is 4:1, double fill
promotions shall be made as follows:

          1st, white female A
          2d,  black A
          3d,  black B
          4th, black C
          5th, black D
          6th, white female B
          7th, black E

It is understood and agreed that this provision shall
not be interpreted so as to alter the method the City
has utilized in the past in promoting blacks and
females to double-fill positions created by the
existing federal consent decree [USA v. City of
Cincinnati, U.S.D.C., S.D. OH., No. C-1-80-
369] relating to the ranks of specialist and sergeant.
By consenting to the use of this method in this
decree, the Sentinels and the individual plaintiffs
are not consenting to the use of this method under
the federal decree.

The provisions of this decree do not apply to the
position of chief of police. However, the City
should seek to apply affirmative action in an effort
to promote qualified blacks and/or females to that
position in a manner consistent with state civil
service laws.

This decree shall be implemented immediately,
including application of the decree to the current
captain promotion eligible list. For the current
captain list only the city shall promote in rank
order two white lieutenants to double fill
positions as police captains at the same time it
promotes the two black lieutenants to double fill
positions as police captains.

For the next lieutenant promotion eligible list only,
the interim goal shall be adjusted upward so as to
result in double fill promotions to the rank of
lieutenant in rank order on a ratio of one black or
female (pursuant to the guidelines at the bottom of
page four and top of page five) for every white male
promoted to a regular complement position as police
lieutenant.

During the life of the next lieutenant promotion
eligible list only, the city shall promote in rank
order seven police officers to double fill positions
as police specialists at the same time double fill
positions are filled under this decree at the ranks
of captain and lieutenant. No more than seven double



ENTERED
SEP 1 4 1987
IMAGE

5

fill specialist positions shall be created under this provision. Double fill specialist positions created under this provision shall be in addition to, but counted as regular complement positions for the purpose of determining double fill specialist promotions to be established during this period under the decree in USA v. City of Cincinnati, U.S.D.C., S.D.OH., No. C-1-80-369.

Vacancies caused by the promotion of the two black lieutenants and two white lieutenants on the current captain promotion eligible list, as well as all vacancies created as the result of the one year double-filling requirement in the rank of police lieutenant, and all other vacancies in the sworn ranks of the police division created during the life of the next lieutenant promotion eligible list shall be filled promptly by promotions to or from all applicable lower ranks in the Cincinnati Police Division.

The promotion eligible lists for ranks above sergeant in the Cincinnati Police Division shall be valid for one (1) year or until the list is exhausted, whichever shall occur first. The complement of positions for the ranks of police specialist, sergeant, and lieutenant shall remain fixed and not be reduced until the expiration of the next lieutenant promotion eligible list following the entry of this decree. The approved and funded complement for each rank for the purpose of this provision is captain, 14, lieutenant, 39, sergeant, 120*, and specialist, 138.

[*Subject to final decision in Smith et.al. vs. City of Cincinnati, et al., USDC, CASE NO. C-1-87-0381.]

After expiration of the next lieutenant promotion eligible list, complement strength in all ranks shall be determined by the appointing authority or its designated representatives in a manner consistent with state civil service laws and the "Notice of Complement" requirements of this decree.

ENTERED
SEP 14 1987
IMAGE 162

In the event that the authorized complement for the rank of captain should be reduced prior to expiration of the next lieutenant promotion eligible list, resulting demotions and layoffs shall be made according to seniority consistent with Stotts v. Firefighters, 104 S. Ct. 2576 (1984).

Plaintiffs shall dismiss the motion to intervene and for

enforcement of the consent decree and the appeal they have initiated

6

in the United States District Court, Southern District of Ohio, Western Division, in Case No. C-1-80-369, and in the United States Court of Appeals, Sixth Circuit, in Case No. 87-3475, and all parties hereto expressly waive any right they may have to recover damages, costs or attorney fees through this date in either of those two proceedings or in the instant action. The Fraternal Order of Police, Queen City Lodge No. 69, agrees to dismiss the pending grievance concerning the alleged negotiations between the Sentinels and the City.

This court shall retain continuing jurisdiction of this action.

Judge

Entered this ___14th___ day of ___September___ 1987.

ENTER

JUDGE RICHARD A. NIEHAUS

DATE:

AGREED:

_A. A. Gerhardstein_
Alphonse A. Gerhardstein
Trial Attorney for Plaintiffs

_John H. Burlew_ by AAG
John H. Burlew
Attorney for Plaintiffs

_M. Kathleen Robbins_
M. Kathleen Robbins
Trial Attorney for Defendant City of Cincinnati

_Donald E. Hardin_ BY: JAY HILL H329
Donald E. Hardin
Trial Attorney for Defendant-intervenor
Queen City Lodge No. 69,
Fraternal Order of Police

ENTERED
SEP 14 1987
IMAGE 163

7

EXHIBIT
2

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | C-1-80-369 |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | |
| CITY OF CINCINNATI, OHIO; THE | ) | |
| CINCINNATI POLICE DIVISION: | ) | |
| ARTHUR F. HULL, JR., Chairman | ) | |
| WILLIAM P. SHEEHAN, and RICHARD | ) | |
| E. GUGGENHEIM, in their | ) | |
| Capacities as Members of the | ) | |
| Cincinnati Civil Service | ) | |
| Commission, | ) | |
| | ) | |
| Defendants. | ) | |

Indexed _____
Docketed _____
Journal _____
Motion _____
Issue _____
Card _____

## CONSENT DECREE

The Plaintiff United States of America filed its Complaint in this action against, <u>inter alia</u>, the City of Cincinnati, alleging that the defendants are engaged in a pattern or practice of discrimination in employment on the basis of race and sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e et sea., the nondiscrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 42 U.S.C. Section 3789d (c)(3) and the nondiscrimination provisions of the State and Local Fiscal Assistance Act of 1972, as amended, 31 U.S.C. Section 1242.

The parties, being desirous of settling this action by appropriate decree, agree to the jurisdiction of this Court over the respective parties and subject matter of this action and hereby waive the entry of findings of fact and conclusions of law. The City of Cincinnati and its officials, sharing the goal of insuring equal employment opportunity within the

3

Cincinnati Police Division and desiring to avoid protracted and unnecessary litigation, accept this Decree as final and binding among the parties signatory hereto as to the issues resolved herein, as well as on all persons who consent to the relief hereinafter provided. This Decree, being entered with the consent of the defendants, shall not constitute an admission, adjudication or finding on the merits of the case, and the defendants deny that any unlawful discrimination has occurred.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. The defendants, their officials, agents, employees and successors, and all persons in active concert or participation with them in the performance of police functions covered by the Complaint filed in this action are permanently enjoined from engaging in any act or practice which has the purpose or effect of discriminating against any black or female employee of, or any black or female applicant or potential applicant for, employment with the Cincinnati Police Division [hereinafter sometimes referred to as the CPD] because of such individual's race or sex. Specifically, the defendants shall not discriminate against any individual in hiring, promotion, assignment, upgrading, training, compensation, discipline or discharge in whole or in part because of such individual's race or sex.

Further, defendants shall not retaliate against or in any respect adversely affect any person because that person has opposed discriminatory policies or practices or because of that person's participation or cooperation with the initiation, investigation, litigation or administration of this Decree. Remedial actions and practices required by the terms of this Decree or permitted to effectuate and carry out programs under this Decree shall not constitute unlawful

discrimination within the meaning of 42 U.S.C. Section 2000e-2(a).

2. It is the purpose and intent of this Decree to insure that blacks and women are not disadvantaged by the hiring, promotion, assignment and other employment policies and practices of the CPD and that any disadvantage to blacks and women which may have resulted from past discrimination is remedied so that equal employment opportunity be provided to all. The defendants have agreed that in determining whether compliance has been achieved, an appropriate standard of comparision is the proportion of qualified blacks and women in the labor force of the City of Cincinnati and have agreed to undertake as the long term goal of this Decree, subject to the availability of qualified applicants, approximating that proportion of blacks and women in all the sworn ranks of the CPD.

In meeting this long term goal, the defendants adopt the interim goals set out below, on an annual basis, in filling vacancies within the sworn ranks of the CPD:

A. It is recognized that the CPD has recently made substantial efforts to increase the representation of blacks and women in the sworn entry rank of police officer, which are reflected in the thirty-four (34) percent black and twenty-three (23) percent female composition of the 1980 Police Recruit List. Defendants agree to continue such recruitment efforts and to adopt, as an interim measure, the goal of hiring qualified black and female officers in at least the percentages which they are represented on the 1980 Police Recruit List. For purposes of determining compliance with this interim goal, persons who fail to complete probation shall not be counted as having been appointed, and a black female maybe counted as both black and female.

B. For the sworn promotional positions of police

specialist and sergeant, the interim goal shall be to fill vacancies in an affirmative manner so that at the termination of this Decree, blacks and women will hold a percentage of these positions equal to or exceeding the percentage of blacks and women in the pool of candidates eligible for such positions. This goal shall be deemed to have been met if in any certification to fill these positions, twenty-five (25) percent of the positions are filled with blacks and women in proportion to their relative representation in the pool eligible for such positions. Three years from the entry of this Decree, the parties shall meet to determine whether adjustment of this interim goal is necessary for achievement of the long term goals of this Decree.

C. For all other promotional positions, the interim goal shall be to fill vacancies with qualified black and female applicants in proportion to their representation in the applicant pool for the particular position.

However, nothing herein shall be interpreted as requiring defendants to hire unnecessary personnel, or to hire, transfer or promote a person who is less qualified over a person who is more qualified on the basis of properly validated employment selection devices within the meaning of the Uniform Guidelines on Employee Selection Procedures (1978), 43 Fed. Reg. 38290 (Friday, August 25, 1978) [hereinafter Uniform Guidelines].

3. In order to establish a list of qualified applicants for entry level positions, defendants may administer a written examination as well as a physical agility test on a pass-fail basis; for the purpose of establishing a list of qualified

candidates for promotional positions, defendants may administer written examinations on a pass-fail basis. Neither the written or physical examinations may, however, be used as a defense for failure to meet the goals set out in paragraph 2, above, and in no event shall defendants use any standards or selection procedures in evaluating the fitness of candidates for positions within the sworn ranks of the CPD which are inconsistent with the achievement of the goals in paragraph 2 or which have the purpose or effect of limiting the employment opportunities of blacks or women.

4. Defendants shall provide to plaintiff within thirty (30) days of entry of this Decree a list of all disqualifying factors for employment as a police officer and a list of those factors which are not automatically disqualifying, but which are considered in evaluating an applicant's character or suitability for employment. These lists may be amended and supplemented from time to time as necessary to correct oversights, to make adjustments required by changing circumstances, or to prevent injustice. Plaintiff shall review these factors and notify the CPD of its position as to the validity of these considerations. Approval or acquiescence of plaintiff in the use of factors which are not automatically disqualifying shall not be deemed to be approval of the manner in which the factor may be utilized with respect to any particular individual.

5. No additional appointments shall be made from existing eligibility lists for positions covered by this Decree and said lists shall be deemed to have expired for all purposes with the entry of this Decree, unless the defendants can show that continued use of the list will allow compliance with the interim goals established in this Decree.

Before establishing any eligibility list for the position of police officer, police specialist or police sergeant , the

defendants shall determine whether, based on estimated hiring during the life of the list and the race and sex composition of the list, the CPD will be able to meet its interim hiring goals from that list. Should compliance not be reasonably expected given the composition of the list, the defendant's shall immediately notify the plaintiff in writing of the matter, specifying all relevant details, including a copy of the list, with candidates identified by race and sex, and the number of anticipated appointments over the life of the list. The affected parties shall then meet within a reasonable period to discuss alternative methods by which the CPD can meet its goals.

6. Defendants shall make all good faith efforts, consistent with the needs of the CPD, to place black and female officers in specialized job assignments where they have not previously been represented.

7. Defendants shall retain for a period of five (5) years all records relating to the recruitment, selection, appointment, promotion, training, assignment and discipline of persons covered by this Decree, including applications, identified by race and sex, as set forth in Section 4 of the Uniform Guidelines, supra; all medical and background investigation files, training evaluations, evaluations of applicants and employees, eligibility lists and appointments, with persons identified by race and sex; and all records relating to discipline and discharge. Plaintiff shall have the right to inspect any and all such documents upon reasonable notice to defendants without further order of this Court. In addition, defendants shall make available such information or records as plaintiff requests in writing, provided such requests shall not be unduly burdensome.

8. For purposes of this Decree, a reporting period shall run from July 1 through December 31 and from January 1 through June 30 for each year. Thirty (30) days after the close of each reporting period defendants shall provide to

plaintiff:

(a) The number of persons by race and sex applying for sworn positions in the CPD during the reporting period and the number by race and sex who passed and failed each step of the selection process thereafter, previous to appointment.

(b) The number of persons by race and sex, appointed or promoted to each sworn position in the CPD during the reporting period.

(c) Copies of each eligibility list established for sworn positions during the reporting period, with persons identified by race and sex.

(d) The name, address, telephone number, race and sex of each person terminated or who resigned from a sworn position during the reporting period, and a statement of the reasons for termination or resignation.

(e) The total number of persons in each job classification in the CPD by race and sex as of the close of the reporting period.

(f) An estimate of the number of appointments to sworn positions anticipated by the CPD in each sworn job classification during the next reporting period.

Defendants shall also provide to plaintiff, within forty-five (45) days of the entry of this Decree, a report showing the number of persons by race and sex, in each sworn rank of the CPD as of June 1, 1980.

9. At any time after five years from the date of this Decree, defendants may notify plaintiff with sixty (60) days notice, of their desire to terminate this Decree; and upon showing of achievement of the goals of this Decree, it shall be terminated. Absent such a showing, this Decree shall be extended and if necessary amended, to serve the purposes of justice and achievement of the goals of this Decree.

Entered this ___8th___ day of July, 1980.

UNITED STATES DISTRICT JUDGE

Agreed:

JAMES C. CISSELL
United States Attorney

RICHARD A. CASTELLINI
City Solicitor

ANN MARIE TRACEY
Assistant Unites States
        Attorney

PAUL R. BERNINGER
Assistant City Solicitor
City of Cincinnati
City Hall
Cincinnati, Ohio  45202

DAVID L. ROSE
KATHERINE P. RANSEL
        Attorneys
        Department of Justice
        Washington, D.C.  20530

EXHIBIT

tabbies®

3

## PRIVILDGED ATTORNEY-CLIENT DOCUMENT

### Testimony from Tiffaney J. Hardy, Director of Communications

#### Statement regarding the overtime of Lt. Danita Pettis

On **June 2, 2015** I was approached by LT. Emmett Gladden and Lt. Danita Pettis saying they needed to discuss something with me. They wanted to talk privately in my office, which seemed a little odd to me. They explained that Chief Blackwell had added LT. Pettis to the Public Information Office to help out with the rash of shootings we were experiencing at the time. It was explained then and corroborated several times by Chief Blackwell that Lt. Pettis was to assist with the shootings overnight to provide a consistent voice overnight. Since Sgt. Donna and I work long hours during the day, Chief Blackwell felt adding her at night would be beneficial. Lt. Pettis began immediately assisting with shootings.

As time went along, I noticed that Lt. Pettis started attending several additional events and activities on the Chief's schedule. When asked by Captains and staff for clarification on her role, Chief Blackwell indicated that she was to assist with shootings and officer-involved shootings.

On **July 8th**, there was an incident where I was trying to clarify with Chief Blackwell information related to a public records request regarding his calendar, travel, and his attendance at the All Star Game festivities. Prior to this I had been regularly seeing Dr. Daum, the Police Psychologist about what I was experiencing and the sense that the office was getting more hostile. During a verbal exchange with Chief Blackwell, I was asking several clarifying questions to make sure I understood what he was saying. He then said "This isn't rocket science Tiffaney, this isn't that hard. Come on." He then proceeded to say that "if I handled the situation better that this public relations mess wouldn't be happening." He finally said, "I am going to let someone else handle this since you must have forgotten who you work for, that you work for ME!" I could not believe that he would say that to me and I asked him "Did you really say that to me? Did you REALLY just say that to me?" What concerned me the most was that I initially could not remember this conversation or saying it to him until I remembered the conversation later that day. It was like I blacked out the conversation entirely. I was so upset over the exchange that I left for lunch and ended up having to leave for the day. I immediately scheduled an appointment with Dr. Daum.

At this point and several months prior I had been having health issues: extreme headaches, inability to sleep, loss of appetite related to the anxiety I had been experiencing. **On July 10th**, I met with Dr. Daum and explained to him the situation. He then diagnosed me with anxiety. I explained that I was concerned about returning to the office for health reasons, so he wanted me to see my primary care physician and he marked me off until I could be seen by my doctor on July 13. On July 13th my doctor diagnosed me with anxiety and prescribed medications to help me deal with situation and stress in the office. Dr. Daum then marked me off of work from July 13 through July 20th. My primary doctor also began the process for FMLA to deal the office stress should I need it.

**On August 6,** I started noticing that Lt. Pettis had been attending scheduled events even though staff from the PIO office were scheduled and present. As I began thinking of the events of that week, I remembered that Lt. Pettis had worked our National Night Events that previous Tuesday on August 4, 2015. I thought she was attending these events on her own volition, so at approximately 1400 hours I met with Ms. Ellie Topham, the CFD Finance Director. I explained to her my concerns about Lt. Pettis attending events that we already had coverage for, so I was curious about the amount of overtime she was accruing. The impetus for this was to determine the amount of overtime so that I could have a

conversation with Chief Blackwell for two reasons: 1) to inform him of the amount of overtime that was occurring and 2) to get clarification on the roles of Lt. Pettis and her work within the PIO office. I further explained to Ms. Topham that I was planning on using the report to have a conversation with Chief Blackwell and ask that she not mention it to anyone.

At that time I had Sgt. Hurst from my office pull the off-day group list and schedule to determine Lt. Pettis' off days. To my surprise, many of her OT days coincided with off days from her assigned job duties at the Central Business Section.

> As I was discussing the off-day group process with my staff for clarification in a closed-door meeting in my office, Lt. Pettis happened to walk by and listened to my conversation with staff members Sgt. Donna Hurst and Police Specialist Scott Johnson. Lt. Pettis then approached us later that afternoon saying that she had overhead the entire conversation. We had a general discussion and I explained to her that I was concerned about the amount of overtime she was accruing and the number of events she was attending to get clarification from Chief Blackwell. At that time, she stated that Chief Blackwell often called her to attend these events and that's why she was attending.

On **August 6th** at 3:45 pm I text Chief Blackwell, saying *"We need to talk to clear the lines of communications. Also we need to clarify Danita's role in our office. I wanted to bring something to your attention about the amount of overtime she's had that's been circulating around."*

I did not receive a response from him. I attend a community National Night Out function at 6pm that day, but the opportunity didn't present itself to have a private, calm conversation with him.

I was on approved vacation from August 7 – August 10. Upon my return on **August 11th**, I immediately asked to meet with Chief Blackwell at 0830 hours to discuss the Lt. Pettis overtime matter with him. He was not available to meet at that time. At approximately 1030 hours, Lt. Gladden approached me saying he wanted to discuss something with me. We met privately in an office where he shared with me that Chief Blackwell wanted him to "begin an investigation on when I knew or was made aware of a public record request regarding Lt. Danita Pettis." From Lt. Gladden's line of questioning I explained that I had been told Thursday night by Col. Dave Bailey that he thought that there had been a public records request going weeks back around the time of the All Star Game. However, the first official public record I saw was on Monday, August 10th while I was out on vacation. I also explained to him that sometimes public records request are not always sent directly to the PIO office. Sometimes they are submitted directly to the Records Management Section, the Law Department, or directly to the City Manager's Office. I also explained to Lt. Gladden that I was quite surprised at the amount of overtime Lt. Pettis had received from June 2nd through July 17th, the current pay period. During that time Lt. Pettis had accrued almost 200 hours of OT and that she had worked 21/30 work days in June. Lt. Gladden and I continued our conversation and left with a better understanding of what I trying to accomplish by pulling Lt. Pettis' OT records which was only to bring the matter to the Chief's attention to protect the Department and the Chief.

Later that afternoon at approximately 1330 hours, I met with Chief Blackwell and Lt. Gladden. I explained to the Chief that when I first started working for him I always said that I would have his back and tell him the truth. I also shared that these two things were the impetus of why I pulled Lt. Pettis' time. He quickly said that I had no right to pull her time and that he didn't believe me. He then accused me of orchestrating the public records request for overtime for Lt. Pettis and his entire office. He then stated that he didn't trust me and that he didn't know if he would ever trust me or even work with me. He then began to berate me in front of Lt. Gladden discussing every personnel matter, project, or things

Hardy | **2**

he was upset about. His body language was very expressive and he raised his voice. I was quite blown away with his actions and I felt completely deflated. That day I left for a couple of hours because I was concerned for my own mental health and anxiety I felt in the office.

## Additional Incidents

Fast forward to **August 22, 2015** Chief Blackwell sent photos for me to post. I was having technical difficulties with my phone and laptop, so I explained that I would post on Sunday. On Sunday, after spending my off-day with family, I posted the pictures around 11pm. On Monday, August 24th there was an early event for which PIO Sgt. Donna Hurst attended. She attended from 0745 hours until about 0830 hours. At 0836 hours, Chief Blackwell sent a text asking me to come over to the event. I explained that Donna had been there and that she should still be there. The day was progressing along until I was called into the Chief's Office at about 0930 hours. Upon entering his office I wanted to discuss the week at hand and what we needed to focus on for the day. He immediately started asking why PIO wasn't at the event. I explained to him that Sgt. Hurst had been at the event, taken photos, and had already posted photos to Facebook. He said that has saw that, but we weren't there while he was there. He then began to talk about the weekend pictures and why they weren't posted in a timely manner. I explained the technical difficulties I had on Saturday, but that I had posted on Sunday. He then proceeded to ask "why I should have a take home car, if when he needed me to come in on a Saturday afternoon at 3pm then that's what he needed. He further stated, "And if that meant bringing your ass in on a Sunday, it meant bringing your ass in on a Sunday!" I was quite appalled by his use of language. Again, I felt berated and had to leave the office again for the hostile work environment that I felt. This time I continued with one of my sessions with Dr. Daum to discuss how I was feeling. Dr. Daum documented how I was feeling and gave me coping strategies to better deal with the stress.

## Summary

In summary confidentiality, loyalty, and trust are important to me as these qualities have been the hallmark of every single position I have held going back to working as a college intern with the U.S. EPA Office of Civil Rights. It is with a heavy heart that I have submitted this testimony and presented facts as I know them.

Chief Blackwell has had a great community engagement platform and innovative policing strategies and for that I am thankful in how he has been able to engage the community as well as the department.

I can say without a shadow of a doubt that the hostility that is felt in the office currently has not always been present. I feel that something in the course of the last six or so months has happened. The last several months have been difficult for me and I have seen the morale of others slip. Several staff have tried to guide Chief Blackwell by presenting our thoughts, suggestions, and ideas to make situations better. The situation may have occurred from the political pressure, lack of support he felt, or even a need for validation, but I felt it necessary to share that the interactions, tone, unrealistic expectations and his level of exhibited frustration has had an adverse impact on the office.

Respectfully Submitted,

Tiffaney Hardy, Director of Communications
Cincinnati Police Department

EEOC Form 5 (11/09)

**EXHIBIT 4**

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 473-2018-00623 |

**Ohio Civil Rights Commission** and EEOC

*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Tamera Brown** | ~~redacted~~ | |

| Street Address | City, State and ZIP Code |
|---|---|
| **11932 Belgreen Ln., Cincinnati, OH 45240** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **CINCINNATI POLICE DEPARTMENT** | **Unknown** | **(513) 352-3505** |

| Street Address | City, State and ZIP Code |
|---|---|
| **801 Plum St., Cincinnati, OH 45202** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest | Latest **12-16-2017**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. I am Caucasian. I have been subjected to a hostile work environment by my supervisor, Lieutenant Danita Pettis, African American. On November 26, 2017, I filed a formal complaint. On November 28, 2017, LT Pettis filed a complaint against me. On December 16, 2017, I was transferred.

II. Management was aware of Lieutenant Pettis behavior toward Caucasian female Officers. Management transferred me only after Lieutenant Pettis filed an erroneous complaint against me.

III. I believe I have been discriminated and retaliated against, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. CINCINNATI AREA OFFICE<br>SIGNATURE OF COMPLAINANT<br><br>MAR 13 2018 |
| **Mar 13, 2018** _Tamera Brown_<br>Date     Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE RECEIVED<br>(month, day, year) |

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Ms. Tamera Brown<br>11932 Belgreen Ln.<br>Cincinnati, OH 45240 | From: | Cincinnati Area Office<br>John W. Peck Fed. Bldg.<br>550 Main St., Room 10-019<br>Cincinnati, OH 45202 |

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| 473-2018-00623 | Derwin E. Jamison,<br>Investigator | (513) 684-2844 |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Melanie L. Breen /MS*                           MAR 1 4 2018

Enclosures(s)

**Melanie L. Breen,**
**Area Office Director**                              (Date Mailed)

cc:  **Mr. William Hicks**
**Senior City Solicitor**
**CITY OF CINCINNATI**
**801 Plum Street**
**City Hall, Rm 214**
**Cincinnati, OH 45202**

EEOC, CINCINNATI AREA OFFICE

MAR 1 4 2018

**EXHIBIT 5**

RECEIVED

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Age |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 473-2018-00622 |

| **Ohio Civil Rights Commission** | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Joy Ludgatis** | | **1962** |

| Street Address | City, State and ZIP Code |
|---|---|
| **11166 Macar Drive, Cincinnati, OH 45241** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **CINCINNATI POLICE DEPARTMENT** | **500 or More** | **(513) 352-3505** |

| Street Address | City, State and ZIP Code |
|---|---|
| **801 Plum St., Cincinnati, OH 45202** | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest — Latest **12-10-2017**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. On November 22, 2017, and November 24, 2017, I was verbally attacked and subjected to discriminatory treatment by Lt. Danita Pettis (Female) (African American), in the presence of coworkers because of my sex (Female) and race (Caucasian). During my employment, Lt. Danita Pettis has accused me of making derogatory remarks that were found to be untrue by a peer review. I was transferred to another District because of Lt. Pettis's unfounded accusation. On November 28, 2017, I filed a complaint against Lt. Pettis regarding the hostile work environment that was endorsed by coworkers. On December 1, 2017, Lt. Pettis submitted a transfer request in an attempt to have Officer Tamera Brown (Female) (Caucasian) and I reassigned. I am aware that Lt. Pettis filed a complaint regarding insubordinates creating a hostile work environment. On December 10, 2017, Officer Brown and I were transferred to another District.

II. Management has failed to take corrective action and the discriminatory treatment continues.

III. I believe that I and a class of employees have been discriminated against due to our sex (Female) and race (Caucasian) and retaliated against for our complaints in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 3/14/18 *Date* — *Joy Ludgatis* Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EEOC Form 161 (11/16)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: **Joy Ludgatis**<br>**11166 Macar Drive**<br>**Cincinnati, OH 45241** | From: **Cincinnati Area Office**<br>**John W. Peck Fed. Bldg**<br>**550 Main St  Room 10-019**<br>**Cincinnati, OH 45202** |

| | | |
|---|---|---|
| [ ] | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* | |
| EEOC Charge No. | EEOC Representative | Telephone No. |
| 473-2018-00622 | **Daniel F. Williams,**<br>Investigator | **(513) 357-5599** |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

*Melanie L. Breen /MS*

MAR 16 2018

Enclosures(s)

**Melanie L. Breen,**
**Area Office Director**

*(Date Mailed)*

cc: **William Hicks**
**Senior City Solicitor**
**CITY OF CINCINNATI**
**801 Plum Street**
**City Hall Room 214**
**Cincinnati, OH 45202**



**EXHIBIT**

**6**

ci

**CINCINNATI**

Interdepartmental Correspondence Sheet

To 115
for Ministry
S./d.

Date: 11/26/17

To: Colonel Eliot K. Isaac, Police Chief

From: Police Officer Tamera Brown P314, District 4

Copies to: Captain Martin Mack, District 4 Commander

Subject: Hostile work environment

On 11/24/17, I experienced a disturbing display of unprofessionalism and abuse of rank. While addressing a roll call of third shift officers, one third shift Sergeant and a civilian rider from the Leadership Council of Cincinnati, Lt. Danita Pettis ended a typical roll call with a speech that began with this statement. I don't care about your opinion and I don't care what you have to say. She commented specifically about how Specialist Joy Ludgatis believes that her 28 years on the job gives her the right to question the Lt's command decisions. She stated she didn't care if we had 28 years, 28 days, or 128 years. Lt. Pettis stated that she is the relief commander and until you, (The officers), take a test and receive some rank you have, "No skin in the game." We will not question her authority and we will follow commands when given. She completed what I can only describe as a tirade by saying, "Everyone in this room knows those officers were not shot at. That to this day the suspect has not been charged with Felonious Assault on an Officer because even the officers involved know they were not being shot at. Now... Does anyone have anything to say?"

Needless to say after being told my contribution of nearly 15 years to Cincinnati Police Department as a Patrol Officer is meaningless until I choose a path she deems as worthy, I refrained from commenting.

In this Correspondence I would like to correct her erroneous assumption about Joy Ludgatis questioning her authority. I was personally disturbed by her lack of action on 11/16/17. Her comments that night to the third shift officers being held in roll call that night stating she didn't believe the officers were shot at. Her complete disdain for the events evident by her demeanor and how she ended the roll call 27 minutes after the incident occurred. Releasing us from roll call with the statement, "I guess we better go handle the district since the entire second shift is on this incident." I was so deeply affected by her conduct that I confided in Lt. Christopher Ruehmer. Lt. Ruehmer in turn constructed an email outlining the incident and sent it to the command staff. That email sparked a chain of events leading to an investigation, which caused Lt. Pettis to address 2 separate roll calls in an egregiously unprofessional and belligerently aggressive manner. I would also like to say I have spoken with the officers involved in the original incident. Those officers absolutely believed they were being fired upon. I personally relieved second shift officers and took custody of the suspect while the incident was being investigated by district 4 investigators. The investigators conducted a GSR kit and took the suspect's discarded clothing sending both to the lab to be analyzed. Charges are pending on the suspect awaiting the results of the lab.

I am personally in fear, professionally, of Lt. Pettis' retaliatory actions. I have no doubt they will ensue once it is discovered that I am responsible for setting into motion this current set of events. I understand I have no responsibility for Lt. Pettis' behavior, which was her choice alone. I do not regret taking the actions however I do regret my fellow officers' verbal and emotional abuse at her hands

due to the actions I took. Lt. Pettis is a highly intelligent and driven individual with plans for future advancement. She also has a long memory and an impressive tenacity to hold onto a grudge. This is evident in her personal attack of PS. Ludgatis. I have no wish to be the future focus of her ire. This is why I feel compelled to have these incidents formally documented. I'm respectfully requesting to be removed from under Lt. Pettis' supervision. It is evident to me from her actions and statements that she will not be a fair, impartial, and effective supervisor at the conclusion of this investigation. I am willing to speak to others pertaining to these events. I would also respectfully request a private meeting with Captain Mack.

TRB/trb

_TRB_

11.28.17
CHIEF-
REQUEST THOROUGH REVIEW OF
INCIDENT BY IIS.

_Pam_



**CINCINNATI** city

Interdepartmental Correspondence Sheet

Date: 11/26/17

To: Colonel Eliot K. Isaac, Police Chief

From: District four Third Shift

Copies to: Captain Mack, Lt. Colonel Neudigate, F.O.P. President Daniel Hils

Subject: Hostile Work Environment

_____

We have witnessed and have been treated in a manor which we perceive as extremely hostile, demeaning, and unprofessional by Lt. Danita Pettis. Lt. Pettis through practices of verbal abuse and emotional intimidation has created an environment of unproductivity on our relief. We fear unfair retaliation from Lt. Pettis. We wish to respectfully request a conference regarding these matters with Captain Martin Mack.



city

# CINCINNATI

**Interdepartmental Correspondence Sheet**

Date: 11/28/17

To: Colonel Eliot K. Isaac, Police Chief

From: Police Specialist Joy Ludgatis, District Four

Copies to: Captain Martin Mack, Lt. Colonel Neudigate, F.O.P. President Daniel Hils

Subject: Hostile Work Environment

On 11/22/17 I was the subject of humiliating, demeaning, and unprofessional verbal abuse by Lt. Danita Pettis. This attack occurred during a third shift rollcall with 14 PO/PS's and 2 Sgt's present. This hostile verbal assault occurred after she asked me personally, by name, if I had any comments about why she didn't send 3rd shift officers out of rollcall when 2nd shift officers came on the air saying they were shot at on 11/16/17. She wrongly assumed I had sent an email to the command staff regarding this, when actually Tamara Brown had. Tamara had been so upset about not being sent out into the field to help fellow officers the night of 11/16/17 that she initiated a complaint . Lt. Danita Pettis, assuming it was me, began a personal tirade against me. She escalated this verbal diatribe to include comments which disrespected Chief Isaac and Lt. Colonel Neudigate in front of the entire relief. She made the comment that she didn't care if I went running to "The Chief" or "my good buddy Neudigate" because she didn't give a crap what anyone thought. She was in charge and nobody was going to question her authority. She made statements belittling my contributions to the relief, saying that because I am the desk officer I am making these comments from the safety of the district, insinuating I wouldn't risk my personal safety for my fellow officers. She finished this hostile display with a direct threat of retaliation, stating if I didn't watch myself I could find myself transferred "AGAIN". This rant was taped and is added as an attachment to this form 17.

Two days later on 11/24/17, in a third shift rollcall (which I was not present for), Lt Danita Pettis went through the same authoritarian rant as 2 days prior and named me specifically. She spoke about me in a demeaning and unprofessional manner again to the rest of the third shift PO/PS  and Sergeants on duty that night.

Lt. Danita Pettis created a hostile work environment on both dates and then sent all the officers out on the streets for a 10 hour  tour of duty.

JAL/jal

*Capt, my Mack*
*11/29/17*



**CINCINNATI** city

**Interdepartmental Correspondence Sheet**

Date:   11/28/17

To:   Colonel Eliot K. Isaac, Police Chief

From:   Lieutenant Danita W. Pettis, District Four

Copies to:

Subject:   **Request for Internal Investigation:** Police Sergeant Dan Hils

On November 27, 2017, I received 7 cell phone calls from Sergeant Dan O'Malley. I returned Sgt. O'Malley's phone call at approximately 0209 hours. During this phone call Sgt. O'Malley advised me that Sgt. Hils had come to the District Four roll call on 11/26/17, on Lt. Danita Pettis' off day to address her roll call and instruct the entire roll call for all the officers who would be interested, in how to go about typing up a hostile work environment complaint against Lt. Pettis, and who to send it to and who to blind cc on the complaint. Sgt. Kelvin Lynn was also present this roll call.

*INFORMAL MEETING AFTER Roll for Any OF GoES Who WANTED T ATTEND .*

Sgt. O'Malley then advised Lt. Pettis that Sgt. Hils began to advise all of the officers in the roll call that he had previously arrested Lt. Pettis, "kicked her ass", and maced her when responding to her home for a call for service. Sgt. Hils then proceeded to go in to the details of the call for service, the arrest, and his use of force on Lt. Pettis 25 years ago in 1992. After recounting the entire event for all of the officers and sergeants in the roll call, Sgt. Hils proceeded to state he doesn't even know how Lt. Pettis got this job, and that she shouldn't be a lieutenant either. Sgt. Hils stated that he only knows Lt. Pettis was hired under Chief Snowden's watch before Colonel Streicher became the Police Chief. He stated that Lt. Pettis was a, "Teflon Don" and that she has done a lot of stuff on this job for which she was able to get out of and that nothing ever sticks to her. Sgt. Hils then advised the officers in the roll call that unfortunately, as an FOP member he had to defend Lt. Pettis also.

*HOSTILE WORK EN INGENERA NOT SPECIF TO HER*

Sgt. O'Malley advised Lt. Pettis that he felt very uncomfortable with the things Sgt. Hils was saying about her because he knew that it was, "highly inappropriate" and "unprofessional" and had nothing to do with explaining how the officers should go about typing a complaint and forwarding it if they chose to do so. Lt. Pettis asked Sgt. O'Malley why himself nor Sgt. Lynn did not step in and advise Sgt. Hils his conversation was inappropriate in an effort to terminate that part of the discussion that was taking place. Sgt. O'Malley stated he did not know.

On November 28, 2017 at 1004 hours Lt. Pettis spoke with Sgt. Lynn who advised he also remembered Sgt. Hils raising Lt. Pettis' criminal history prior to becoming a Cincinnati Police Officer and feeling that it was uncalled for and inappropriate. Lt. Pettis asked Sgt. Lynn why he did not step in and advise Sgt. Hils his conversation was inappropriate, Sgt. Lynn apologized to Lt. Pettis and stated he should have, but, that he just did not want to get involved in it because he is a new sergeant and he is still trying to learn the job and

doesn't want any problems with anyone.

On November 26, 2017 Sgt. Hils responded to District Four 3rd relief roll call and made inflammatory and derogatory statements about the 3rd relief shift commander, Lt. Pettis, to those officers and sergeants under her command, in her absence.

Sgt. Hils' actions are in violation of Section One – Failure of Good Behavior – of the *Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Department* ; which states; (in part)

1.10   Members shall not publicly criticize or ridicule the Department, its policies, or other Members by talking, writing, or expressing themselves in any manner when such Expression:

    A. Is directed towards a person with whom the member has a working relationship And the expression impairs the working relationship.

    C. Improperly disclosed investigative or confidential information. (information has been expunged from a criminal record)

    D. Tends to impair the operation of the Department by interfering with its or ability of supervisors to maintain discipline; or was made with reckless disregard for truth or falsity.

AND

1.07   Members shall not exhibit or divulge the contents of any criminal record to any person except in the conduct of the Department functions or in accordance with the provisions of law.

Sgt. O'Malley also advised Lt. Pettis that Sgt. Hils gave the officers permission to, and instructed them to continue to video/audio tape Lt. Pettis' roll calls, or whatever else they wanted to because the Department has given them Body Worn Cameras for the purpose of taping things.

1.03   Members shall exercise the responsibility and authority of the position to which they are assigned in accordance with Department Position Classification/Job Description, Civil Service Classification Specifications, and work rules.

Based on Sgt. Hils actions I am requesting an Internal Investigation into his actions as designated by the Cincinnati Police Department – Section Fifteen –Disciplinary Table.

DWP/dwp





EXHIBIT
**10**



city of
**CINCINNATI**

**Interdepartmental Correspondence Sheet**

Date: December 5, 2017

To: Colonel Eliot K. Isaac, Police Chief

From: Lieutenant Colonel Dave Bailey, Executive Assistant Chief

Copies to:

Subject: **Internal Investigations Section Case #17160**

Internal Investigations Section (IIS) has recently opened case #17160. This case was initiated due in part to complaints forwarded internally through the Department and also the City Human Relations Department by Police Lieutenant Danita Pettis, Sergeant Daniel O'Malley, and Police Officers Joy Ludgatis and Tamera Brown, all assigned to District Four. The incident stems from a decision made by Lieutenant Pettis relative to a firearm discharge situation at 1234 Myrtle Avenue on the evening on November 16, 2017. Based on the information received to date by CPD Administration, that decision received significant and vocalized dissent from several third shift officers. In particular, Police Officers Joy Ludgatis and Tamera Brown expressed extreme dissatisfaction with Lt. Pettis's decision and made numerous negative remarks about Lt. Pettis to other CPD staff on that topic.

On the evening of November 22, 2017, Lt. Pettis, in apparent reaction to those comments, made negative and discrediting comments about Officer Ludgatis in the third shift roll call while in the presence of other shift members and supervisors. Lt. Pettis allegedly conducted a similar roll call again on the evening of November 24, 2017, admonishing those critical of her leadership and decision making.

On November 26, the Fraternal Order of Police President Sergeant Daniel Hils intervened and attended the District Four Third Shift roll call to address the incident. During his visit, Sergeant Hils made numerous negative comments about Lieutenant Pettis in personal and professional contexts, and he allegedly urged the shift to continue to question and oppose her leadership. Although the Internal investigation is only in its preliminary stages, the conduct exhibited by CPD personnel Pettis, Hils, Ludgatis, and Brown is deeply disappointing from a management perspective. First of all, as members of a highly regarded police agency, our members should epitomize conflict resolution and problem-solving abilities. Secondly, the conduct involves members at almost each rank of the

{00245626-3}

third shift at District Four, which if allowed to continue, will undoubtedly adversely impact the third shift if not the entire district operation.

Due to the negative district-wide impact from this very unfortunate chain of events, it is clear that the potential negative consequences of this current confrontational environment must be minimized and any future incidents of this nature must be prevented. In the meantime, District Four must have the opportunity to recover and resume operations at peak efficiency. This can only occur if the three principal parties are transferred out of District Four and separated. It is therefore my recommendation that Lieutenant Danita Pettis, and Police Officers Joy Ludgatis and Tamera Brown be transferred to new assignments immediately, even while the remainder of the Internal investigation proceeds. At the conclusion of the IIS investigation, additional administrative actions may be warranted.

I therefore request the following immediate transfers:

(PETTIS)
- Lieutenant Danita Kilgore from District Four to District Three.
- Specialist Joy Ludgatis from District Four to District Two.
- Police Officer Tamera Brown from District Four to District One.

DJB/djb

Approved EKd 12/5/17

12.7.17
TRANSFERS EFFECTIVE
12/10/17
Purl tme

**EXHIBIT**

**11**

# CINCINN

**Interdepartmental Correspondence Sheet**

Date:     12/01/17

To:       Colonel Eliot K. Isaac, Police Chief

From:     Lieutenant Danita W. Pettis, District Four

Copies to:

Subject:  Request for temporary transfer of Specialist Joy Ludgatis and Officer Tamera Brown

I respectfully request a temporary transfer of Specialist Joy Ludgatis and Officer Tamera Brown pending the findings of the EEOC complaint filed by Lt. Danita Pettis on 11/28/17 reference creation of a hostile work environment for Lt. Pettis by these two officers. Officer Brown initiated the circulation of a, "hostile work environment" Form 17 against Lt. Pettis in which she attempted to intimidate other officers on District Four third relief to sign. Lt. Pettis was advised by Officers William Keuper and Elizabeth McNay that Officer Brown approached Officers Keuper and McNay twice attempting to get them to sign the document she created, after they advised her on two separate occasions they did not want to sign it because they did not agree with it. Specialist Ludgatis then approached Officers Keuper and McNay a third time requesting they sign the document against Lt. Pettis. Again, Officer's Keuper and McNay refused to sign the document because they were in disagreement with it.

Officer Brown further provided an audio tape to Captain Martin Mack of Lt. Pettis conducting roll call. It is the belief of Lt. Pettis that Officers Brown and Ludgatis are continuing to surreptitiously record all of Lt. Pettis' roll calls in violation of the City of Cincinnati Human Resources Policy Manual No. 2.17 Recording Devices, at the direction of FOP President Dan Hils based on statements personally witnessed by Sgt. Dan O'Malley in a roll call attended by Specialist Ludgatis, Officer Brown, and President Dan Hils on 11/26/17.

For these reasons, Lt. Pettis believes that Officer Brown and Specialist Ludgatis are continuing to conduct themselves in a manner that would suggest and create an ongoing hostile work environment for Lt. Pettis in the midst of an EEOC complaint/ Internal Investigation into this matter.

I respectfully request both Officers be detailed to another District pending the outcome of the EEOC investigation.


DWP/dwp

Lt. Pettis —
Written Re___
for 1.03, 1.___
and ESL for 3.0___
Viol.

EXHIBIT
**12**

Sgt. Hils —
Admin. Insight
and Written Reprimand
for 1.03 and 1.07
Viol.

Sgt. Phillips—
Written Reprimand
for 1.03 Viol

Sgt. Kemme —
Written Reprimand
for 1.08 Viol

Sgt. O'Malley —
Written Reprimand
for 3rd 3.01a
Viol

P.O. Defranco —
Written Reprimand
for 1.03 viol.

## Internal Investigations Section
### Captain Kimberly A. Williams, Commander

**Case Number:** 17160          **Date Assigned:** 11/29/17

**Investigator:** Sergeant Matthew J. Vogeler

**Reviewed By:** _Capt Kimberly A Williams_     **Date:** _3/13/18_

**Approved By:** _____     **Date:** _____

**Submitted to the Police Chief on:** _____

**Approved by the Police Chief on:** _Eliot H Isaac_     _4/22/18_

### CINCINNATI POLICE DEPARTMENT
### INTERNAL INVESTIGATIONS SECTION
### CASE #17160

**Introduction:**

Internal Investigations Section has completed an investigation into a complaint of a Hostile Work Environment filed by Police Lieutenant Danita Pettis, Badge: L4, District Three, on November 28, 2017. Lieutenant Pettis alleged a hostile work environment was created by Police Sergeant Daniel Hils, Badge: S77, Chief's Office/Fraternal Order of Police Lodge 69 President; Police Specialist Joy Ludgatis, Badge: PS18, District Two; and Police Officer Tamera Brown, Badge: P314, District One.

Lieutenant Pettis alleged that on November 26, 2017, Sergeant Hils created a hostile work environment by addressing District Four third relief officers during roll call. While addressing third relief officers Sergeant Hils revealed information from Lieutenant Pettis' past criminal history and defamed Lieutenant Pettis' character, which undermined Lieutenant Pettis' authority as a relief commander.

*Note: Lieutenant Pettis was assigned as the District Four third relief commander from April 23, 2017 thru December 10, 2017.*

Additionally, Lieutenant Pettis alleged that on November 21, 2017 Specialist Ludgatis made comments to Captain Swingley that were insubordinate and were meant to undermine Lieutenant Pettis' authority. Lieutenant Pettis further alleged that on November 24, 2017, Specialist Ludgatis and Officer Tamera Brown attempted to pressure third relief officers to sign a petition against Lieutenant Pettis, which undermined Lieutenant Pettis' authority as a relief commander. Lieutenant Pettis alleged these actions by Specialist Ludgatis and Officer Tamera Brown created a hostile work environment.

Internal Investigations Section has also completed an investigation into a complaint of a Hostile Work Environment filed by Specialist Ludgatis and Officer Tamera Brown.

Officer Tamera Brown alleged that on November 16, 2017, Lieutenant Pettis created a hostile work environment by her lack of action related to a shots fired incident in which Lieutenant Pettis did not send third relief officers to assist second relief officers after an officer was shot at.

Specialist Ludgatis alleged that on November 22, 2017, Lieutenant Pettis created a hostile work environment by making humiliating, demeaning, and unprofessional comments towards Specialist Ludgatis in front of fellow officers.

Additionally, Specialist Ludgatis and Officer Tamera Brown further alleged that on November 24, 2017, Lieutenant Pettis made demeaning comments about Specialist Ludgatis to the third relief officers, when Specialist Ludgatis was not present during roll call and in front of several third relief officers.

**Interviews:**

**Lieutenant Danita Pettis, Badge: L4, District Three**

*Note: Lieutenant Pettis failed to appear for her scheduled interview with IIS on December 7, 2017 at 2130 hours. Lieutenant Pettis was personally notified of the interview by Lieutenant Douglas Snider, Badge: L65, Internal Investigation Section, on December 6, 2017, and confirmed she would be at the interview.*

On November 16, 2017, Lieutenant Pettis was on duty in uniform, preparing for third shift roll call at approximately 2040 hours. Lieutenant Pettis heard, via her police radio, a shots fired run involving District Four second shift officers.

*Note: Lieutenant Pettis was assigned to District Four from April 23, 2017 thru December 10, 2017.*

Captain Dennis Swingley, Badge: C4, Night Chief, responded to the scene, along with two second shift District Four supervisors. It was not immediately clear if the officers were shot at or if they heard shots.

Lieutenant Pettis attempted several times to have the officers on scene clarify if shots were fired at police. No clear answer was given by the officers involved. It was not until the canine arrived on scene several minutes later that the officers clarified that they were shot at.

Upon confirming that officers were shot at Lieutenant Pettis advised Emergency Communications Section to implement situational notifications. Captain Swingley instructed Lieutenant Pettis to stand down and that he would be handling the incident.

Lieutenant Pettis conducted the roll call as normal and at the end of roll call asked officers if they had anything to add.

At no time before, during, or after roll call did any officer ask to respond to the shots fired run or did Lieutenant Pettis prevent anybody from going to the run. Furthermore, nobody addressed the incident with Lieutenant Pettis at the end of roll call or a later date.

Lieutenant Pettis did not make any negative comments regarding the officers involved in the shots fired run and only stated she agreed with Police Officer Terrence Dobbins, Badge: P43, District Four, when Officer Dobbins stated he heard a lot of "maybes" over the radio from the officers on scene.

On November 21, 2017, Lieutenant Pettis was on duty in uniform. Officer Pettis took off one-half hour holiday time and arrived at 2130 hours, after the conclusion of roll call. Lieutenant Pettis was informed by Sergeant Dan O'Malley, Badge: S92, District Four, that Captain Swingley addressed the roll call to go over the shots fired run that occurred on November 16, 2017.

Sergeant O'Malley informed Lieutenant Pettis that Police Specialist Joy Ludgatis, Badge: PS18, District Two, was "going off" regarding Lieutenant Pettis not sending third shift officers into the field to respond on the incident. Lieutenant Pettis was informed that Specialist Ludgatis called it "bullshit" and "stupid" that no third relief officers were sent to the incident.

Lieutenant Pettis was not present for Specialist Ludgatis' remarks, but felt they were insubordinate and were meant to undermine Lt. Pettis' authority and "poison" the relief against her.

Lieutenant Pettis felt Specialist Ludgatis made these comments about Lieutenant Pettis because Lieutenant Pettis is a black female, and Specialist Ludgatis would not question her authority if Lieutenant Pettis was a white male Lieutenant.

Lieutenant Pettis feels she was attacked by Specialist Ludgatis because of her race, based on comments Specialist Ludgatis made two years prior regarding minorities getting promoted.

Lieutenant Pettis was informed by Captain Martin Mack, Badge: C16, District Four, that Captain Swingley emailed Lieutenant Colonel Paul Neudigate, Badge: LTC06, Patrol Bureau, and that an investigation regarding the shots fired incident on November 16, 2017 and Lieutenant Pettis was initiated.

On November 22, 2017 Lieutenant Pettis was on duty in uniform, and conducted third relief roll call. At the end of roll call Lieutenant Pettis addressed the comments made by Specialist Ludgatis to Captain Swingley. Lieutenant Pettis intended to explain to Specialist Ludgatis that Specialist Ludgatis was not in charge and that her opinions about Lieutenant Pettis' supervision don't matter, and to stop disrespecting her.

Lieutenant Pettis admitted that while other District Four third relief officers were present, she was speaking directly to Specialist Ludgatis. Lieutenant Pettis asked Specialist Ludgatis if she had an issue with Lieutenant Pettis and the shots fired incident. Specialist Ludgatis stated she did and gave her account of what occurred during roll call on November 16, 2017.

Lieutenant Pettis challenged Specialist Ludgatis' account of the incident and felt that Specialist Ludgatis was very disrespectful and insubordinate challenging her. Lieutenant Pettis felt Specialist Ludgatis was attacking her in front of her subordinates and indirectly calling her a liar.

Lieutenant Pettis felt the conversation with Specialist Ludgatis could have been more beneficial if done in a private setting but did not intend to "get into with" Specialist Ludgatis, and felt Specialist Ludgatis escalated the conversation by challenging her.

Lieutenant Pettis told Specialist Ludgatis several times to be quiet because Specialist Ludgatis was trying to interrupt her, and made the statement, "I don't care what you think," under her breath. Lieutenant Pettis does not believe the statement concerning Specialist Ludgatis working the desk and not covering officers was demeaning towards Specialist Ludgatis because it was a fact.

Lieutenant Pettis believed that Specialist Ludgatis was recording roll call utilizing her cellular telephone and was smirking at Lieutenant Pettis in an attempt to "bait" her into unprofessional comments.

Lieutenant Pettis acknowledged she stated "I could care less, could give two craps about what you think," but was directing these comments at Specialist Ludgatis. Lieutenant Pettis did not mean she did not care what all officers thought, just Specialist Ludgatis' thoughts regarding her supervision.

Lieutenant Pettis felt that she was not negative towards Specialist Ludgatis and never used any profanity toward her.
Lieutenant Pettis singled Specialist Ludgatis out because of the comments Specialist Ludgatis made about Lieutenant Pettis to Captain Swingley. Lieutenant Pettis did not single Specialist Ludgatis out because of her race or gender.

Lieutenant Pettis believes the EEO compliant filed against her by Specialist Ludgatis is retaliation for Lieutenant Pettis filling an EEO complaint against Specialist Ludgatis two years ago.

On November 24, 2017, Lieutenant Pettis was on duty in uniform and conducted third relief roll call. At the end of roll call Lieutenant Pettis spoke to the officers and Mr. Bill Tucker, a civilian rider, who was present for the roll call. She addressed the relief to explain what was stated during roll call on November 22, 2017 and the incident on November 16, 2017.

Lieutenant Pettis does not recall making the statement, "I don't care about your opinion and I don't care what you have to say," or the comment about officers having "no skin in the game."

Lieutenant Pettis acknowledged saying that everybody in the room besides the sergeant and the civilian rider were two ranks below her. Lieutenant Pettis felt this statement was not disrespectful because it was a fact. Lieutenant Pettis made this statement so officers would not question her decision.

Lieutenant Pettis did not feel she was discourteous or demeaning towards the officers and was professional while addressing roll call.

Police Officer Tamera Brown, Badge: P314, District One, was present for this roll call and never brought any issues to Lieutenant Pettis' attention concerning November 16, 2017, or the comments made by Lieutenant Pettis during roll call.

Several days after this roll call Lieutenant Pettis was informed by Police Officer William Keuper, Badge: P629, District Four, and Police Officer Elizabeth McNay, Badge: P436, District Four, that Officer Tamera Brown went to Lieutenant Chris Ruehmer, Badge: L117, District Four, and authored a Form 17, Interdepartmental Correspondence Sheet (Form 17), regarding a hostile work environment on third relief under Lieutenant Pettis' supervision.

Officer Keuper and Officer McNay told Lieutenant Pettis that Specialist Ludgatis and Officer Tamera Brown were attempting to get third relief officers to sign the Form 17 against her.

Officer Keuper and Officer McNay never stated they were badgered or harassed by Specialist Ludgatis and Officer Tamera Brown, but were asked twice by Officer Tamera Brown and a third time by Specialist Ludgatis to sign the form. Lieutenant Pettis believed that when asked three times to do something and you refuse each time that you are being badgered.

Lieutenant Pettis has not seen the Form 17 authored by Officer Tamera Brown and does not believe it was ever submitted.

Lieutenant Pettis believes Officer Tamera Brown created a hostile work environment against Lieutenant Pettis by badgering officers to sign a form against her and by going to Lieutenant Ruehmer and not directly to her, undermining Lieutenant Pettis' authority.

Lieutenant Pettis has supervised Officer Tamera Brown in District Four, and previously when they both were assigned to the Vortex Unit. Lieutenant Pettis never had any issues with Officer Tamera Brown during that time.

Lieutenant Pettis feels Officer Tamera Brown filed her EEO complaint against Lieutenant Pettis in an attempt to get Lieutenant Pettis transferred because Officer Brown does not like Lieutenant Pettis' style of management, and wants a different Lieutenant who does not hold officers accountable.

On November 27, 2017, Lieutenant Pettis was off duty when she was contacted by Sergeant O'Malley via her personal telephone. Sergeant O'Malley informed Lieutenant Pettis that a day prior, on November 26, 2017, Sergeant Daniel Hils, Badge: S77, Chief's Office/Fraternal Order of Police Lodge 69 President, spoke to District Four third relief officers and made disparaging comments about Lieutenant Pettis. Lieutenant Pettis was not present for any of the comments made by Sergeant Hils.

Lieutenant Pettis was informed that Sergeant Hils brought up an arrest of Lieutenant Pettis from 25 years ago, prior to Lieutenant Pettis being employed by the City of Cincinnati. Lieutenant Pettis believes this incident was brought up by Sergeant Hils to undermine Lieutenant Pettis' authority, and was made against Lieutenant Pettis because of her race and gender.

Lieutenant Pettis believes Sergeant Hils' comments against her were based on her race, because while speaking to District Four third relief Sergeant Hils referred to the community of Avondale as an "urban ghetto" and referred to Lieutenant Pettis as a "Teflon Don." Lieutenant Pettis' believes being called a "Teflon Don" and referring to Avondale, the neighborhood where Lieutenant Pettis was from, as an "urban ghetto" refers to her as a criminal based upon Lt. Pettis' race.

Lieutenant Pettis instructed Sergeant O'Malley to author a Form 17 documenting the statements made by Sergeant Hils. Lieutenant Pettis authored a Form 17 under the direction of Lieutenant Colonel Neudigate for an investigation into Sergeant Hils comments.

Lieutenant Pettis never disseminated any material related to investigation to anybody outside the investigative chain. Lieutenant Pettis did provide copies of several Form 17's to Police Officer Eddie Hawkins, Badge: P905, Youth Services Section, because Officer Hawkins was acting as her representative as president of the Sentinel Police Association.

Lieutenant Pettis stated she was contacted by several reporters, including Jennifer Baker with FOX19 local news. Lieutenant Pettis instructed Ms. Baker she was not allowed to speak with news media.

On December 6, 2017, Lieutenant Pettis was ordered by Colonel Eliot K. Isaac, Police Chief, not to go on the radio regarding the investigation. However, Lieutenant Pettis went on channel 1230 AM, WDBZ, with radio host Lincoln Ware concerning the ongoing investigation.

## Police Specialist Joy Ludgatis, Badge: PS18, District Two

On November 16, 2017, at approximately 2050 hours, Specialist Ludgatis was in uniform, preparing for Third Relief roll call at 2100 hours.

*Note: Specialist Ludgatis was assigned to District Four from February 22, 2015 to December 10, 2017.*

A District four second relief officer came across the radio with shots fired. Captain Swingley identified himself as the incident commander and began coordinating resources.

The incident began prior to third relief roll call and continued during third relief roll call.

There was some initial confusion as to whether the officer was shot at or the officer heard a shot.

Lieutenant Pettis and Sergeant Kelvin Lynn, Badge: S488, District Four, were the Third Relief supervisors conducting roll call that evening. Lieutenant Pettis and Sergeant Lynn never sent any third relief officers to assist with the shots fired incident and conducted roll call as usual.

During roll call the second relief officer clarified that shots were fired at him. Lieutenant Pettis continued to conduct roll call, including the training, and did not send any third relief officers to assist second relief.

Upon hearing the officer was shot at, Lieutenant Pettis attempted to start the situational notifications when she was instructed by Captain Swingley that he would be handling the incident.

Lieutenant Pettis seemed irritated by the whole situation and the confusion that was occurring on the radio, and appeared to make light of the shots fired incident.

No third relief officer, including Specialist Ludgatis, asked Lieutenant Pettis or Sergeant Lynn if they could respond to the shots fired run.

On November 22, 2017, Specialist Ludgatis was in uniform and on duty. Specialist Ludgatis attended third relief roll call. Roll call was conducted as usual, and at the end of roll call Lieutenant Pettis addressed the officers concerning the shots fired run on November 16, 2017.

Lieutenant Pettis explained the shots fired incident and then personally singled Specialist Ludgatis out in front of her fellow third relief officers. Lieutenant Pettis began hollering and yelling at Specialist Ludgatis.

Lieutenant Pettis told Specialist Ludgatis several times to be quiet and informed Specialist Ludgatis that she "could give two craps about what you think."

Lieutenant Pettis accused Specialist Ludgatis of sending an electronic mail (email) to the Command Staff concerning Lieutenant Pettis. Specialist Ludgatis stated she did not send an email to the Command Staff and that Officer Tamera Brown sent the email to the Command Staff.

Lieutenant Pettis stated to Specialist Ludgatis that she "sit on the desk every night, you don't cover nobody."

Specialist Ludgatis felt belittled and humiliated by these comments and the way Lieutenant Pettis spoke to her in front of other officers.

Specialist Ludgatis felt she was singled out by Lieutenant Pettis because of the history between the two of them, stemming from a complaint filed by Lieutenant Pettis against Specialist Ludgatis in February 2015. Furthermore, Specialist Ludgatis felt Lieutenant Pettis singled her out because of Specialist Ludgatis' race and gender.

Specialist Ludgatis stated Lieutenant Pettis attempted to make the incident in 2015 a race issue and believes this is race-related as well, and that Lieutenant Pettis would not have spoken to her the way she did if Specialist Ludgatis was not a white female. Specialist Ludgatis did not elaborate on what made her believe this.

Specialist Ludgatis has never observed Lieutenant Pettis treat officers differently based upon their race or gender.

Lieutenant Pettis was transferred to District Four in April 2017 and Specialist Ludgatis stated that prior to November 22, 2017 they had no issues and were professional towards each other while assigned to District Four.

The roll call on November 22, 2017, was recorded by Police Officer Thomas Defranco, Badge: P881, District Four, and Officer Defranco forwarded a copy of the recording to Specialist Ludgatis. Specialist Ludgatis made a copy of the recording and attached it to a Form 17 to Chief Isaac concerning the roll call. Specialist Ludgatis made no other copies and did not disseminate the recording to anybody else.

Specialist Ludgatis stated that she was singled out by Lieutenant Pettis again during roll call on November 24, 2017. Specialist Ludgatis was not present for the roll call on November 24, 2017. Specialist Ludgatis stated she was informed by Officer Tamera Brown that Lieutenant Pettis named Specialist Ludgatis and stated that Specialist Ludgatis thinks that because she has 28 years on she could run the relief. Specialist Ludgatis was upset that Lieutenant Pettis made these comments to fellow officers.

Prior to November 26, 2017, Specialist Ludgatis contacted Sergeant Hils about concerns of several of the District Four third shift officers, and was seeking advice as to how to properly go further with their concerns. On November 26, 2017 Sergeant Hils intended to address roll call, but arrived after roll call at approximately 2200 hours.

District Four third relief officers were coming and going from the roll call room freely as Sergeant Hils was speaking. Specialist Ludgatis was unsure of exactly which officers were present for Sergeant Hils' comments.

Sergeant Hils explained to the officers how to voice their complaints as a relief regarding supervision, and what they could do to make changes.

Sergeant Hils informed the officers that if the relief stuck together about their concerns and did the proper forms, changes can occur. Sergeant Hils gave the example of a recent situation in District Three where officers sought change over perceived safety issues.

Sergeant Hils also stated Lieutenant Pettis is a member of the FOP and as the President, he cannot take sides in issues concerning members, and that he will represent Lieutenant Pettis just like he would represent another member.

Specialist Ludgatis recalls Sergeant Hils speaking about a previous arrest and fight he had with Lieutenant Pettis, prior to Lieutenant Pettis becoming a Cincinnati Police Officer.

Specialist Ludgatis did not recall specifics of what Sergeant Hils said regarding the arrest.

Specialist Ludgatis did not recall Sergeant Hils make comments concerning recording conversations between officers and supervisors, or utilizing the body worn cameras to record these statements.

Sergeant Hils told officers that policing in District Four on third shift is a tough job, but does not recall Sergeant Hils using the term "urban ghetto."

Specialist Ludgatis stated she intended to author a Form 17 documenting the comments by Lieutenant Pettis about her, but became aware of a Form 17 being authored by District Four third relief collectively. Specialist Ludgatis is unsure who authored the Form 17, but was asked to sign the Form 17 by Officer Tamera Brown.

Specialist Ludgatis never coerced or threatened any officer to sign the Form 17, and stated she instructed some of the newer officers not to sign the Form 17 or get involved. Specialist Ludgatis advised the newer officers to let the senior officers address the issues involving Lieutenant Pettis.

## Police Officer Tamera Brown, Badge: P314, District One

On November 16, 2017 at approximately 2052 hours Officer Tamera Brown was on duty in uniform, preparing for District Four third relief roll call.

*Note: Officer Brown was assigned to District Four from July 26, 2009 to December 10, 2017.*

Officer Kevin Manz, Badge: P20, District Four second relief, broadcasted shots fired via his police radio. An officer needs assistance call was broadcasted regarding the broadcast by Officer Manz. Officer Manz was asked several times, by several supervisors, including Lieutenant Pettis and Captain Swingley, if shots were fired at police.

It took several minutes to confirm that shots were fired at police. Officer Brown stated that while this incident was occurring, Lieutenant Pettis continued with roll call and made it clear that she did not believe the officers were shot at.

Officer Dobbins stated to Lieutenant Pettis that there were a lot of "maybes" being broadcasted on the radio, to which Lieutenant Pettis replied, "I agree with you, I don't think they were shot at."
Officer Brown stated Lieutenant Pettis seemed irritated by the incident.

Lieutenant Pettis dismissed roll call at approximately 2119 hours.

Officer Brown stated that no officer, including herself, asked Lieutenant Pettis or any other supervisor to respond to the shots fired incident. Officer Brown felt that Lieutenant Pettis was not approachable based on her behavior during the shots fired incident.

On November 17, 2017 Officer Brown approached Lieutenant Ruehmer, who was assigned to District Four first relief, to ask for guidance on what could be done regarding the lack of action by Lieutenant Pettis on November 16, 2017 during the shots fired incident. Officer Brown believed that Lieutenant Ruehmer authored an email message to the Command Staff anonymously on her behalf.

On November 24, 2017 at approximately 2100 hours, Officer Brown was in uniform on duty and attended District four third relief roll call. Lieutenant Pettis addressed the officers and informed them that, "I don't care about your opinion and I don't care what you have to say." Lieutenant Pettis continued by stating that the officers did not "have any skin in the game," and that if something "goes down" Lieutenant Pettis is the one accountable because she earned her rank.

Lieutenant Pettis singled Specialist Ludgatis out by stating, "Joy Ludgatis thought she could say something because she has 28 years on." Lieutenant Pettis continued by saying, "I don't care if you have 28 years, 28 days or 128 years on."

Note:   Specialist Ludgatis was not present for the roll call on November 24, 2017.

Lieutenant Pettis further stated that everybody beside the civilian rider and the sergeants in the room were two ranks below her, and the officers will not question her authority.

Officer Brown was angered and disheartened by Lieutenant Pettis' comments. Officer Brown felt that she puts her uniform on like everybody else, including Lieutenant Pettis, and takes the same risks as all of her fellow officers.

Officer Brown was aware of a prior incident involving Specialist Ludgatis and Lieutenant Pettis from when they were assigned to the Central Business Section, but Officer Brown never observed any incident or negative comments between Lieutenant Pettis and Specialist Ludgatis while assigned to District Four prior to November 24, 2017.

Officer Brown never had any issues with Lieutenant Pettis while in District Four or when she worked for Lieutenant Pettis in a previous assignment.

Officer Brown has never observed Lieutenant Pettis treat officers differently based upon race or gender, stating Lieutenant Pettis treats people differently based upon their performance.

Following roll call on November 24, 2017 Officer Brown authored a Form 17, outlining the comments made by Lieutenant Pettis and how her unprofessionalism and abuse of rank was creating a hostile work environment.

On November 26, 2017, at approximately 2100 hours, Officer Brown was on duty in uniform attending District Four third relief roll call. Sergeant Hils arrived after roll call concluded and informed that he would be available for any officer that had any issues and wished to speak with him.

Officer Brown is not sure who requested Sergeant Hils to come speak to the relief regarding the supervision on third relief and what could be done to address those issues.

Approximately ten third relief officers spoke with Sergeant Hils in the District Four roll call room. This was an informal gathering and several officers came and went throughout the duration of meeting.

Officer Brown recalls a recording of third relief roll call from November 22, 2017 being played for Sergeant Hils, but does not recall who played the recording. Officer Brown was unsure who made the recording.

Sergeant Hils informed the officers that he arrested Lieutenant Pettis prior to her becoming a Cincinnati Police Officer. Sergeant Hils went into detail about the arrest, but Officer Brown does not recall Sergeant Hils stating that he kicked Lieutenant Pettis' ass.

Officer Brown does not recall Sergeant Hils making the statement that Lieutenant Pettis will "bitch or scream it was race, sexism, or whatever" to get promoted.

Officer Brown stated Sergeant Hils never said he was confronted by Lieutenant Pettis about her not getting hired, but did state he was confronted by an individual from City of Cincinnati Human Resources that told Sergeant Hils he was the reason Lieutenant Pettis could not get hired.

Sergeant Hils explained that he could give the officers examples of what they could do regarding the situation with Lieutenant Pettis, but he could not tell them directly what to do because Lieutenant Pettis is a member of the Fraternal Order of Police Lodge 69, and he has a duty to defend her like any other member.

Sergeant Hils gave an example of officers in another district that wrote a Form 17 addressing concerns regarding safety issues on their relief, and that each officer signed it to show unity and invoke change. Officer Brown authored a Form 17 on the behalf of third relief officers. Officer Brown informed several officers that the Form 17 was at the front desk for third relief officers to sign if they choose.

Officer Brown never harassed or pressured Officer Kueper, Officer McNay, or any other officer to sign the Form 17. Officer Brown sent the Form 17 via email to Captain Mack, Lieutenant Colonel Neudigate, Sergeant Hils, and Chief Isaac. Officer Brown is unsure what happened to the Form 17 with the officer's signatures on it.

The goal of the Form 17 was to have a meeting with Captain Mack to discuss issues affecting the relief, and was not meant to be insubordinate or undermine Lieutenant Pettis. The letter was based upon Lieutenant Pettis' actions, and not based upon Lieutenant Pettis' race or gender.

Sergeant Hils informed officers that when officers are being spoken to similar to the way Lieutenant Pettis spoke to Specialist Ludgatis, he wished they would record the conversation utilizing their personal recording devices. Sergeant Hils never instructed officers to utilize their body worn cameras to record conversations between supervisors and officers.

Sergeant Hils stated that if there is a policy against recording supervisors in an incident similar to the conversation between Lieutenant Pettis and Specialist Ludgatis, it would be a "worthwhile" ESL (Employee Supplement Log).

Officer Brown does not recall Sergeant Hils making the comment "urban ghetto," referring to the neighborhoods in District Four.

Officer Brown did not recall Sergeant Hils making any comments about Lieutenant Fern or referring to him as a "drunk."

Officer Brown stated the meeting with Sergeant Hils was very informal, with several conversations taking place in the roll call room at one time. Officer Brown stated it's possible she did not hear some of Sergeant Hils' comments because she was speaking with other officers.

Officer Brown has never heard Specialist Ludgatis make any discourteous comments reference Lieutenant Pettis' race or gender.

Officer Brown did not feel that Lieutenant Pettis treated her differently because of her race prior to November 24, 2017, but feels that Lieutenant Pettis is singling her and Specialist Ludgatis out and filed a hostile work environment complaint against them in an attempt to deflect attention from Lieutenant Pettis' actions. Officer Brown believes that she and Specialist Ludgatis' race and gender played a role in how they were treated, considering the only two individuals Lieutenant Pettis named in her complaint were white females.

Officer Brown stated there are other white females assigned to District Four third relief besides Specialist Ludgatis and Officer Brown.

## Sergeant Daniel O'Malley, Badge: S92, District Four

Note: Sergeant O'Malley failed to appear for his scheduled interview with IIS on December 7, 2017 at 2200 hours. Sergeant O'Malley was notified of the interview via an electronic blotter entry on December 6, 2017 at 1430 hours, and worked a full ten hour shift the night of December 6, 2017.

On November 21, 2017, at approximately 2100 hours, Sergeant O'Malley was in uniform on duty, at District Four conducting third relief roll call. Captain Swingley addressed the roll call and spoke about a shots fired incident that occurred on November 16, 2017.

*Note:  Sergeant O'Malley was not on duty during the shots fired incident on November 16, 2017.*

Captain Swingley explained the incident, the decisions that he made, and what he expected of the officers and supervisors involved.

Sergeant O'Malley did not mention any comments made by Specialist Ludgatis that could have been seen as insubordinate or undermining Lieutenant Pettis' authority.

On November 26, 2017, at approximately 2100 hours, Sergeant O'Malley was conducting third relief roll call. During roll call Sergeant O'Malley was made aware by Officer Tamera Brown that Sergeant Dan Hils would be coming to District Four to speak with third relief officers. Officer Brown did not give a reason Sergeant Hils was speaking to the officers, but Sergeant O'Malley assumed it had to do with incidents involving Lieutenant Pettis.

Sergeant Hils was in plainclothes when he arrived at approximately 2145 hours, after roll call had concluded. Sergeant Hils arrived and spoke with several of the third relief officers, including Sergeant O'Malley. The officers were not required to attend and officers were free to come and go if they wished.

Sergeant Hils stated to the officers that he previously had an incident involving Lieutenant Pettis. Sergeant Hils detailed having to arrest Lieutenant Pettis prior to Lieutenant Pettis being hired by the City of Cincinnati. Sergeant Hils stated several times he had to use force and "kick her ass," referencing the arrest of Lieutenant Pettis.

Sergeant Hils stated that Lieutenant Pettis "was able to manage working her way up and become a Lieutenant only because she will kick, scream, bitch, and yell it was race, sexism, or whatever." Sergeant Hils stated that Lieutenant Pettis was "Teflon" every time she had some issues. Sergeant Hils informed the officers that if they did file a complaint against Lieutenant Pettis he would represent her as he would equally represent any member of the union.

While Sergeant Hils was speaking an unknown officer played a recording of a third relief roll call from November 22, 2017. Sergeant O'Malley stated that several officers stood around the device playing the recording, making it hard for him to hear. Sergeant O'Malley could tell the recording was of Lieutenant Pettis addressing the shots fired run on November 16, 2017.

Sergeant Hils addressed the recording of the roll call. Sergeant Hils explained that he was not aware of a policy against recording roll call, but stated that if recording your roll calls will protect you it is fine and acceptable to him. Sergeant Hils never instructed officers to use their body worn cameras to record roll calls or supervisors.

Sergeant O'Malley is unsure how the conversation about Lieutenant Fern began, but recalled Sergeant Hils stating that Lieutenant Fern was having issues with his subordinates, and referred to Lieutenant Fern as a "drunk."

Sergeant Hils continued to speak to the relief and informed them they had a hard job to do, and that it was tough policing in the "urban ghetto." Sergeant O'Malley stated Sergeant Hils chose these words to express to the relief the area in which they work is tough to police. Sergeant O'Malley stated he could see how the term "urban ghetto" could be insensitive to some individuals.

Sergeant O'Malley felt the comments made by Sergeant Hils to District Four third relief were unprofessional. Sergeant O'Malley felt that Sergeant Hils should not have mentioned Lieutenant Pettis' past arrest to any officers, especially her subordinates, and undermined her ability as a relief commander.

Sergeant O'Malley never observed Lieutenant Pettis treat any officer differently based upon their sex and race.

Sergeant O'Malley felt that third relief officers were upset with Lieutenant Pettis' style of supervision, and that all the incidents occurring had nothing to do with race or gender.

Lieutenant Pettis gave all the officers clear expectations of what she expected of them, and some officers did not agree with these expectations. Sergeant O'Malley stated that Lieutenant Pettis held officers accountable and took a very hands on approach with the officers, and several officers were not happy with this approach.

Sergeant O'Malley contacted Lieutenant Pettis via telephone regarding the comments made by Sergeant Hils.

Sergeant O'Malley authored a Form 17 documenting the comments by Sergeant Hils and gave a copy to Lieutenant Pettis. He submitted the original to Captain Mack.

## Sergeant Kelvin Lynn, Badge: S488, District Four

On November 16, 2017, at approximately 2045 hours, Sergeant Lynn was preparing for his tour of duty, getting his equipment and paperwork together to prepare for third shift roll call at 2100 hours. Sergeant Lynn had his department radio on and heard a run regarding shots fired. It was unclear to Sergeant Lynn if shots were fired at officers, but Sergeant Lynn could tell there was some distress in the officer's voice on the radio.

Sergeant Lynn entered the roll call room, where Lieutenant Pettis and several third relief officers were seated preparing for roll call. Sergeant Lynn asked the officers if they were listening to their radios and hearing the shots fired run. Specialist Ludgatis responded that they were indeed listening to the radio. Sergeant Lynn asked if it was shots fired at officers since he wasn't exactly sure and the situation seemed confusing. Lieutenant Pettis replied it was shots fired but it was unclear if it was at officers. Specialist Ludgatis stated to Sergeant Lynn she believed the shot was fired at officers.

Sergeant Lynn thought officers should have been dismissed from roll call to respond to the scene, but did not instruct officers to do so believing that he would be overriding Lieutenant Pettis, which to him was inappropriate.

Sergeant Lynn stated had he been the officer in charge at the time, he would have immediately sent third relief officers to assist. At no time prior to the roll call or during the roll call did an officer ask Lieutenant Pettis or Sergeant Lynn if they could respond to the shots fired run.

Lieutenant Pettis continued to attempt to get further information regarding the shots fired run and ascertain if shots were indeed fired at officers while Sgt. Lynn conducted roll call. There were multiple supervisors on the scene of the shots fired, including two District Four second shift sergeants and Captain Dennis Swingley.

Sergeant Lynn does not recall if an officer needs assistance call was ever broadcasted, but at one point Lieutenant Pettis requested Emergency Communications Section implement the situational notifications. Captain Swingley informed dispatch to hold off on implementing the situational notifications. Sergeant Lynn believed that Captain Swingley was on scene and was in charge of the shots fired incident.

Sergeant Lynn does not recall Lieutenant Pettis rolling her eyes or make the statement that third shift officers better go "handle the district" since second shift is tied up on the shots fired incident. Sergeant Lynn does recall Lieutenant Pettis, prior to roll call, speak with Officer Dobbins and state she did not believe the officers were shot at.

Sergeant Lynn never spoke with Lieutenant Pettis regarding her decision not to send third relief officers to assist.

On November 24, 2017 at 2100 hours Sergeant Lynn was on duty in uniform. Sergeant Lynn conducted roll call for third relief officers, along with Lieutenant Pettis. Upon completion of roll call Lieutenant Pettis addressed the roll call and one civilian observer regarding the November 16, 2017 shots fired incident.

Lieutenant Pettis reminded the officers that she was their relief commander and that everyone in the room, with the exception of Sergeant Lynn and the civilian rider, were two ranks below her. Lieutenant Pettis informed officers not to undermine her authority and explained to them rank and file.

Sergeant Lynn recalls Lieutenant Pettis making the comment or a comment similar to, "I don't care about your opinion, or what you have to say," while addressing the officers, and that she is the relief commander and the officers work for her.

Sgt. Lynn also recalls Lieutenant Pettis telling officers that since they do not have rank they have "no skin in the game." Sergeant Lynn interpreted that as Lieutenant Pettis meant your opinion is meaningless to her if you do not have rank.

Sergeant Lynn believed that these comments made by Lieutenant Pettis were not an appropriate thing to say to the officers and was unprofessional. Sergeant Lynn believed the comments were very demeaning and berating to the officers.

Upon completion of roll call, Sergeant Lynn asked Lieutenant Pettis what occurred to have her address the third relief officers in that manner.

Lieutenant Pettis replied that she needed to remind some officers, specifically Specialist Ludgatis, that Lieutenant Pettis was in control; however, Specialist Ludgatis was not present.

Sergeant Lynn never observed Lieutenant Pettis treat officers different based on their race or sex.

On November 26, 2017 Sergeant Lynn was on duty in uniform, along with Sergeant O'Malley. During roll call Officer Tamera Brown informed Sergeant O'Malley and Sergeant Lynn that Sergeant Hils would be attending roll call to assist officers with how to file a hostile work environment complaint and address any concerns they may have. Sergeant Lynn and Sergeant O'Malley completed roll call and waited until approximately 2130 for Sergeant Hils to arrive.

Sergeant Hils informed Officer Tamera Brown via cellular text message that he was late and would respond later in the evening. Officer Lynn ended roll call and dismissed the officers.

Sergeant Lynn left the District and returned around 2200 hours, observing that the roll call room was closed. Sergeant Lynn entered the roll call room and observed Sergeant Hils, dressed in plainclothes, seated at the table with Sergeant O'Malley next to him, and approximately twelve officers seated in the roll call room.

Sergeant Hils was discussing a tape recording that was being played on Specialist Ludgatis' cellular telephone. The recording was of a District Four third shift roll call that occurred on November 22, 2017, when Lieutenant Pettis made comments towards Specialist Ludgatis.

Sergeant Lynn believed the statements Lieutenant Pettis made on the recording were unacceptable, disrespectful, and discourteous. Sergeant Lynn apologized to the officers and informed them he did not feel this way.

Sergeant Hils instructed the officers that they could record conversations with supervisors if they wished too. Sergeant Lynn did not hear Sergeant Hils mention recording these conversations with their body worn camera.

Sergeant Lynn overheard Sergeant Hils talking about a previous arrest he had made. Sergeant Lynn was unclear who Sergeant Hils was speaking about and asked Officer Dobbins. Officer Dobbins explained to Sergeant Lynn that Sergeant Hils had arrested Lieutenant Pettis prior to her being hired as a police officer.

Sergeant Lynn never heard Sergeant Hils make any unprofessional or discourteous comments about Lieutenant Pettis.

Sergeant Lynn and Officer Dobbins' conversation was interrupted by a call on the radio for an officer requesting back up. Sergeant Lynn left the District to assist the officers. While headed to the officer's location, Sergeant Lynn was disregarded and returned to the District. Sergeant Lynn returned to the roll call room and observed that several officers had left.

Sergeant Hils was still in the room and was writing down instructions for the remaining officers on how to move forward with their concerns.

Sergeant Lynn briefly spoke with Sergeant O'Malley, who seemed upset by what had been discussed with Sergeant Hils. Sergeant O'Malley informed Sergeant Lynn that something wasn't right. Sergeant Lynn believed that Sergeant O'Malley meant the comments made by Lieutenant Pettis on the recording. Sergeant O'Malley told Sergeant Lynn that he had some "typing to do."

Sergeant O'Malley met Sgt. Lynn in the field later in the shift and briefly discussed Sergeant Hils' comments made earlier to the officers. Sergeant O'Malley stated it wasn't right for Sergeant Hils to discuss Lieutenant Pettis' history.

Sergeant Lynn never obtained or distributed any material pertaining to this investigation to anyone outside the investigation. Sergeant Lynn was only aware of Specialist Ludgatis having a recording of the roll call on November 22, 2017.

Sergeant Lynn never heard Sergeant Hils make any unprofessional or discourteous statements pertaining to Lieutenant Fern. Sergeant Lynn never heard Sergeant Hils refer to District Four as the "urban ghetto."

Sergeant Lynn believed that Sergeant Hils was there as the Fraternal Order of Police President to address concerns of the officers regarding statements made by Lieutenant Pettis.

On November 28, 2017 at approximately 1000 hours, Sergeant Lynn received a phone call via his cellular telephone from Lieutenant Pettis. Lieutenant Pettis inquired about comments made by Sergeant Hils, specifically her history. Sergeant Lynn informed Lieutenant Pettis he thought Sgt. Hils was speaking about her past interactions with Sergeant Hils.

Sergeant Lynn informed Lieutenant Pettis that the comments he heard were uncalled for and inappropriate; however, Sgt. Lynn was referring to the comments made by Lieutenant Pettis on the recording and not comments made by Sergeant Hils. Sergeant Lynn only heard Sergeant Hils speaking of arresting somebody, not specifically Lieutenant Pettis.

Sergeant Lynn believes that Sergeant His was addressing the officers due to their concerns regarding previous actions by Lieutenant Pettis, and not because of Lieutenant Pettis' race or gender.

## Sergeant Michael Reynolds, Badge: S51, District Four

On November 21, 2017 Sergeant Reynolds was on duty in uniform, and conducted District Four third relief roll call. The Night Chief, Captain Swingley, addressed roll call concerning the shots fired incident that occurred on November 16, 2017.

Captain Swingley was present at roll call to address any questions or concerns the officers might have regarding the incident.

Specialist Ludgatis had several questions for Captain Swingley concerning the incident. Captain Swingley addressed Specialist Ludgatis' questions and continued to explain the incident. At no time while Specialist Ludgatis was speaking with Captain Swingley was Specialist Ludgatis insubordinate or disrespectful to Lieutenant Pettis.

On November 22, 2017 Sergeant Reynolds was on duty in uniform, and conducted District Four third relief roll call. Upon the completion of roll call Lieutenant Pettis addressed the third relief officers.

Lieutenant Pettis spoke about the shots fired incident that occurred on November 16, 2017 and the decisions she made during the incident. Lieutenant Pettis informed the officers that she was the relief commander and that she was in charge.

Lieutenant Pettis was initially calm while addressing the officers, but quickly escalated when Lieutenant Pettis addressed Specialist Ludgatis.

Lieutenant Pettis addressed Specialist Ludgatis and informed her that she was a desk officer and she was not going to be able to assist the officers anyway. Lieutenant Pettis instructed Specialist Ludgatis several times to be quiet.

Sergeant Reynolds recalls Lieutenant Pettis telling Specialist Ludgatis that, "You volunteer to sit on the desk every night. You don't cover nobody." Sergeant Reynolds felt this was a truthful statement, but felt it was personal.

Sergeant Reynolds believed that Lieutenant Pettis singled Specialist Ludgatis out because of Specialist Ludgatis questioning Lieutenant Pettis' decisions on November 21, 2017 to Captain Swingley. Sergeant Reynolds does not believe Lieutenant Pettis' comments to Specialist Ludgatis were made because of Specialist Ludgatis' race or gender.

Sergeant Reynolds felt several statements made by Lieutenant Pettis were inappropriate, and if there was a personal issue that Lieutenant Pettis had with Specialist Ludgatis it should have been addressed in private and not in front of Specialist Ludgatis' peers. Sergeant Reynolds felt that Lieutenant Pettis was unprofessional when addressing Specialist Ludgatis.

Sergeant Reynolds spoke with Lieutenant Pettis privately after roll call and informed her that he thought the interaction with Specialist Ludgatis could have been handled differently. Sergeant Reynolds stated that the way Lieutenant Pettis spoke during roll call would upset some officers, and he expected them to make a complaint against Lieutenant Pettis.

Sergeant Reynolds was assigned to District Four prior to Specialist Ludgatis and Lieutenant Pettis being transferred to District Four. At no time did Sergeant Reynolds observe Specialist Ludgatis say or do anything to undermine Lieutenant Pettis' authority as the relief lieutenant.

Prior to November 22, 2017 there were no incidents that occurred to lead Sergeant Reynolds to believe there were problems between Lieutenant Pettis and Specialist Ludgatis.

Sergeant Reynolds stated that Lieutenant Pettis holds the officers that work for her accountable and treats them all equally. Sergeant Reynolds has not observed Lieutenant Pettis treat officers differently based upon their race or gender.

Sergeant Reynolds has never heard or observed Tamera Officer Brown say or do anything that was insubordinate or undermining to Lieutenant Pettis.

Sergeant Reynolds was not aware the roll call on November 22, 2017 was being recorded and is unsure who made the recording.

## Sergeant Michelle Phillips, Badge: S135, District Four

On November 22, 2017, at approximately 2100 hours Sergeant Michelle Phillips was on duty in uniform and conducted roll call for District Four third relief. At the end of roll call Lieutenant Pettis addressed the third relief officers.

Lieutenant Pettis addressed a shots fired incident that occurred on November 16, 2017 prior to third relief roll call. Lieutenant Pettis also addressed an issue with Specialist Ludgatis concerning statements Specialist Ludgatis made regarding Lieutenant Pettis not allowing officers to leave roll call to respond to the shots fired incident.

Lieutenant Pettis clearly singled Specialist Ludgatis out, speaking directly to her, but in front of several other District Four third relief officers.

Lieutenant Pettis told Specialist Ludgatis several times to "be quiet" and "you be quiet right now." Sergeant Phillips stated Lieutenant Pettis told Specialist Ludgatis that she sits "on the desk every night, you don't cover nobody." Lieutenant Pettis continued to single Specialist Ludgatis out and make comments toward her until roll call was dismissed.

Specialist Ludgatis barely spoke while Lieutenant Pettis was speaking to her and was not disrespectful towards Lieutenant Pettis.

Sergeant Phillips stated Specialist Ludgatis had a smirk on her face and did not immediately answer Lieutenant Pettis when asked a question, but never said anything disrespectful to her.

Sergeant Phillips felt uncomfortable while Lieutenant Pettis was making these comments towards Specialist Ludgatis, and contemplated grabbing Lieutenant Pettis' leg in an attempt to get her to stop. Sergeant Phillips never observed Lieutenant Pettis speak this way previously, and stated it was totally out of character for Lieutenant Pettis to make the comments she did.

Sergeant Phillips believed that the comments by Lieutenant Pettis towards Specialist Ludgatis were unprofessional and should not have taken place in front of other officers. Sergeant Phillips does not believe that the comments made by Lieutenant Pettis to Specialist Ludgatis had anything to do with Specialist Ludgatis' race or gender.

Sergeant Phillips was caught off guard by Lieutenant Pettis' comments and was told by Lieutenant Pettis after roll call that she did not mean to make those comments. Sergeant Phillips and Sergeant Reynolds informed Lieutenant Pettis that her comments to Specialist Ludgatis should have been made in private. Lieutenant Pettis replied that Specialist Ludgatis made statements about Lieutenant Pettis in front of Lieutenant Pettis' peers, therefore Lieutenant Pettis felt she could address Specialist Ludgatis in front of her peers.

Note:  Lieutenant Pettis was referring to the comments made by Specialist Ludgatis on November 21, 2017 to Captain Swingley during District Four third relief roll call.

Sergeant Phillips has never observed Lieutenant Pettis treat officers differently based upon their race or gender. Sergeant Phillips stated that Lieutenant Pettis treats everybody the same and is very fair and straightforward with everybody, no matter race or gender.

Prior to November 22, 2017, Sergeant Phillips never observed any interactions or conversations between Lieutenant Pettis and Specialist Ludgatis that led Sergeant Phillips to believe there was an issue or problem between Lieutenant Pettis and Specialist Ludgatis.

Sergeant Phillips stated she had never heard Specialist Ludgatis or Officer Brown make any negative comments about Lieutenant Pettis' race or gender. Sergeant Phillips has never had any issues with Specialist Ludgatis and spoke with her on a daily basis.

Sergeant Phillips never observed Specialist Ludgatis say or do anything that would have undermined Lieutenant Pettis' duties as relief commander.

On November 27, 2017 Officer Tamera Brown approached Sergeant Phillips and asked to address roll call regarding Captain Mack wishing to speak with District Four third relief officers. Officer Brown informed the officers that Captain Mack was addressing (looking into) the issues regarding the supervision of third relief by Lieutenant Pettis. Officer Brown explained what issues she was going to address with the Captain and informed officers to speak to the Captain so that the relief's concerns were heard.

Sergeant Phillips felt Officer Brown was trying to get officers to agree with her point of view regarding Lieutenant Pettis, but Sergeant Phillips did not believe that Officer Brown was trying to undermine Lieutenant Pettis' authority.

Sergeant Phillips played a recording of Officer Brown addressing roll call on November 27, 2017 that she had recorded utilizing her personal cellular phone. Sergeant Phillips stated she recorded the comments made by Officer Brown because she figured since an unknown officer recorded the roll call on November 22, 2017, and felt officers could always be recording, Sergeant Phillips wanted to have a record of what Officer Brown was saying.

## Captain Dennis Swingley, Badge: C4, Night Chief

On November 21, 2017, at approximately 2100 hours, Captain Swingley was on duty in uniform. Captain Swingley attended roll call at District Four to discuss an incident that occurred on November 16, 2017 concerning possible shots fired at officers.

After Captain Swingley finished speaking about the incident he asked if there were any questions or comments concerning the incident.

Specialist Ludgatis stated she believed that her relief should have responded to the shooting from roll call but believed that her supervisor's conducted roll call as usual, and did not send officers to assist with the shot fired incident.

Specialist Ludgatis was concerned and felt that officers should have been sent to assist her fellow officers.

Specialist Ludgatis did not single Lieutenant Pettis out in front of fellow District Four officers, and only mentioned Lieutenant Pettis by name when Specialist Ludgatis spoke privately with Captain Swingley upon completion of roll call.

At no time while Specialist Ludgatis was speaking to Captain Swingley either during roll call or privately after roll call did Captain Swingley believe Specialist Ludgatis was undermining Lieutenant Pettis' authority or being insubordinate to Lieutenant Pettis.

Later that evening Captain Swingley authored an email to Lieutenant Colonel Neudigate, addressing the concerns raised by Specialist Ludgatis about the shots fired incident.

## Mr. Bill Tucker, Leadership Cincinnati Member

On November 24, 2017 at approximately 2100 hours, Mr. Bill Tucker was participating in a civilian ride along in Cincinnati Police District Four. Mr. Tucker attended third shift roll call. A male sergeant conducted roll call, inspecting officers and recording their equipment numbers for the lineup. Upon completion of roll call a female lieutenant addressed roll call.
*Note: IIS has identified the female lieutenant as Lieutenant Danita Pettis.*

Lieutenant Pettis made demeaning comments towards an officer who was not present. Lieutenant Pettis stated that this officer did not know what she was talking about.

Lieutenant Pettis stated that it didn't matter if you had 28 days or 28 years on the job, the officer's opinions did not matter. Lieutenant Pettis informed the officers that she was in charge and that's what these bars mean, pointing to the lieutenant bars on her uniform shirt.

Mr. Tucker was "taken back" by the comments by Lieutenant Pettis, and believed the comments to be unprofessional and very demeaning towards the officers.

## Police Officer Thomas Defranco, Badge: P881, District Four

On November 22, 2017, at approximately 2100 hours, Police Officer Thomas Defranco, Badge: P881, District Four, was on duty in uniform and attended District four third relief roll call.

Officer Defranco recorded the roll call utilizing his personal cell phone. Officer Defranco explained this was the only time he recorded a roll call. Officer Defranco stated that since Lieutenant Pettis was assigned to District Four third relief, incidents involving Lieutenant Pettis were "building up," and upon hearing about the roll call on November 16, 2017 concerning the shots fired incident, he decided to record roll call.

Officer Defranco stated he recorded the roll call due to the fact that in the past, when Lieutenant Pettis addressed roll call, she was demeaning towards the officers and made officers feel "worthless" on several occasions.

Officer Defranco forwarded the recording to Specialist Ludgatis to go with a Form 17 Specialist Ludgatis was authoring to the Police Chief. Officer Defranco also forwarded the recording to Sergeant Jay Kemme, Badge: S304, District Four, and Sergeant Ron Hale, Badge: S67, Patrol Bureau.

The roll call on November 22, 2017 was conducted as normal, then at the end of roll call Lieutenant Pettis addressed the officers. Lieutenant Pettis addressed the incident involving shots fired incident that occurred on November 16, 2017. Lieutenant Pettis mentioned that an officer was second guessing her command, then singled Specialist Ludgatis out as the officer second guessing her.

Lieutenant Pettis made belittling comments regarding Specialist Ludgatis being assigned to the District Four desk and not covering fellow officers. Lieutenant Pettis informed Specialist Ludgatis she would be thrown out (of District Four) like her previous assignment. Lieutenant Pettis told Specialist Ludgatis several times to "be quiet" and did not allow Specialist Ludgatis to speak.

Specialist Ludgatis was never disrespectful towards Lieutenant Pettis while Lieutenant Pettis was speaking to her.

Officer Defranco believed that Lieutenant Pettis was unprofessional towards Specialist Ludgatis and the whole interaction should not have taken place in front of Specialist Ludgatis' peers.

Officer Defranco believed that Lieutenant Pettis singled Specialist Ludgatis out due to a prior incident that occurred several years earlier when both Lieutenant Pettis and Specialist Ludgatis were assigned to the Central Business Section, and comments made the day prior by Specialist Ludgatis to Captain Swingley during District Four third relief roll call.

On November 26, 2017, Officer Defranco was working an outside employment extension of police services detail (detail) in uniform and stopped in District Four to log into his detail and retrieve a required marked police vehicle for the detail.

Officer Defranco observed Sergeant Dan Hils inside the roll call room speaking with several District Four third relief officers. They were discussing and listening to the recording of the third shift roll call from November 22, 2017.

Officer Defranco was not sure if he played the recording for Sergeant Hils or if Specialist Ludgatis played the recording.

Upon hearing the recording, Sergeant Hils commented that if this is how the officers are being spoken to by supervisors, to record their comments utilizing personal recording devices, but do not use the body worn cameras to do so. Officer Defranco was not aware it was a violation of City of Cincinnati Human Resource Manual to record a supervisor.

Officer Defranco was headed to his detail and only remained in the roll call room for approximately five minutes.

Officer Defranco does not recall Sergeant Hils making comments about Lieutenant Pettis' prior criminal history or about Lieutenant Michael Fern.

Officer Defranco has been assigned to District Four since January 3, 2016. Officer Defranco never observed any negative or unprofessional interactions between Lieutenant Pettis and Specialist Ludgatis prior to November 22, 2017.

Officer Defranco never observed any negative or unprofessional interactions between Lieutenant Pettis and Officer Brown.

Officer Defranco never observed Lieutenant Pettis treat officers differently based upon their race or gender. Officer Defranco felt she treated officers based upon their production and meeting her expectations.

For example, Lieutenant Pettis moved Officer Dobbins and Officer Elisha Orth, Badge: P529, Canine Squad, to the relief traffic car when they did not meet her expectations. Officer Defranco does not believe race had anything to do with Lieutenant Pettis's decision to move Officer Dobbins and Officer Orth to the traffic car.

*Note: Officer Orth was assigned to District Four third relief during the incidents described in this report.*

After November 26, 2017 Officer Defranco was approached by Officer Tamera Brown and Specialist Ludgatis and asked to sign a Form 17 regarding Lieutenant Pettis. Officer Defranco stated he did not sign the Form 17 after noticing a grammatical error on the form and never saw the form again.

Officer Defranco never observed Specialist Ludgatis or Officer Brown make any comments that he perceived as attempting to undermine Lieutenant Pettis' supervision, and never heard any negative comments about Lieutenant Pettis' race or gender by either Specialist Ludgatis or Officer Brown.

## Police Officer William Kueper, Badge: P629, District Four

November 24, 2017, Police Officer William Kueper was on duty in uniform at District Four third Shift roll call. Towards the end of roll call Officer Kueper recalled that Lieutenant Pettis addressed roll call. Officer Kueper recalled Lieutenant Pettis stating that everybody was two ranks below her and will not question her authority. Officer Kueper believed this statement was inappropriate because Mr. Bill Tucker, a civilian rider, was present for the roll call.

Officer Kueper recalled Lieutenant Pettis using the phrase "skin in the game," but does not recall what she was referring to.

Officer Kueper stated he was distracted with other duties and did not recall any other statements Lieutenant Pettis made.

Officer Kueper has never observed Lieutenant Pettis treat any officers differently based upon their age, sex, or race.

Officer Kueper has never observed Lieutenant Pettis treat Specialist Ludgatis differently or speak badly about Specialist Ludgatis.

On November 26, 2017, Police Officer William Kueper was on duty in uniform for District Four third Shift roll call. Police Officer Tamera Brown addressed the roll call and stated Sergeant Dan Hils would be attending roll call.

Officer Kueper believed that Sergeant Hils was coming to speak with Officer Tamera Brown and any other officers who wished to speak with Sergeant Hils regarding issues related to Lieutenant Pettis.

Roll call ended and Officer Kueper immediately entered the field with his partner, Officer McNay. Officer Kueper never attended any meeting with Sergeant Hils and never heard any statements made by Sergeant Hils.

Later that evening, Officer Kueper was shown a Form 17 by Officer Brown and Specialist Ludgatis. Officer Kueper did not read the Form 17, and when asked to initial the Form 17 by Officer Brown and Specialist Ludgatis, Officer Kueper declined. Officer Tamera Brown and Specialist Ludgatis each asked Officer Kueper once to sign the Form 17. Officer Kueper believes either Officer Tamera Brown or Specialist Ludgatis asked an additional time. Officer Kueper informed them he did not wish to get involved and declined to sign the Form 17. Officer Kueper never felt harassed, threatened, or coerced into signing the Form 17 by either Specialist Ludgatis or Officer Tamera Brown.

After November 26, 2017 Officer Kueper spoke with Lieutenant Pettis regarding the Form 17. Officer Kueper informed Lieutenant Pettis he was asked twice and possibly a third time by either Officer Brown or Specialist Ludgatis.

Officer Kueper was also approached by Lieutenant Pettis at the Fraternal of Police monthly meeting on November 27, 2017 and asked why Officer Kueper did not sign Form 17. Officer Kueper informed Lieutenant Pettis he was not present for several of the incidents and did not feel comfortable signing without having firsthand knowledge of the incidents.

Officer Kueper never told Lieutenant Pettis that he or Officer McNay was pressured to sign the Form 17.

## Police Officer Elizabeth McNay, Badge: P436, District Four

On November 26, 2017, Police Officer Elizabeth McNay was on duty in uniform and present for District Four third Shift roll call. During roll call Police Officer Tamera Brown addressed the roll call and stated Sergeant Dan Hils would be attending roll call. Officer Brown informed the officers that Sergeant Hils would be addressing third relief regarding previous incidents. Officer McNay was not present for any of the prior incidents.

Roll call ended and Officer McNay immediately entered the field with her partner, Officer Kueper. Officer McNay never attended any meeting with Sergeant Hils and never heard any statements made by Sergeant Hils.

Officer McNay has not had any issues with Lieutenant Pettis, and never observed Lieutenant Pettis treat officers differently based upon their age, race, or sex. Officer McNay has never observed Lieutenant Pettis single out or speak badly about Specialist Ludgatis, Officer Tamera Brown, or any other officer.

Officer McNay was asked by Specialist Ludgatis to sign a Form 17. Officer McNay did not read the form and was not sure what it stated. Officer McNay believes the form was related to incidents that occurred while Officer McNay was on a scheduled off day.

Officer McNay was asked only once to sign the form by Specialist Ludgatis. Officer McNay never felt harassed, threatened, or coerced into signing the Form 17.

On November 27, 2017 Officer McNay attended the Fraternal Order of Police monthly meeting with Officer Keuper. At the conclusion of the meeting Officer Keuper was having a conversation with Lieutenant Pettis when Officer McNay approached them. Lieutenant Pettis stated she wished to speak with Officer McNay concerning what was occurring on third relief.

Officer McNay stated she did not have an opinion about what was going on because she was not present for any of the roll calls and felt uncomfortable speaking about something she was not present for. Lieutenant Pettis did not push her for more information and Officer McNay excused herself from the conversation. Officer McNay had no further conversation with Lieutenant Pettis.

Officer McNay never told Lieutenant Pettis that she was pressured by either Officer Tamera Brown or Specialist Ludgatis to sign any form.

## Police Officer Terrence Dobbins, Badge: P43, District Four

On November 16, 2017 at approximately 2050 hours, Officer Dobbins was in uniform preparing for District Four Third relief roll call. Officer Dobbins heard a District Four second relief officer broadcast shots fired via his department issued radio. It was not initially clear if the officer was shot at. Several supervisors, including Lieutenant Pettis, attempted to clarify if the officer was shot at, but the officer did not immediately confirm he was shot at.

The officer was asked several times and several minutes went by before the officer confirmed he was shot at. Lieutenant Pettis, upon hearing the officer confirm he was shot at, requested Emergency Communications Section implement the situational recall notification, however Captain Swingley instructed them to hold off on the notifications and instructed Lieutenant Pettis he would be handling the incident.

At no point before or after roll call did any officer ask Lieutenant Pettis or another supervisor if they could respond on the shots fired incident. Lieutenant Pettis never informed any officer that they could not go on the shots fired run.

Officer Dobbins stated, in his opinion, the reason no officer asked to respond on the shots fired run is because they were "afraid" and "intimidated" to ask.

Officer Dobbins stated that on a daily basis Lieutenant Pettis made it clear to her subordinates that she was in charge and that you need to understand your "role" as an officer. Officer Dobbins stated Lieutenant Pettis is continually "mean" to officers, and when asked to describe her supervisory style, Officer Dobbins described Lieutenant Pettis as a "bully."

On one occasion Officer Dobbins stated he did not produce an amount of traffic citations that Lieutenant Pettis deemed sufficient in a monthly review period, so she made him the traffic car for third relief and even informed Officer Dobbins that he could end up at Internal Investigations Section being charged with dereliction of duty.

Lieutenant Pettis created an elitist environment where she made the officers think and believe that they were beneath her and did not know anything. Officer Dobbins stated Lieutenant Pettis treated all officers the same, and it did not matter the officer's race or gender.

On November 24, 2017, Officer Dobbins was on duty in uniform and attended District four third relief roll call. Towards the end of roll call Lieutenant Pettis addressed the third relief officers, as well as Mr. Bill Tucker, a member of Leadership Cincinnati, who was participating in a ride along that evening.

Lieutenant Pettis stated that, "everybody in this room besides the civilian and the sergeant are two pay grades below me, and that until you get promoted and get some skin in the game you have no opinion, and do what I tell you to do."

Officer Dobbins felt that Lieutenant Pettis comments were unprofessional and demeaning towards the officers present.

On November 26, 2017 Officer Dobbins was on duty in uniform and attended District Four third relief roll call. Officer Dobbins stated that several unknown third shift officers requested Sergeant Dan Hils speak to them regarding the hostile work environment created on the relief by Lieutenant Pettis.

Roll call concluded before Sergeant Hils arrived. When Officer Dobbins reentered the roll call room Sergeant Hils was present with several other officers. Officers were consistently entering and exiting the room while conversations were taking place.

Sergeant Hils explained to the officers how to make an Equal Employment Opportunity complaint against Lieutenant Pettis if they chose to.

Sergeant Hils reiterated several times though that if a complaint was made against Lieutenant Pettis, she is a Fraternal Order of Police member and he will defend her as he would any other member.

At one point, an unknown officer played a recording of third relief roll call from November 22, 2017. After the recording was played, Officer Dobbins could not believe the comments that were made by Lieutenant Pettis and the way she spoke to Specialist Ludgatis in front of her peers.

Sergeant Hils then informed the officers that he had arrested Lieutenant Pettis before she was appointed a Cincinnati Police Officer. Officer Dobbins does not recall Sergeant Hils making the statement about "kicking her ass" when referring to the arrest of Lieutenant Pettis.

Officer Dobbins does not recall Sergeant Hils stating that Lieutenant Pettis will "bitch or scream it was race, sexism, or whatever" to get promoted.

Officer Dobbins stated that Sergeant Hils made comments about recording roll call as long as they did not utilize their body worn cameras.

Officer Dobbins did recall Sergeant Hils making comments about Lieutenant Fern, but did not recall exactly everything he said.

Officer Dobbins stated that several conversations were taking place in the roll call room at the same time. It is possible Officer Dobbins did not hear some of Sergeant Hils comments because he was speaking with other officers.

Officer Dobbins recalled Sergeant Hils utilizing the term "ghetto" when speaking to the officers about the areas they were policing. Officer Dobbins is unsure if Sergeant Hils utilized the term "urban ghetto," but recalls him using the term "ghetto." Officer Dobbins does not believe that race played a role in Sergeant Hils using the term "ghetto," and believes the term was geared towards the crime taking place in that area.

Officer Dobbins did not believe that any of the comments made by Sergeant Hils about Lieutenant Pettis or the neighborhoods in District Four had anything to do with any individuals' race or gender.

Officer Dobbins felt Lieutenant Pettis filing the complaints against Specialist Ludgatis, Officer Tamera Brown, and Sergeant Hils is Lieutenant Pettis attempting to make the bully the victim. On an unknown date Officer Dobbins was asked to sign a Form 17, titled "*Hostile Work Environment*," on behalf of third relief by either by Specialist Ludgatis or Officer Tamera Brown, but he was unsure who asked him. Officer Dobbins never felt coerced or pressured to sign the Form 17.

Officer Dobbins stated that he felt the actions and comments of Officer Tamera Brown, Specialist Ludgatis, Lieutenant Pettis, and Sergeant Hils had nothing to do with race, gender, or any protected classification.

### Police Officer Justin Gottman, Badge: P362, District Four

On November 16, 2017 at approximately 2045 hours, Officer Gottman was in uniform preparing for District Four third relief roll call. Prior to or as roll call was beginning, Officer Gottman heard a broadcast via his police radio for a shots fired incident involving District Four second shift officers. It was not clear if the shots were fired at police or not, creating some confusion during the incident.

Lieutenant Pettis attempted to clarify if the officer was shot at, but the officer did not immediately confirm he was shot at. Roll call continued as normal while the incident was occurring.

At no point during the roll call did Officer Gottman or any other third relief officer ask Lieutenant Pettis or any other supervisor if they could respond to the shots fired incident. Furthermore, Lieutenant Pettis never instructed any officer that they could not respond to the shots fired incident.

On November 24, 2017, Officer Gottman was on duty in uniform attending District Four third relief roll call. At the conclusion of roll call Lieutenant Pettis addressed the third relief officers. Officer Gottman felt that Lieutenant Pettis was attempting to apologize for comments she had made in a previous roll call to Specialist Ludgatis.

Officer Gottman recalled Lieutenant Pettis make a statement similar to "besides the civilian rider and the sergeant everyone else in this room is two ranks below me" and that she does not care about the officer's opinions or what the officers had to say. Lieutenant Pettis also informed the officers that since they do not have rank they have "no skin in the game."

Officer Gottman had no opinion on the statements that Lieutenant Pettis said, but could see how the statements could be disrespectful to the more senior officers on the relief.

Officer Gottman never observed Lieutenant Pettis treat officers differently based upon their race or gender, and that Lieutenant Pettis treats officers equally overall.

Officer Gottman has never heard Specialist Ludgatis or Officer Brown say anything negative about Lieutenant Pettis' race or gender, or observed them do anything to undermine Lieutenant Pettis' authority.

On November 26, 2017 Officer Gottman was on duty in uniform and attended District Four third relief roll call. Sergeant Hils responded to District Four after the conclusion of roll call to speak about the conversation that occurred between Lieutenant Pettis and Specialist Ludgatis, as well as any other issues officers might wish to speak with Sergeant Hils about.

Officer Gottman was not present when the recording of roll call from November 22, 2017 was played for Sergeant Hils. Officer Gottman was not aware that the roll call was recorded and had no knowledge of who made the recording.

Officer Gottman recalled Sergeant Hils informing the officers present that he had arrested Lieutenant Pettis in the past. Officer Gottman recalls Sergeant Hils making a statement similar to "I kicked her ass," when referring to the arrest of Lieutenant Pettis. Officer Gottman also recalled Sergeant Hils stating that Lieutenant Pettis will "bitch, scream, and yell it was race to get what Lieutenant Pettis wants."

Sergeant Hils explained to the officers if they were to file a complaint against Lieutenant Pettis, he as Fraternal Order of Police Union President would have to defend her as he would any other member.

Officer Gottman did not recall Sergeant Hils making any statement about Lieutenant Fern. Officer Gottman did not recall Sergeant Hils making any statement regarding recording supervisors or the policy or procedure against recording supervisors.

Officer Gottman was dispatched on a service call and was not present for the entire meeting with Sergeant Hils. It is possible that several statements were made by Sergeant Hils when Officer Gottman was not present.

During the meeting with Sergeant Hils, Officer Tamera Brown made a statement to several officers that a Form 17 was being authored on the behalf of the relief concerning issues on the relief, and the relief should sign the Form 17. Officer Brown stated to the officers present that it would be better for the newer officers to not sign the form and to let the senior officers address the issues occurring on third relief. Officer Gottman never saw the Form 17 and never signed the Form 17.

## Police Officer Regina Adams, Badge: P293, District Four

On November 16, 2017 at approximately 2045 hours, Officer Adams was in uniform preparing for District Four third relief roll call. Officer Adams heard over fellow officer's police radios a shots fired incident involving District Four second shift officers. There was some confusion whether the officer heard shots or if the officer was shot at. The shots fired incident occurred prior to roll call and evolved as roll call was occurring.

The Night Chief, Captain Swingley, and Lieutenant Pettis attempted several times to clarify if the officer was shot at. When the officer finally acknowledged that shots were fired at police Lieutenant Pettis asked to initiate the situational notification procedure. Captain Swingley canceled that request and informed Lieutenant Pettis that he would be handling the incident.

At no point during the roll call did Officer Adams or any other third relief officer ask Lieutenant Pettis or any other supervisor if they could respond to the shots fired incident. Officer Adams felt the incident was being handled by officers on scene and there was no urgency for officers from third relief roll call to respond. At no point did Lieutenant Pettis instruct officers that they could not respond to the shots fired incident. Officer Adams stated the roll call was normal in duration and time.

On November 22, 2017 at approximately 2100 hours, Officer Adams was on duty and in uniform attending District Four third relief roll call. Officer Adams was not aware this roll call was being recorded and was unsure who recorded the roll call.

Lieutenant Pettis addressed all the officers and spoke about the shots fired incident that occurred on November 16, 2017 and explained the decisions that she made during the incident.

Lieutenant Pettis then asked if any officers had any issues regarding the shots fired incident or her decisions. No one replied to Lieutenant Pettis' inquiry, causing Lieutenant Pettis to specifically address Specialist Ludgatis, asking her if she had an issue.

Specialist Ludgatis mentioned she was upset with the decision not to send third relief officers to assist on the shots fired incident. Specialist Ludgatis explained to Lieutenant Pettis what she heard during the shots fired incident.

Lieutenant Pettis then began to "put Specialist Ludgatis in her place" by informing Specialist Ludgatis that Lieutenant Pettis was in charge.

Lieutenant Pettis made a comment to Specialist Ludgatis about going to the desk while the rest of the officers in roll call take care of things. Lieutenant Pettis also stated to Specialist Ludgatis that she "volunteers to sit on the desk every night, you don't cover nobody."

Officer Adams felt embarrassed for Specialist Ludgatis because she felt Lieutenant Pettis was being very demeaning towards Specialist Ludgatis in front of her peers. Officer Adams felt these comments were unprofessional and out of line.

Case: 1:18-cv-00412-MWM-KLL Doc #: 23 Filed: 02/04/19 Page: 80 of 157 PAGEID #: 376

Officer Adams felt both Lieutenant Pettis and Specialist Ludgatis should have had this interaction in private, but acknowledged that Specialist Ludgatis only made statements when addressed by Lieutenant Pettis.

Officer Adams believes that Lieutenant Pettis singled out Specialist Ludgatis because of comments Specialist Ludgatis made to captain Swingley on a previous date that Officer Adams was not present for. Officer Adams does not believe Lieutenant Pettis singled Specialist Ludgatis because of her race or gender.

Officer Adams has never observed Lieutenant Pettis treat officers differently based upon their race or gender, and acknowledged that she treats all officers equally. Officer Adams felt she was treated the same way as other officers of different races and genders.

Officer Adams never heard Specialist Ludgatis speak disrespectful about Lieutenant Pettis. Officer Adams never observed any interaction between Lieutenant Pettis and Specialist Ludgatis that gave any indication that there was an issue or tension between the two of them.

On November 24, 2017, Officer Adams was on duty in uniform attending District Four third relief roll call. At the conclusion of roll call Lieutenant Pettis addressed the third relief officers. Officer Adams recalls Lieutenant Pettis making the statement to the officers that, "besides the civilian rider and the sergeant everyone else in this room is two ranks below me," and briefly remembers Lieutenant Pettis stating she does not care about the officer's opinion. Officer Adams was upset by the comments and felt it was inappropriate for Lieutenant Pettis to make these statements to the officers.

Officer Adams was never asked to sign a Form 17 or petition against Lieutenant Pettis.

### Police Officer Maggie Hinkle, Badge: P284, District Four

On November 16, 2017 at approximately 2040 hours, Officer Hinkle was in uniform preparing for District Four third relief roll call. Officer Hinkle heard a District Four second relief officer, via his police radio, broadcast a shots fired incident. It was clear that a shot was fired but was unclear who the shot was fired at.

It was still unclear as roll call began if the officer was shot at. Lieutenant Pettis attempted to clarify what occurred by asking several questions via her police radio.

No third shift officer asked either Lieutenant Pettis or another supervisor if they could respond to the shots fired incident before or during roll call, and at no time did Lieutenant Pettis or another supervisor inform any officer they could not respond on the shots fired incident.

On November 21, 2017, at approximately 2100 hours, Officer Hinkle was in uniform on duty at District Four, attending third relief roll call. Captain Swingley addressed the roll call and spoke about a shots fired incident that occurred on November 16, 2017. Captain Swingley explained the incident and explained the decisions that he made that evening in an attempt to clarify the incident for all the officers.

Officer Hinkle does not recall Specialist Ludgatis make any comments about Lieutenant Pettis and did not recall Specialist Ludgatis asking any questions, but did state that Captain Swingley instructed officers to ask him any questions.

On November 22, 2017, at approximately 2100 hours, Officer Hinkle was on duty in uniform and attended District Four third shift roll call. Towards the completion of roll call Lieutenant Pettis addressed the third relief officers.

Lieutenant Pettis began addressing the officers by explaining the shots fired incident that occurred on November 16, 2017. Lieutenant Pettis went into detail about what was broadcasted and then explained the decisions she made that evening.

Lieutenant Pettis then made the conversation personal and singled Specialist Ludgatis out, making several degrading comments towards Specialist Ludgatis. Specifically, Lieutenant Pettis addressed Specialist Ludgatis' assignment as the District Four desk officer and how Specialist Ludgatis needs to be woman enough to speak to her.

Specialist Ludgatis did not say anything disrespectful or insubordinate to Lieutenant Pettis, and when Specialist Ludgatis attempted to speak she was "shut down" by Lieutenant Pettis. Lieutenant Pettis told Specialist Ludgatis several times to "be quiet," and when Specialist Ludgatis attempted to speak, Lieutenant Pettis interrupted her by stating "and?" several times. The conversation between Lieutenant Pettis and Specialist Ludgatis was very one-sided, with Lieutenant Pettis doing the majority of the speaking. Officer Hinkle was disappointed by the comments made by Lieutenant Pettis, which Officer Hinkle felt were disrespectful and unprofessional.

On November 24, 2017, Officer Hinkle was on duty in uniform and attended District Four third relief roll call. At the conclusion of roll call Lieutenant Pettis addressed the third relief officers, as well as Mr. Bill Tucker, a member of Leadership Cincinnati, who was participating in a ride along that evening.

Lieutenant Pettis stated to the officers that "besides the civilian rider and the sergeant everybody else in this room is two ranks below her and she was in charge." Lieutenant Pettis informed that officers that she did not care if they had 28 years or 28 days on.

Officer Hinkle felt these comments Lieutenant Pettis made were demeaning towards her and made her feel like she was not part of the relief.

Officer Hinkle had worked with Lieutenant Pettis and Specialist Ludgatis for approximately one month prior to November 22, 2017. Officer Hinkle had never observed any interaction between Lieutenant Pettis and Specialist Ludgatis that made her believe there were issues between the two of them.

Officer Hinkle felt Lieutenant Pettis treated each officer equally, no matter their race or gender. As a white female officer, Officer never felt she was treated differently by Lieutenant Pettis. Officer Hinkle never heard Specialist Ludgatis or Officer Brown make any negative comments about Lieutenant Pettis' race or gender, or heard them make any statements that were insubordinate or an attempt to undermine Lieutenant Pettis' authority as relief commander.

Officer Hinkle was never asked to sign a Form 17 by either Specialist Ludgatis or Officer Brown.

Officer Hinkle was not aware that the roll call on November 22, 2017 was being recorded and was unsure who recorded the roll call.

## Police Officer Kevin Martin, Badge: P236, District Four

On November 16, 2017, at approximately 2050 hours, Officer Martin was on duty and in uniform, preparing for District Four third relief roll call. Via his police radio Officer Martin heard a District Four second relief officer broadcast a shots fired incident. It was not clear if the officer was shot at or the officer had heard a shot.

Due to the confusion, Lieutenant Pettis attempted to get a definitive answer whether the officer was shot at or not. While attempting to clarify the incident, Lieutenant Pettis continued with roll call.

At no point during roll call did any officer ask Lieutenant Pettis or any other supervisor to respond to the shots fired incident. At no point during the shots fired incident did Lieutenant Pettis tell officers they could not respond.

On November 22, 2017 at approximately 2100 hours, Officer Martin was on duty, in uniform, and attended District Four third relief roll call. Officer Martin was not aware this roll call was being recorded and was unsure who recorded the roll call.

Lieutenant Pettis addressed all the officers and asked if any officers had any issues regarding the shots fired incident on November 16, 2017. Specialist Ludgatis mentioned she was upset that the relief was not sent to assist on the shots fired incident. At no point was Specialist Ludgatis disrespectful or insubordinate towards Lieutenant Pettis.

Lieutenant Pettis told Specialist Ludgatis several times to "be quiet," and also stated to Specialist Ludgatis that she "sits on the desk every night, you don't cover nobody." Officer Martin felt the comments were belittling towards Specialist Ludgatis.

Officer Martin also recalls Lieutenant Pettis stating, "You sit there in the comfort of the office, in the comfort of the district, and answer telephones every night." Officer Martin felt these comments were specifically directed towards Specialist Ludgatis even though other officers were present.

Officer Martin stated Lieutenant Pettis said "you ain't taking no supervisory test, therefore I could care less, could give two craps about what you think." Officer Martin said that he would like to believe that his opinion matters even though he realizes that supervisors don't have to take his advice.

Officer Martin stated the comments by Lieutenant Pettis made him uncomfortable.

On November 24, 2017 at approximately 2100 hours, Officer Martin was on duty, in uniform, and attended District Four third relief roll call.

Lieutenant Pettis addressed roll call again concerning the shots fired incident on November. Officer Martin did not recall any specific comments made by Lieutenant Pettis during that roll call.

Officer Martin was never approached by Specialist Ludgatis or Officer Brown and asked to sign a Form 17 or petition against Lieutenant Pettis.

Officer Martin has never observed Lieutenant Pettis treat any officer differently based upon their race or gender. Officer Martin has never heard Lieutenant Pettis say anything disrespectful about Specialist Ludgatis or Officer Brown.

Officer Martin has never heard Specialist Ludgatis or Officer Brown say anything negative about Lieutenant Pettis' race or gender.

## Police Officer Jason Wallace, Badge: P70, District Four

On November 16, 2017 at approximately 2045 hours, Officer Wallace was in uniform preparing for District Four third relief roll call. Officer Wallace heard, via his police radio, a District Four second relief officer broadcast shots fired.

There was some confusion on the radio as to whether the officer was shot at or heard shots. Lieutenant Pettis attempted to clarify and confirm that the officer was shot at. Captain Swingley arrived on scene and instructed Lieutenant Pettis to stand down and that he would be handling the incident.

At no time during roll call and while the shots fired incident was occurring did any officer ask either Lieutenant Pettis or any other supervisor if they could respond on the shots fired incident. Lieutenant Pettis never denied or instructed officers not to respond to the shots fired incident.

On November 22, 2017 at approximately 2100 hours, Officer Wallace was on duty and in uniform, attending District Four third relief roll call. Officer Wallace was not aware the roll call was being recorded and was unsure who recorded the roll call.

Roll call was conducted as usual, and at the conclusion of roll call Lieutenant Pettis addressed the officers. Lieutenant Pettis explained the shots fired incident on November 16, 2017 and why she made the decisions she did that day.

Lieutenant Pettis then switched from addressing the officers to what Officer Wallace described as a personal attack on Specialist Ludgatis. Lieutenant Pettis called Specialist Ludgatis out by name and told Specialist Ludgatis she didn't cover any officers while working the desk. Lieutenant Pettis told Specialist Ludgatis she could care less about what she has to say.

Officer Wallace felt like Lieutenant Pettis was attacking Specialist Ludgatis for being assigned to the desk. Officer Wallace felt these comments were unprofessional to make in front of fellow officers. Officer Wallace was embarrassed for Specialist Ludgatis.

Specialist Ludgatis said very little and only spoke when addressed by Lieutenant Pettis. Specialist Ludgatis did not say anything unprofessional or disrespectful to Lieutenant Pettis.

Officer Wallace assumed Lieutenant Pettis singled Specialist Ludgatis out because Lieutenant Pettis believed that Specialist Ludgatis made a complaint regarding the shots fired incident on November 16, 2017.

Prior to this interaction Officer Wallace had not observed Lieutenant Pettis interact with Specialist Ludgatis in a way that led him to believe there were any issues between the two of them.

On November 26, 2017 Officer Wallace was on duty in uniform and attended District Four third relief roll call. Officer Wallace was made aware that Sergeant Dan Hils would be coming to District Four to speak to them regarding the incidents between Lieutenant Pettis, Officer Tamera Brown, and Specialist Ludgatis.

After roll call was completed Sergeant Hils arrived and spoke with several officers, including Officer Wallace, in the roll call room. Sergeant Hils was called to District Four by Officer Tamera Brown and Specialist Ludgatis to discuss options about what could be done regarding the way Lieutenant Pettis spoke to Specialist Ludgatis during roll call on November 22, 2017.

Sergeant Hils stated that he represents both the officers in the room as well as Lieutenant Pettis. He gave the officers different options they could use to seek a resolution. Sergeant Hils stated that if discipline was taken against Lieutenant Pettis, he would defend her as he would any member of the union.

Sergeant Hils told the officers about arresting Lieutenant Pettis 25 years ago before she was hired by the City of Cincinnati. Sergeant Hils stated he used force during the arrest of Lieutenant Pettis, but does not recall Sergeant Hils stating he kicked Lieutenant Pettis' ass.

A recording of roll call from November 22, 2017 was played by an unknown officer for Sergeant Hils. Officer Wallace stated Sergeant Hils informed officers that if recording roll call protected them, then to do what you have to do.

Officer Wallace does not recall Sergeant Hils make any comments about Lieutenant Fern.

Officer Wallace was never asked to sign a Form 17 or petition against Lieutenant Pettis by either Officer Tamera Brown or Specialist Ludgatis.

Officer Wallace never heard any comments by either Officer Tamera Brown or Specialist Ludgatis that were disrespectful towards Lieutenant Pettis or were undermining to her authority as the relief commander.

## Police Officer Christian Schapker, Badge: P407, District Four

On November 16, 2017 at approximately 2050 hours, Officer Schapker was in uniform preparing for District Four third relief roll call. Prior to roll call beginning Officer Schapker heard, via his police radio, a District Four second relief officer broadcast shots fired. It was not clear if the officer was shot at or heard a shot.

Lieutenant Pettis attempted to clarify and confirm that the officer was shot at. The officers involved did not supply Lieutenant Pettis with a definitive answer if they had actually been shot at or not.

At no time during roll call and while the shots fired incident was occurring did any officer ask either Lieutenant Pettis or any other supervisor if they could respond on the shots fired incident. Lieutenant Pettis never denied or instructed officers not to respond to the shots fired incident.

On November 22, 2017 at approximately 2100 hours, Officer Schapker was on duty and in uniform, attending District Four third relief roll call. Roll call was conducted as usual, and at the conclusion of roll call Lieutenant Pettis addressed the officers.

Lieutenant Pettis addressed the shots fired incident that occurred on November 16, 2017 and asked officers if they had any issues concerning the incident. Specialist Ludgatis informed Lieutenant Pettis that she believed officers should have been released from roll call to respond to the shots fired incident.

Specialist Ludgatis was not confrontational towards Lieutenant Pettis. Specialist Ludgatis was professional and was not insubordinate when speaking with Lieutenant Pettis.

Lieutenant Pettis started to slightly raise her voice and was speaking very strongly, speaking directly to Specialist Ludgatis. Officer Schapker recalls Lieutenant Pettis telling Specialist Ludgatis that she needs to just worry about the desk. Officer Schapker recalls Lieutenant Pettis tell Specialist Ludgatis "you sit there in the comfort of your office, you don't cover nobody." Lieutenant Pettis stated "I could care less. I could give two craps what you think."

Officer Schapker felt these statements by Lieutenant Pettis were very condescending and demeaning towards Specialist Ludgatis.

Officer Schapker stated the interaction between Lieutenant Pettis and Specialist Ludgatis was very one-sided, with Lieutenant Pettis doing the majority of the speaking.

Prior to November 22, 2017, Officer Schapker had never seen Lieutenant Pettis interact with Specialist Ludgatis in a way that led him to believe there were any issues between the two of them.

Officer Schapker never heard Specialist Ludgatis or Officer Tamera Brown make any negative comments about Lieutenant Pettis' race or gender, or heard them make any statements that were insubordinate or an attempt to undermine Lieutenant Pettis' authority as relief commander.

Officer Schapker never observed Lieutenant Pettis treat any officer differently based upon their race or gender, and in general treats all officers equally.

Officer Schapker was never asked to sign a Form 17 or petition against Lieutenant Pettis by either Officer Tamera Brown or Specialist Ludgatis.

On November 24, 2017, Officer Schapker was on duty in uniform and attended District Four third relief roll call. At the conclusion of roll call Lieutenant Pettis addressed the third relief officers.

Lieutenant Pettis again explained the shots fired incident from November 16, 2017. Officer Schapker recalled Lieutenant Pettis make a statement about not caring how long an officer has been on the job because she was still in charge. Lieutenant Pettis also stated that besides the civilian rider and the sergeant, everybody else in the room was two ranks below her. Lieutenant Pettis explained to the officers that she was in charge and nobody would question her authority.

Officer Schapker did not recall Lieutenant Pettis mentioning Specialist Ludgatis, who was not present for this roll call.

On November 26, 2017 Officer Schapker was on duty in uniform and attended District Four third relief roll call. Officer Schapker was informed that Sergeant Hils would be speaking to officers to discuss Lieutenant Pettis' actions and comments.

Sergeant Hils arrived after roll call was dismissed and spoke with several of the District Four third relief officers.

Sergeant Hils explained to the officers the options they had regarding Lieutenant Pettis' comments and actions. Sergeant Hils stated that if discipline was taken against Lieutenant Pettis he would defend her as he would any member of the union.

Officer Schapker recalled Sergeant Hils informing the officers that he had arrested Lieutenant Pettis prior to Lieutenant Pettis being employed by the City of Cincinnati. Officer Schapker did not recall Sergeant Hils stating he "kicked Lieutenant Pettis' ass" during the arrest or stating that Lieutenant Pettis will "bitch and scream" to get what she wants.

Officer Schapker was not present when the recording of roll call from November 22, 2017 was played and does not recall Sergeant Hils making any comments about recording roll call.

Officer Schapker does not recall Sergeant Hils making any comments about Lieutenant Fern.

Officer Schapker was not present for all of Sergeant Hils comments because he arrived after Sergeant Hils had started speaking and he left before Sergeant Hils concluded.

### Police Officer Aubrey Pitts, Badge: P280, District Four

On November 21, 2017, at approximately 2100 hours, Officer Pitts was in uniform on duty at District Four and attended third relief roll call. Captain Swingley addressed the roll call and spoke about a shots fired incident that occurred on November 16, 2017.

Specialist Ludgatis asked Captain Swingley several questions regarding the incident and how it was handled by District Four third relief supervisors. Specialist Ludgatis never named any of the third relief supervisors by name and did not make any disrespectful comments about any of the third relief supervisors while speaking to Captain Swingley.

Officer Pitts stated he believed that Specialist Ludgatis was just asking questions and was not being insubordinate.

On November 22, 2017, at approximately 2100 hours, Officer Pitts was on duty in uniform and attended District Four third relief roll call. Towards the end of roll call Lieutenant Pettis addressed the officers. Lieutenant Pettis went over the shots fired incident that occurred on November 16, 2017.

At one point Specialist Ludgatis was asked directly by Lieutenant Pettis what Specialist Ludgatis recalled from that day. Specialist Ludgatis stated that an officer broadcasted via his police radio that he was shot at, and they remained in roll call. This caused the conversation to get "heated" and Lieutenant Pettis told Specialist Ludgatis to "be quiet" because Lieutenant Pettis was speaking.

Lieutenant Pettis continued with how she was going to run her relief and that she was in command. Lieutenant Pettis continued to single Specialist Ludgatis out and made several demeaning comments towards Specialist Ludgatis. One of the comments that Officer Pitts felt was demeaning towards Specialist Ludgatis was when Lieutenant Pettis asked Specialist Ludgatis, "who do you cover?" referring to Specialist Ludgatis working the district desk.

Officer Pitts felt Lieutenant Pettis continued to demean Specialist Ludgatis even when she dismissed roll call. Lieutenant Pettis looked at Specialist Ludgatis and stated "you're dismissed to the desk." Officer Pitts felt this singled Specialist Ludgatis out because all the other officers were entering the field.

Officer Pitts felt Lieutenant Pettis was professional at first when addressing the officers, but when Lieutenant Pettis singled Specialist Ludgatis out it was unprofessional and should have been handled behind closed doors and not in front of fellow officers.

Officer Pitts felt that Lieutenant Pettis singled Specialist Ludgatis out because of the questions Specialist Ludgatis had asked the previous day to Captain Swingley.

Officer Pitts has never observed Lieutenant Pettis treat other officers differently based upon their race or gender. Officer Pitts never observed Lieutenant Pettis treat Specialist Ludgatis differently prior to November 22, 2017.

Officer Pitts never heard Officer Tamera Brown or Specialist Ludgatis make any negative comments about Lieutenant Pettis' race or gender, and never heard Officer Tamera Brown or Specialist Ludgatis say or do anything that appeared to undermine Lieutenant Pettis' command of District Four third relief.

After roll call was completed Officer Pitts observed that it appeared that Specialist Ludgatis was "hurt" by Lieutenant Pettis' comments, causing Officer Pitts to check on her to make sure she was okay and see if she needed anything.

Officer Pitts described the District four third relief roll call on November 22, 2017 as the most "awkward" roll call he has ever attended.

On November 24, 2017, at approximately 2100 hours, Officer Pitts was in uniform on duty at District Four and attended third relief roll call. Lieutenant Pettis addressed the officers at the completion of roll call.

Officer Pitts recalled Lieutenant Pettis make the statements, "Besides the civilian rider and the sergeant, everyone else in this room is two ranks below me," and, "I don't care about your opinion and I don't care what you have to say." Officer Pitts felt that it was unfair for Lieutenant Pettis to make these statements about her subordinates.

Officer Pitts has never been approached or asked to sign a petition or a form against Lieutenant Pettis by either Officer Tamera Brown or Specialist Ludgatis.

Officer Pitts was not aware that the roll call on November 22, 2017 was being recorded and does not know who recorded it.

## Police Officer Estella Spaulding, Badge: P623, District Four

On November 21, 2017, Officer Spaulding was on duty in uniform, and attended District four third relief roll call. Captain Swingley addressed roll call concerning the shots fired incident that occurred on November 16, 2017.

Captain Swingley was speaking about the incident when Specialist Ludgatis voiced her concerns about the incident, and that she was "appalled" by what had occurred. Specialist Ludgatis never mentioned Lieutenant Pettis by name only that she believed supervisors should have sent third relief officers to assist on the shots fired run. Officer Spaulding never heard Specialist Ludgatis say anything disrespectful about Lieutenant Pettis to Captain Swingley.

Officer Spaulding never felt Specialist Ludgatis was being disrespectful towards Lieutenant Pettis or made any comments attempting to undermine Lieutenant Pettis' authority in front of other officers while speaking to Captain Swingley.

On November 22, 2017, Officer Spaulding was on duty in uniform and attended District Four third relief roll call. At the completion of roll call Lieutenant Pettis addressed the officers.

Lieutenant Pettis spoke about the shots fired incident that occurred on November 16, 2017 and the decisions she made during the incident. While speaking about the incident Lieutenant Pettis' tone changed and Lieutenant Pettis made several comments directed at Specialist Ludgatis. Lieutenant Pettis's asked Specialist Ludgatis what she heard during the shots fired incident. Specialist Ludgatis replied to Lieutenant Pettis about what she heard on November 16, 2017.

Lieutenant Pettis then began to describe what Lieutenant Pettis had heard and informed Specialist Ludgatis that she could have come to Lieutenant Pettis if she had an issue with what occurred on November 16, 2017. Specialist Ludgatis replied she could not speak with Lieutenant Pettis because Lieutenant Pettis would act the way she was acting now. This was the only comment Specialist Ludgatis made towards Lieutenant Pettis. Specialist Ludgatis never made insubordinate comments towards Lieutenant Pettis or attempted to undermine Lieutenant Pettis' authority.

At this point, Officer Spaulding said Lieutenant Pettis completely changed from addressing an issue affecting the relief to a "personal" matter with Specialist Ludgatis. Officer Spaulding believes that Lieutenant Pettis singled Specialist Ludgatis out because Specialist Ludgatis voiced an issue with Lieutenant Pettis the previous day with Captain Swingley. Officer Spaulding does not believe Lieutenant Pettis singling Specialist Ludgatis had anything to do with Specialist Ludgatis' race or gender.

Officer Spaulding remembered Lieutenant Pettis telling Specialist Ludgatis to be quiet several times, explaining that she gave Specialist Ludgatis a chance to speak now it was her turn to speak.

Officer Spaulding also recalled Lieutenant Pettis mention Specialist Ludgatis working the desk and not covering fellow officers. Officer Spaulding stated the comment was a true statement, but if the comment was made towards her, she would take it as disrespectful and demeaning.

Officer Spaulding stated she believed that Lieutenant Pettis was professional up until the conversation became personal, and believes Lieutenant Pettis should have had the conversation with Specialist Ludgatis in private.

Officer Spaulding has worked with Lieutenant Pettis since April 2017. Officer Spaulding has never observed Lieutenant Pettis treat officers differently based upon their race or gender. Furthermore, Officer Spaulding never observed Lieutenant Pettis treat either Officer Tamera Brown or Specialist Ludgatis any differently than other officers. Officer Spaulding never observed any actions or comments by either Lieutenant Pettis or Specialist Ludgatis leading her to believe there were problems between them.

Officer Spaulding has never heard Specialist Ludgatis or Officer Tamera Brown make any comments about Lieutenant Pettis.

Officer Spaulding was never asked to sign a petition or any form by either Specialist Ludgatis or Officer Tamera Brown.

Officer Spaulding was not aware that the roll call on November 22, 2107 was being recorded or who recorded the roll call.

## Police Officer Derrick Johnson, Badge: P174, District Four

On November 26, 2017 Officer Derrick Johnson was on duty in uniform, and attended District Four third relief roll call. During roll call Officer Tamera Brown informed third relief that Sergeant Dan Hils would be attending to address any issues that were occurring with Lieutenant Pettis.

Officer Johnson was dismissed from roll call and prepared his marked police vehicle. When he returned, Sergeant Hils was in the roll call room speaking with several third relief officers. Officer Johnson spoke with Sergeant Hils, who was in plainclothes, regarding an incident with Lieutenant Pettis informing Officer Johnson he could be terminated if caught recording roll call.

Approximately two months earlier Officer Johnson was pulled into the Lieutenant's office and questioned by Lieutenant Pettis and a third relief sergeant. Lieutenant Pettis asked Officer Johnson if he was recording roll call with his personal cellular telephone. Officer Johnson stated he was not recording roll call and inquired as to why he was singled out. She stated somebody informed her they observed a red record light on his phone during a previous roll call.

Officer Johnson explained that he would often take photos utilizing his personal cell phone of his upcoming court dates to be added to his calendar upon completion of roll call. Officer Johnson stated Lieutenant Pettis informed Officer Johnson if he was recording roll call he could be terminated, and supplied him with a copy of City of Cincinnati Human Resource Policy Regulation 2.17 Recording Devices.

Sergeant Hils spoke with Officer Johnson and addressed his concerns regarding what Lieutenant Pettis instructed him on.

Officer Johnson stated officers were free to come and go and he could have got up and left if he wished to do so. The main focus of the conversation between Sergeant Hils and the third relief officers was a possible EEO complaint against Lieutenant Pettis.

Sergeant Hils stated that if there was an EEO complaint filed against Lieutenant Pettis, as the Union President he would defend her since she is a member of the Fraternal Order of Police Union, and he would defend her like any other member.

Officer Johnson does not recall Sergeant Hils make any comment regarding a prior arrest of Lieutenant Pettis by Sergeant Hils, or any comments about Lieutenant Fern.

Officer Johnson does not recall Sergeant Hils making any comments about recording supervisors or utilizing the body worn cameras to record supervisors.

Officer Johnson heard a recording played by an unknown officer, and does not recall the type of device the recording was played on. Officer Johnson stated he felt his issue he wished to discuss with Sergeant Hils was addressed, and he left the room as the recording began.

While present in the room with Sergeant Hils, Officer Johnson did not hear Sergeant Hils make any negative or unprofessional comments about Lieutenant Pettis.

Officer Johnson was briefly shown a Form 17 by Officer Tamera Brown concerning an EEO complaint, and was instructed if he wished to sign the form he could. Officer Johnson never felt coerced or harassed to sign any form against Lieutenant Pettis.

Officer Johnson works with Lieutenant Pettis approximately one day a week. Officer Johnson has not observed Lieutenant Pettis treat officers differently based upon their race or gender.

Officer Johnson had never heard Lieutenant Pettis speak bad about or single Specialist Ludgatis or Officer Tamera Brown out.

## Police Officer Michael Moore, Badge: P925, District Four

On November 26, 2017 Officer Michael Moore was on duty in uniform, and attended District Four third relief roll call. During roll call it was announced that Sergeant Dan Hils would be attending to speak with third relief officers. Sergeant Hils was delayed and arrived after the completion of roll call.

Officers were not required to attend the meeting with Sergeant Hils and could have left the meeting at any time if they chose to.

Several officers spoke with Sergeant Hils concerning prior incidents with Lieutenant Pettis that had occurred during roll call. Officer Moore was not present for any of those roll calls and was unaware of what occurred.

Officer Moore believes that Officer Defranco played a recording of a previous roll call involving comments made by Lieutenant Pettis for Sergeant Hils.

After hearing the recording Sergeant Hils informed the officers present that it is against policy to record roll call, but stated if officers felt uncomfortable during roll call to record it.

Sergeant Hils did not instruct officers to utilize their body worn cameras to record roll call. Sergeant Hils made several comments regarding arresting Lieutenant Pettis 25 years ago, prior to her becoming a Cincinnati Police Officer. Officer Moore recalled Sergeant Hils making the statement the he "kicked her ass," referring to Lieutenant Pettis during the arrest. Officer Moore also recalls Sergeant Hils stating that Lieutenant Pettis will "bitch" and "complain" to get what she wants. Officer Moore recalls Sergeant Hils mentioning Lieutenant Fern, but does not recall the exact comments that were made about Lieutenant Fern.

Officer Moore recalled Sergeant Hils using the phrase "urban ghetto" once or twice while addressing the District Four officers. Sergeant Hils used the term to describe the type of neighborhoods the officers were policing. Officer Moore took the term "urban ghetto" to mean poor neighborhood.

Officer Moore did not believe that any of the comments about Lieutenant Pettis by Sergeant Hils were based upon Lieutenant Pettis' race or gender.

Officer Moore has worked for Lieutenant Pettis since her transfer to District Four in early 2017. Officer Moore has never observed Lieutenant Pettis treat anybody improper or treat them differently based upon their race or gender.

Officer Moore was never asked to sign a petition or any form against Lieutenant Pettis by either Officer Tamera Brown or Specialist Ludgatis.

Officer Moore has never heard Specialist Ludgatis or Officer Tamera Brown make any disparaging comments about Lieutenant Pettis or make any action to undermine Lieutenant Pettis' authority.

## Police Officer William Goetz, Badge: P100, District Four

On November 21, 2017, Officer William Goetz was on duty in uniform, and attended District Four third shift roll call. Captain Swingley addressed the roll call and spoke about a shots fired incident that occurred on November 16, 2017. Captain Swingley asked the roll call if they had any questions concerning the incident. Specialist Ludgatis had several questions, mainly asking why District Four Supervisors did not send third relief officers to assist with the shots fired run. Specialist Ludgatis did not identify the supervisors by name.

Officer Goetz did not feel that Specialist Ludgatis was insubordinate or undermining any of the third shift supervisors, only asking for further clarification from Captain Swingley.

On November 22, 2017, at approximately 2100 hours Officer Goetz was on duty in uniform attending District Four third shift roll call. Towards the completion of roll call Lieutenant Pettis addressed the third shift officers.

Lieutenant Pettis made several points regarding her decision concerning the shots fired incident that occurred on November 16, 2017. Lieutenant Pettis reiterated to the officers that she is the Lieutenant and is in charge of the relief, and if there are any issues with her decision to come speak to her directly.

Lieutenant Pettis then went from addressing the relief to what Officer Goetz described as a personal attack against Specialist Ludgatis by Lieutenant Pettis. Lieutenant Pettis made demeaning comments referring to Specialist Ludgatis being assigned to the District Four desk and not covering other officers.

Officer Goetz believed Lieutenant Pettis started out professional, but believed that Lieutenant Pettis was unprofessional with her attack against Specialist Ludgatis.

Officer Goetz believed that Lieutenant Pettis singled Specialist Ludgatis out due to Specialist Ludgatis' comments made the day prior to Captain Swingley. Officer Goetz does not believe Lieutenant Pettis's treatment of Specialist Ludgatis had anything to do with Specialist Ludgatis' sex or race. Officer Goetz has never observed Lieutenant Pettis treat officers differently based upon their race or sex, and treats all officers equally.

Officer Goetz was transferred to District Four on April 23, 2017. Officer Goetz never observed any negative interactions between Lieutenant Pettis and Specialist Ludgatis or Officer Tamera Brown during the seven months prior to November 22, 2017.

Officer Goetz has never observed Specialist Ludgatis or Officer Brown make any comments that he perceived as attempting to undermine Lieutenant Pettis' supervision and never heard any negative comments about Lieutenant Pettis' race or sex.

Officer Goetz was never asked by Officer Tamera Brown or Specialist Ludgatis to sign a form or petition against Lieutenant Pettis.

Officer Goetz was not aware that the roll call on November 22, 2017 was being recorded and was not sure who recorded the roll call.

## Police Officer Aaron Watkins, Badge: P292, District Four

On November 21, 2017, Officer Aaron Watkins was on duty in uniform and attended District Four third shift roll call. Captain Swingley addressed the roll call and spoke about a shots fired incident that occurred on November 16, 2017.

Specialist Ludgatis questioned why District Four Supervisors did not send third relief officers to assist with the shots fired run. Specialist Ludgatis did not identify the supervisors by name.

Officer Watkins did not feel that Specialist Ludgatis was insubordinate, but felt the questions could have been asked at a different time.

On November 22, 2017, at approximately 2100 hours, Officer Watkins was on duty in uniform and attended District Four third shift roll call. Towards the completion of roll call Lieutenant Pettis addressed the third shift officers.

Lieutenant Pettis explained her decision concerning the shots fired incident that occurred on November 16, 2017. Officer Watkins was not present on November 16, 2017 and was unfamiliar with the incident.

Lieutenant Pettis then asked Specialist Ludgatis if she had any questions concerning Lieutenant Pettis' decision made on November 16, 2017. Specialist Ludgatis replied to Lieutenant Pettis, causing a verbal altercation with Specialist Ludgatis.

The verbal altercation was one-sided, with Specialist Ludgatis saying very few words and Lieutenant Pettis "scolding" Specialist Ludgatis. Lieutenant Pettis repeatedly told Specialist Ludgatis to "be quiet," made inappropriate comments referring to Specialist Ludgatis being assigned as the District Four third shift desk officer, and downplayed the role Specialist Ludgatis contributed to the relief.

Lieutenant Pettis stated to Specialist Ludgatis, "I could give two craps about what you think." Officer Watkins stated that this comment made him feel that if Lieutenant Pettis didn't care what her subordinates thought, then why should he even mention anything to Lieutenant Pettis.

Officer Watkins believes Lieutenant Pettis should have addressed this issue with Specialist Ludgatis behind closed doors and not in front of her peers.

Officer Watkins believes that Lieutenant Pettis singled Specialist Ludgatis out due to Specialist Ludgatis' comments made the day prior to Captain Swingley. Officer Watkins does not believe Lieutenant Pettis' treatment of Specialist Ludgatis had anything to do with Specialist Ludgatis' sex or race.

Officer Watkins has never observed Lieutenant Pettis treat officers differently based upon their race or sex, and treats all officers equally.

Officer Watkins was transferred to District Four on October 22, 2017. Officer Watkins never observed any negative interactions between Lieutenant Pettis and Specialist Ludgatis or Officer Tamera Brown prior to November 22, 2017.

Officer Watkins has never observed Specialist Ludgatis or Officer Tamera Brown make any comments that he perceived as attempting to undermine Lieutenant Pettis' supervision and never heard any negative comments about Lieutenant Pettis' race or sex.

Officer Watkins was never asked by Officer Tamera Brown or Specialist Ludgatis to sign a form or petition against Lieutenant Pettis.

Officer Watkins was not aware that the roll call on November 22, 2017 was being recorded and was not sure who recorded the roll call.

## Police Officer Jonathan Hix, Badge: P320, District Four

On November 22, 2017, at approximately 2100 hours, Officer Hix was on duty in uniform, and attended District Four third shift roll call. Towards the completion of roll call Lieutenant Pettis addressed the third shift officers.

Lieutenant Pettis addressed the officers regarding her decision concerning the shots fired incident that occurred on November 16, 2017. Lieutenant Pettis spoke about the incident and asked if any officers had any questions or concerns. No officer spoke up, at which time Lieutenant Pettis directly addressed Specialist Ludgatis. Officer Hix was not aware of why Lieutenant Pettis addressed only Specialist Ludgatis.

Specialist Ludgatis stated she believed the incident on November 16, 2017 could have been handled differently. Officer Hix felt Specialist Ludgatis was not disrespectful to Lieutenant Pettis and that Lieutenant Pettis was not disrespectful to Specialist Ludgatis. Officer Hix interpreted the conversation between Specialist Ludgatis and Lieutenant Pettis as a personal disagreement.

Officer Hix has never observed Lieutenant Pettis treat officers differently based upon their race or sex, was strict with all officers, and treated them by the book regardless of their race or sex.

Officer Hix has never observed Specialist Ludgatis or Officer Tamera Brown make any comments that he perceived as attempting to undermine Lieutenant Pettis' supervision and never heard any negative comments about Lieutenant Pettis.

Officer Hix was never asked by Officer Tamera Brown or Specialist Ludgatis to sign a form or petition against Lieutenant Pettis.

Officer Hix was not aware that the roll call on November 22, 2017 was being recorded and was not sure who recorded the roll call.

## Police Officer Andrew Woedl, Badge: P360, District Four

On November 16, 2017 at approximately 2050 hours, Officer Woedl was on light duty assigned to the District Four desk. Officer Woedl was preparing for roll call at 2100 when he heard, via fellow officer's radios, a shots fired run.

Officer Woedl stated there was some confusion, and the officers involved and supervisors were "going back and forth" on whether the shots were fired at the officers or not.

Several supervisors, including Lieutenant Pettis, attempted to clarify the incident and ascertain what actually occurred.

At no time during roll call and while the shots fired incident was occurring did any officer ask either Lieutenant Pettis or any other supervisor if they could respond on the shots fired incident. Lieutenant Pettis never denied or instructed officers not to respond to the shots fired incident.

On November 22, 2017 at approximately 2100 hours, Officer Woedl was on duty and in uniform and attended District Four third relief roll call. Roll call was conducted as usual, and then at the conclusion of roll call Lieutenant Pettis addressed the officers.

Lieutenant Pettis addressed the shots fired incident that occurred on November 16, 2017 and explained her decisions she made that day, but also made sure that officers were aware that she was in charge. Lieutenant Pettis was speaking to all of the officers, but was directing all her comments at Specialist Ludgatis.

Lieutenant Pettis told Specialist Ludgatis several times to "be quiet" and mentioneded that Specialist Ludgatis works the District desk and does not cover officers. Lieutenant Pettis also told Specialist Ludgatis that she could care less what she thinks because she never took a test to get promoted.

Officer Woedl felt the comments made by Lieutenant Pettis were inappropriate to make in front of other officers. Officer Woedl felt that Lieutenant Pettis was unprofessional and the comments were demeaning towards Specialist Ludgatis.

At no time did Specialist Ludgatis question Lieutenant Pettis' authority.

Officer Woedl believes that Lieutenant Pettis singled Specialist Ludgatis out because Lieutenant Pettis believed that Specialist Ludgatis filed a complaint against Lieutenant Pettis concerning her actions during the shots fired incident on November 16, 2017.

Officer Woedl has never observed Lieutenant Pettis treat officers differently based upon their race or gender, and generally treats all officers fairly.

Officer Woedl has never heard Officer Tamera Brown or Specialist Ludgatis make any negative comments about Lieutenant Pettis' race or gender.

Officer Woedl was never asked to sign a Form 17 or petition against Lieutenant Pettis by either Specialist Ludgatis or Officer Tamera Brown.

Officer Woedl was not aware this roll call was being recorded and was unsure who recorded the roll call.

## Police Officer Matthew Mauric, Badge: P272, District Four

On November 16, 2017 at approximately 2045 hours, Officer Mauric was in uniform preparing for District Four third relief roll call. Via his police radio Officer Mauric heard a District Four second relief officer broadcast shots fired. There was some confusion on whether the officer was shot at or heard a shot.

Several supervisors, including Captain Swingley and Lieutenant Pettis, attempted to clarify and confirm that the officer was shot at. The officers involved did not immediately make it clear and did not give straightforward answers.

It was not until several minutes into roll call that the officers finally confirmed they were shot at.

At no time during roll call and while the shots fired incident was occurring did any officer ask Lieutenant Pettis or any other supervisor if they could respond on the shots fired incident. Lieutenant Pettis never denied or instructed officers not to respond to the shots fired incident.

On November 24, 2017, Officer Mauric was on duty in uniform and attended District Four third relief roll call. At the conclusion of roll call Lieutenant Pettis addressed the third relief officers.

Officer Mauric stated Lieutenant Pettis spoke about Specialist Ludgatis questioning Lieutenant Pettis' authority, and that Lieutenant Pettis did not want officers to challenge her unless they are the same rank as her.

Officer Mauric recalled Lieutenant Pettis making the statement to the officers that "besides the civilian rider and the sergeant, everyone else in this room is two ranks below me."
Officer Mauric also recalls Lieutenant Pettis stating that "since you don't have rank you have no skin in the game." Officer Mauric was not offended by the comments by Lieutenant Pettis, but could see how other officers could be offended.

Officer Mauric did feel that it could have been handled differently, in regards to speaking about an officer when they were not present.

Officer Mauric has never observed Lieutenant Pettis treat officers differently based upon their race or gender, and she treats all officers equally.

On November 26, 2017 Officer Mauric was on duty in uniform and attended District Four third relief roll call. Officer Mauric was informed by Officer Tamera Brown that Sergeant Dan Hils would be coming to District Four to speak to them regarding the incidents between Lieutenant Pettis, Officer Tamera Brown, and Specialist Ludgatis.

Not long after the third relief officers were dismissed from roll call, Sergeant Hils arrived and spoke with several officers, including Officer Mauric, in the roll call room. Sergeant Hils was discussing issues between Lieutenant Pettis and Specialist Ludgatis.

Sergeant Hils told the officers about arresting Lieutenant Pettis 25 years ago before she was hired by the City of Cincinnati. Officer Mauric recalled Sergeant Hils stating something similar to "kicking her ass," referring to his arrest of Lieutenant Pettis.

Officer Mauric recalled Sergeant Hils also talking about Lieutenant Pettis "bitching and screaming about race or gender" to get what she wants.

Sergeant Hils informed the officers that they could author a Form 17 in an attempt to affect change on the relief, and that if they did file a complaint against Lieutenant Pettis he would defend her that same as he would any other member of the union.

During the meeting with Sergeant Hils a recording of roll call from November 22, 2017 was played by an unknown officer. Sergeant Hils referenced the recording and stated something about a policy, but recording roll calls or other situations to protect yourself was acceptable to Sergeant Hils.

Officer Mauric does not recall Sergeant Hils making any comments about Lieutenant Fern. Sergeant Hils was speaking with the officers about the area in which they patrol. Officer Mauric recalled Sergeant Hils using the word "ghetto" when referring to the area, but was unsure if Sergeant Hils utilized the term "urban ghetto."

Officer Mauric never heard Officer Tamera Brown or Specialist Ludgatis make any negative comments about Lieutenant Pettis' race or gender.

Officer Mauric was never asked to sign a Form 17 or petition against Lieutenant Pettis by either Officer Tamera Brown or Specialist Ludgatis.

## Police Officer Dennis Barnette, Badge: P19, District Four

On November 22, 2017 at approximately 2100 hours, Officer Barnette was on duty and in uniform, attending District Four third relief roll call. Officer Barnette was not aware the roll call was being recorded and was unsure who recorded the roll call.

Roll call was conducted as usual, and at the conclusion of roll call Lieutenant Pettis addressed the officers. Lieutenant Pettis explained her actions during the shots fired incident on November 16, 2017.

Officer Barnette stated Lieutenant Pettis was addressing all the officers, but then specifically addressed Specialist Ludgatis. Specialist Ludgatis replied to Lieutenant Pettis, which caused Lieutenant Pettis to focus her attention on Specialist Ludgatis. Officer Barnette described it as a "verbal attack" on Specialist Ludgatis. Specialist Ludgatis would attempt to make a comment and was told repeatedly to "be quiet" by Lieutenant Pettis.

Lieutenant Pettis told Specialist Ludgatis that she "look really good saying that, a person who volunteers to sit on the desk every night. You don't cover nobody." Officer Barnette felt Lieutenant Pettis attacked Specialist Ludgatis and her position as the District Four desk officer. At one point, when Specialist Ludgatis attempted to speak Lieutenant Pettis cut Specialist Ludgatis off and stated "and? and? and?"

At no point during the conversation with Lieutenant Pettis was Specialist Ludgatis disrespectful or insubordinate towards Lieutenant Pettis.

Lieutenant Pettis stressed that the officer's opinions mean nothing to her.  Officer Barnette was upset by the comments Lieutenant Pettis made and felt they were demeaning to him and his fellow officers.  Officer Barnette felt he should have spoken up but admitted he was fearful to do so.

Officer Barnette does not believe that Lieutenant Pettis singled Special Ludgatis out based upon Specialist Ludgatis' race or gender.  Officer Barnette felt that Lieutenant Pettis singled Specialist Ludgatis out, believing that Specialist Ludgatis made a complaint against her concerning the shots fired incident.

Officer Barnette felt Lieutenant Pettis was unprofessional to address Specialist Ludgatis in this manner, particularly in front of fellow officers, including several newly hired officers.

Officer Barnette has worked for Lieutenant Pettis in previous assignments and has never observed Lieutenant Pettis treat officers differently based upon their race or gender.

On November 24, 2017, Officer Barnette was on duty in uniform and attended District Four third relief roll call.  At the conclusion of roll call Lieutenant Pettis addressed the third relief officers.  Specialist Ludgatis was not present for this roll call.

Lieutenant Pettis again explained the shots fired incident from November 16, 2017.  While Lieutenant Pettis was speaking about the incident she continued to mention Specialist Ludgatis.  Lieutenant Pettis stated she didn't care if an officer had 28 days, 28 years or 128 years, unless you're the same rank as her your opinion means nothing to her.  Lieutenant Pettis stated that the officers had "no skin in the game."

Officer Barnette felt Lieutenant Pettis was very aggressive in her tone and was embarrassed by the comments.   Officer Barnette considered transferring from third relief to avoid any more interaction with Lieutenant Pettis.

On November 26, 2017 Officer Barnette was on duty in uniform and attended District Four third relief roll call.  Officer Tamera Brown informed District Four third relief that Sergeant Dan Hils would be coming to District Four to speak to them regarding the incidents between Lieutenant Pettis, Officer Tamera Brown, and Specialist Ludgatis.

Sergeant Hils arrived after roll call had been dismissed and spoke with several officers in the roll call room.  It was not mandatory to be there, and several officers arrived late and some left early.

Sergeant Hils listened to the officer's concerns related to Lieutenant Pettis' actions.  Sergeant Hils repeatedly stated that if disciplinary action was taken against Lieutenant Pettis, he would defend her because she is a member of the union.

Sergeant Hils mentioned arresting Lieutenant Pettis 25 years ago before she was hired by the City of Cincinnati.  Sergeant Hils stated he "kicked her ass" when he went into details of Lieutenant Pettis' arrest.

Sergeant Hils also stated that Lieutenant Pettis will "bitch, scream, and kick and yell it was racism, sexism or whatever to get what she wants."

A recording of roll call from November 22, 2017 was played by an unknown officer for Sergeant Hils. Sergeant Hils informed the officers that he did not care or know about a policy against recording roll call, but recording roll calls or anything else that will protect you is fine and acceptable to him.

Officer Barnette does not recall Sergeant Hils make any comments about Lieutenant Fern.

While speaking to the officers Sergeant Hils stated that they work in the "ghetto." Officer Barnette did not think Sergeant Hils was trying to offend anybody, but just meant to tell the officers they worked in a rough area, referring to the violent crime occurring in District Four.

Officer Barnette was asked to sign a Form 17 by Officer Tamera Brown. Officer Barnette felt the letter was not insubordinate and that the relief just wanted to speak to Captain Mack to address their concerns. Officer Barnette signed the form because Lieutenant Pettis comments made officers on third relief including him feel "worthless."

Officer Barnette never heard any comments by either Officer Tamera Brown or Specialist Ludgatis that were disrespectful towards Lieutenant Pettis' race or gender, or were undermining to her authority as the relief commander. Prior to November 22, 2017 Officer Barnette had never observed any interaction that lead him to believe there were any issues between Lieutenant Pettis and Specialist Ludgatis or Officer Tamera Brown.

### Police Officer Justin Kay, Badge: P365, District Four

On November 16, 2017 at approximately 2050 hours, Officer Kay was in uniform preparing for District Four third relief roll call. As roll call was beginning or just prior to roll call beginning, Officer Kay heard, via his police radio, a District Four second relief officer broadcast a foot pursuit with a shot being fired. It was not clear if the officer was actually shot at.

Lieutenant Pettis attempted to gather information and clarify if the officer was shot at or heard a shot.

At no time during roll call and while the shots fired incident was occurring did any officer ask either Lieutenant Pettis or any other supervisor if they could respond on the shots fired incident. Lieutenant Pettis never denied or instructed officers not to respond to the shots fired incident.

On November 24, 2017, at approximately 2100 hours, Officer Kay was in uniform on duty at District Four attending third relief roll call. Lieutenant Pettis addressed the officers at the completion of roll call.

Lieutenant Pettis spoke about the decisions she made during the shots fired incident on November 16, 2017. Lieutenant Pettis stated she did not appreciate officers making comments about her behind her back, and that if officers had concerns they should come speak to her about them. Lieutenant Pettis seemed agitated while speaking to the officers.

Officer Kay remembers Lieutenant Pettis stating something along the lines of "I don't care about your opinion or what you have to say." Officer Kay did not recall Lieutenant Pettis' exact wording, but recalled her continuing to mention her lieutenant bars and how she earned them.

Lieutenant Pettis informed the officers they were several ranks below her, and if they wanted to make decisions they could take the tests to get promoted.

Officer Kay has not observed Lieutenant Pettis treat any officers differently based upon their race or gender.

Officer Kay never heard any comments by either Officer Tamera Brown or Specialist Ludgatis that were disrespectful towards Lieutenant Pettis' race or gender.

On November 26, 2017 Officer Kay was on duty in uniform and attended District Four third relief roll call. Officer Tamera Brown informed third relief officers that Sergeant Hils would be responding to speak with officers. Sergeant Hils arrived after roll call had been dismissed and spoke with several officers in the roll call room.

Officer Kay did not feel he was required to come back and speak with Sergeant Hils, and stated several officers did not return after roll call was dismissed.

Sergeant Hils spoke with officers regarding their concerns with Lieutenant Pettis and the incident surrounding the shots fired on November 16, 2017. Sergeant Hils informed the officers of several options, and that if discipline was taken against Lieutenant Pettis he would defend her as he would any other member of the Fraternal Order of Police Union.

Sergeant Hils mentioned arresting Lieutenant Pettis 25 years ago, before she was hired by the City of Cincinnati. Officer Kay does not recall Sergeant Hils stating he "kicked her ass," and does not recall any specific details Sergeant Hils mentioned regarding the arrest.

Sergeant Hils stated he did not understand how Lieutenant Pettis got promoted with her history, referring to her criminal history.

A recording of roll call from November 22, 2017 was played by an unknown officer for Sergeant Hils. Sergeant Hils informed officers that if they were in a situation that they were uncomfortable with, it was okay to record the conversation.

Officer Kay does not recall Sergeant Hils make any comments about Lieutenant Fern.

Sergeant Hils utilized the term "urban ghetto" while speaking to the officers regarding the areas they patrol. Officer Kay took the term to mean a busy urban area with high violence, and did not think the term referred to any specific race.

Officer Kay stated Sergeant Hils spoke about Lieutenant Pettis because of the comments she made, and it had nothing to do with Lieutenant Pettis' race or gender, and that he often represents members of all races and genders.

Officer Kay was never asked to sign a Form 17 or petition against Lieutenant Pettis by either Officer Tamera Brown or Specialist Ludgatis. Officer Kay stated he was instructed by Officer Tamera Brown not to get involved because he was a probationary police officer.

## Sergeant Daniel Hils, Badge: S77, Fraternal Order of Police Lodge 69

On November 26, 2017, at approximately 2145 hours, Sergeant Dan Hils was off duty in plain clothes, when he responded to District Four at the request of a District Four Third relief officer to discuss officers being "bullied" by their shift commander, and to answer questions officers may have concerning issues on the relief.

Sergeant Hils met with approximately twelve officers inside the District Four roll call room. This informal meeting took place after roll call had ended and officers were free to go as they pleased.

Sergeant Hils spoke with several officers regarding issues concerning Lieutenant Pettis. Sergeant Hils explained that if discipline against Lieutenant Pettis occurred, the Fraternal Order of Police would have to represent Lieutenant Pettis the same as any other member. Sergeant Hils does not recall stating that Lieutenant Pettis will "bitch" or "scream," but did state that she is not afraid to file a complaint based upon race or gender.

After the discussion, Sergeant Hils stated to several District Four officers that he had arrested Lieutenant Pettis 25 years ago. Sergeant Hils stated he did not say he "kicked her ass," referring to Lieutenant Pettis during the arrest, but did state that he had to utilize force to take Lieutenant Pettis into custody.

Sergeant Hils stated he told the officers the story of the arrest and how Lieutenant Pettis did not get appointed to the Police Academy when retired Police Chief Michael Snowden was Police Chief, and only managed to be appointed when retired Police Chief Thomas Streicher became Police Chief.

Sergeant Hils stated he did not have a good reason for telling the story, and was "bull crapping" about something he should not have been speaking about.

Sergeant Hils stated he made these comments after hearing a recording of Lieutenant Pettis addressing subordinates during a roll call. Sergeant Hils was angered and upset by the way Lieutenant Pettis was speaking to the officers, and may have made these comments out of frustration over Lieutenant Pettis' comments.

*Note: The recording Sergeant Hils heard was the recording of District Four third shift roll call from November 22, 2017.*

Sergeant Hils was never forwarded a copy of the recording or given a copy of the recording.

Sergeant Hils explained to the officers not to record supervisors utilizing their issued body worn cameras, but there could be a City of Cincinnati regulation against recording supervisors utilizing any type of electronic device. Sergeant Hils did state that if the officers are being spoken to improperly he could see how officers might want to record it, but to never utilize the body worn cameras to do so.

Sergeant Hils stated he did not instruct officers to violate Department Policy and Procedure.

Sergeant Hils never referred to Lieutenant Pettis as "Teflon" or "Teflon Don."

Sergeant Hils remembers referring to a relief having similar issues involving Lieutenant Fern, but does not remember calling Lieutenant Fern a "drunk;" however, he did confirm that he could have made that statement.

Sergeant Hils explained to the District Four third relief officers that they have to police a tough area. Sergeant Hils stated he did refer to parts of District Four as the "ghetto," but does not remember using the term "urban ghetto;" however, stated he could have used it.

Sergeant Hils intended the term "ghetto" to mean a high crime area with a large volume of service calls. Sergeant Hils never meant this statement to be negative against any minority group.

Sergeant Hils acknowledged that he was upset by the comments made by Lieutenant Pettis, and that he made a bad choice with some of the things he discussed in front of the officers.

The comments Sergeant Hils made regarding Lieutenant Pettis had nothing to do with Lieutenant Pettis' race or gender, and were made because of the way Lieutenant Pettis spoke to people.

Sergeant Hils was not aware that the arrest of Lieutenant Pettis was expunged and sealed by the courts.

Sergeant Hils failed to identify what officer contacted him asking him to speak with District Four third relief regarding concerns with Lieutenant Pettis. Sergeant Hils also failed to identify what District Four officers were present when he spoke on November 26, 2017 at District Four. Sergeant Hils also failed to identify the officer who played the recording of the roll call from November 22, 2017.

Note:   Sergeant Hils refused to answer these questions, stating he was protected from identifying officers that were possible whistleblowers against supervisors, and based on his status as the FOP President and that these issues concerned union matters.

**Additional Interviews:**

Note:   The following interviews are related to the recording of District Four third relief roll call on November 22, 2017, and the dissemination of the recording to individuals outside of the Cincinnati Police Department that was uncovered during the course of this investigation.

## Sergeant Jay Kemme, Badge: S304, District Four

On November 23, 2017, at approximately 0600 hours, Sergeant Kemme arrived at District Four. Sergeant Kemme was made aware of a recording of District Four third shift roll call from November 22, 2017, where Lieutenant Pettis addressed roll call.

Sergeant Kemme was sent a copy of the recording via cellular text message to his personal cellular telephone by Officer Defranco. Sergeant Kemme believed Officer Defranco sent it to him because Sergeant Kemme was a former supervisor of Officer Defranco.

Sergeant Kemme made a copy of the recording to a compact disc to give to Captain Mack. Sergeant Kemme left the copy of the recording on his desk and left the District for several hours to attend to matters in the field. When Sergeant Kemme returned, he stated several unknown officers had listened to the recording and was informed by an unknown officer that several unknown officers had made a copy of the recording.

Sergeant Kemme was contacted by Police Officer Brian Follrod, Badge: P124, District Four Violent Crimes Squad, who stated he wished to hear the recording. Sergeant Kemme forwarded the recording to Officer Follrod via either text message or email.

Sergeant Kemme was also contacted by Mr. Jeff Schare, who informed Sergeant Kemme he was interested in hearing a recording of the roll call and heard that Sergeant Kemme had a copy of it. Sergeant Kemme forwarded the recording to Mr. Schare via either text message or email. Sergeant Kemme stated he used to work with Mr. Schare and saw no harm in forwarding him a recording of the roll call.

Note: Mr. Jeff Schare was employed with the City of Cincinnati as a police officer from September 15, 1991 to October 16, 2016. Mr. Schare is currently employed as a private investigator for Schare Investigative Services.

When Sergeant Kemme forwarded the recording to Mr. Schare, Sergeant Kemme was not aware that Mr. Schare was a private investigator.

Sergeant Kemme stated that besides Officer Follrod and Mr. Schare, he did not forward the recording to anybody else. After 30 days the recording was automatically deleted from his cellular telephone.

The location of the compact disc of the recording created by Sergeant Kemme is unknown, but Sergeant Kemme believes that it was destroyed.

## Police Officer Brian Follrod, Badge: P124, District Four Violent Crimes Squad

On November 23, 2017, Police Officer Brian Follrod was on duty in uniform inside District Four police station, when he had a brief conversation with Sergeant Kemme in the hallway.

Sergeant Kemme asked Officer Follrod if he was aware of an incident that occurred during the third shift roll call on November 22, 2017. Officer Follrod stated he was not aware of any incident. Sergeant Kemme stated he had a recording of the roll call and would forward it to Officer Follrod to listen to.

Sergeant Kemme forwarded the recording of the roll call to Officer Follrod via his personal cellular telephone.

Officer Follrod listened to the recording with his partner, Police Officer Nicolas Casch, Badge: P164, District Four. Officer Follrod never played the recording for anybody else, nor did he copy the recording or forward it to anybody.

## Sergeant Ron Hale, Badge: S67, Patrol Bureau

On November 22, 2017, Sergeant Hale was in uniform working an off duty extension of police services detail in the area of University of Cincinnati, assigned to their robbery prevention detail.

Sergeant Hale was on a directed patrol when he was approached by Officer Defranco. Officer Defranco played a recording of District Four third relief roll call that occurred earlier in the evening, specifically the parts concerning Lieutenant Pettis addressing the third relief officers.

Officer Defranco forwarded a copy of the recording to Sergeant Hale's personal cellular phone via a text message. Sergeant Hale stated he did not listen to the entire recording and deleted the message that evening.

Sergeant Hale did not make any copies of the recording and did not forward the recording to any individuals.

## Police Officer Eddie Hawkins, Badge: P905, Youth Services Section

Officer Eddie Hawkins stated on an unknown date and time, he was provided several documents related to Internal Investigations Section Case #17160. Specifically Officer Hawkins was provided with the Form 17 authored by Lieutenant Pettis and the Form 17 authored by Sergeant O'Malley. Officer Hawkins was given these forms by Lieutenant Pettis.

Officer Hawkins was the President of the Sentinel Police Association and was assisting Lieutenant Pettis with an allegation of mistreatment by Sergeant Hils.

Officer Hawkins stated the he and Lieutenant Pettis met with Lieutenant Colonel Neudigate, City Manager Harry Black, and Chief Isaac. He provided each of the participants with copies of the Form 17's authored by Lieutenant Pettis and Sergeant O'Malley.

Officer Hawkins stated on an unknown date and time he was contacted by Lieutenant Pettis and sent a copy of a Form 17, authored by Lieutenant Colonel Dave Bailey, Badge: LTC03, Administration Bureau. Lieutenant Pettis stated she was provided with the form by Ms. Jennifer Baker, a news reporter for FOX19. Ms. Baker would not disclose how she obtained a copy of the Form 17 to Lieutenant Pettis or Officer Hawkins.

Officer Hawkins stated that he distributed copies of the Form 17's authored by Lieutenant Pettis and Sergeant O'Malley to members of the Sentinel Police Association after the forms were released to the media to provide transparency for their members and to avoid misinformation.

Officer Hawkins stated he never distributed any material, including the Form 17 authored by Lieutenant Colonel Bailey, to anybody outside the investigative chain.

Officer Hawkins stated he was not aware of any individuals releasing information to anybody outside the investigative chain.

**Additional Information:**

IIS reviewed the Form 17, Interdepartmental Correspondence Sheet, authored by Sergeant Daniel K. O'Malley, titled *"Statements Witnessed,"* dated November 28, 2017. The Form 17 described several statements made by Sergeant Hils regarding Lieutenant Pettis.

IIS reviewed the Form 17, Interdepartmental Correspondence Sheet, authored by Specialist Joy Ludgatis, titled *"Hostile Work Environment,"* dated November 28, 2017. The Form 17 detailed District Four roll calls that occurred on November 22, 2017 and November 24, 2017, specifically statements made by Lieutenant Pettis towards Specialist Ludgatis.

IIS reviewed the Form 17, Interdepartmental Correspondence Sheet, authored by Officer Tamera Brown, titled "*Hostile Work Environment,*" dated November 26, 2017. The Form 17 detailed District Four roll call on November 24, 2017 and Lieutenant Pettis' actions surrounding a shots fired incident that occurred on November 16, 2017.

IIS reviewed the Form 17, Interdepartmental Correspondence Sheet, authored by Officer Tamera Brown, titled "*Hostile Work Environment,*" dated November 26, 2017. The Form 17 was authored on the behalf of District Four third relief, and requested a conference with Captain Mack concerning the treatment of officers by Lieutenant Pettis.

IIS reviewed the Form 17, Interdepartmental Correspondence Sheet, authored by Lieutenant Danita Pettis, titled "*Request for Internal Investigation: Police Sergeant Dan Hils,*" dated November 28, 2017. The Form 17 detailed comments regarding Lieutenant Pettis made by Sergeant Dan Hils on November 26, 2017 to several third relief officers.

IIS reviewed the Form 17, Interdepartmental Correspondence Sheet, authored by Lieutenant Colonel David Bailey, titled "*Internal Investigations Section Case #17160,*" dated December 2, 2017. The Form 17 summarizes the allegations of the complaints made by Lieutenant Pettis, Specialist Ludgatis, and Officer Tamera Brown, and recommends transfer of those individuals.

IIS reviewed a digital recording of District Four third relief roll call from November 22, 2017. The recording was created by Officer Thomas Defranco. The recording detailed the interaction between Lieutenant Pettis and Specialist Ludgatis.

IIS reviewed the Computer Aided Dispatch report for incident number CPD171116001580 from November 16, 2017, along with all related radio broadcasts.

**Conclusion:**

Lieutenant Pettis alleged that on November 21, 2017, Specialist Ludgatis made comments to Captain Swingley that were insubordinate and were meant to undermine Lieutenant Pettis' authority. Lieutenant Pettis also alleged that on November 22, 2017 Specialist Ludgatis was very disrespectful and insubordinate to Lieutenant Pettis, challenging Lieutenant Pettis in front of subordinate officers.

On November 21, 2017, at approximately 2100 hours, Captain Swingley attended roll call at District Four to discuss an incident that occurred on November 16, 2017 concerning possible shots fired at officers.

After Captain Swingley finished speaking about the incident he asked if there were any questions or comments concerning the incident.

Specialist Ludgatis stated she believed that her relief should have responded to the shooting from roll call and believed that her supervisor's conducted roll call as usual, and did not send officers to assist with the shot fired incident.

Specialist Ludgatis was concerned and felt that officers should have been sent to assist her fellow officers.

Specialist Ludgatis did not single Lieutenant Pettis out in front of fellow District Four officers and only mentioned Lieutenant Pettis by name when Specialist Ludgatis spoke privately with Captain Swingley upon completion of roll call.

At no time while Specialist Ludgatis was speaking to Captain Swingley either during roll call or privately after roll call did Captain Swingley or any officer present believe Specialist Ludgatis was undermining Lieutenant Pettis' authority or being insubordinate to Lieutenant Pettis.

On November 22, 2017 Lieutenant Pettis was on duty in uniform conducting third relief roll call. At the end of roll call Lieutenant Pettis addressed the comments made by Specialist Ludgatis to Captain Swingley.

Lieutenant Pettis admitted that while other District Four third relief officers were present, she spoke directly to Specialist Ludgatis. Lieutenant Pettis asked Specialist Ludgatis if she had an issue with Lieutenant Pettis and the shots fired incident. Specialist Ludgatis stated she did, and gave her account of what occurred during roll call on November 16, 2017.

Lieutenant Pettis challenged Specialist Ludgatis' account of the incident and felt that Specialist Ludgatis was very disrespectful and insubordinate challenging her, and was attempting to undermine her authority as relief commander.

Sergeant Phillips stated Specialist Ludgatis hardly spoke while Lieutenant Pettis was speaking to her and was not disrespectful towards Lieutenant Pettis. Sergeant Phillips stated Specialist Ludgatis had a smirk on her face and did not immediately answer Lieutenant Pettis when asked a question, but never said anything disrespectful to her.

At no time did Sergeant Reynolds observe Specialist Ludgatis say or do anything to undermine Lieutenant Pettis' authority as the relief lieutenant.

Several officers that were present stated Specialist Ludgatis only made statements when addressed by Lieutenant Pettis. When Specialist Ludgatis attempted to speak, Lieutenant Pettis told Specialist Ludgatis to "be quiet" several times and interrupted her by stating "and?" several times.

All the officers present stated Specialist Ludgatis spoke very little and did not say anything unprofessional or disrespectful towards Lieutenant Pettis, and that Specialist Ludgatis did not say anything that undermined Lieutenant Pettis' authority as relief commander.

Based on the IIS investigation, IIS recommends this portion of the investigation be closed, **EXONERATED**. *approved E/cf*

Lieutenant Pettis alleged that on November 24, 2017, Specialist Ludgatis and Officer Tamera Brown attempted to pressure third relief officers, specifically Officer William Keuper and Officer Elizabeth McNay, to sign a petition against Lieutenant Pettis, which undermined Lieutenant Pettis' authority as a relief commander. Lieutenant Pettis alleged these actions by Specialist Ludgatis and Officer Tamera Brown created a hostile work environment.

On November 26, 2017, Sergeant Hils spoke to District Four third relief officers regarding treatment by Lieutenant Pettis. Sergeant Hils gave the officers examples of what they could do regarding the situation with Lieutenant Pettis, but he could not tell them directly what to do because Lieutenant Pettis is a member of the Fraternal Order of Police Lodge 69, and he has a duty to defend her like any other member.

Sergeant Hils gave an example of officers in another district that wrote a Form 17 addressing concerns regarding safety issues on their relief, and that each officer signed it to show unity and invoke change.

Officer Tamera Brown authored a Form 17 on the behalf of third relief officers. The goal of the Form 17 was to have a meeting with Captain Mack to discuss issues affecting the relief, and was not meant to be insubordinate or undermine Lieutenant Pettis. The Form 17 was based upon Lieutenant Pettis' actions and not based upon Lieutenant Pettis' race or gender.

Officer Tamera Brown informed several officers that the Form 17 was at the front desk for third relief officers to sign if they chose.

Officer Tamera Brown never harassed, threatened, pressured, or coerced Officer Kueper, Officer McNay, or any other officer to sign the Form 17. Officer Brown sent the Form 17 via email to Captain Mack, Lieutenant Colonel Neudigate, Sergeant Hils, and Chief Isaac. Officer Tamera Brown is unsure what happened to the Form 17 with the officers signatures on it.

Specialist Ludgatis never harassed, threatened, pressured, or coerced Officer Kueper, Officer McNay, or any other officer to sign the Form 17, and stated she instructed some of the newer officers to not sign the Form 17 or get involved. Specialist Ludgatis advised the newer officers to let the senior officers address the issues with Lieutenant Pettis.

Officer Kueper was shown the Form 17 by Officer Brown and Specialist Ludgatis. Officer Kueper did not read the Form 17, and when asked to initial the Form 17 by Officer Brown and Specialist Ludgatis, Officer Kueper declined. Officer Tamera Brown and Specialist Ludgatis each asked Officer Kueper once to sign the Form 17. Officer Kueper believes either Officer Tamera Brown or Specialist Ludgatis asked one additional time. Officer Kueper informed them he did not wish to get involved and declined to sign the Form 17. Officer Kueper never felt harassed, threatened, pressured, or coerced into signing the Form 17 by either Specialist Ludgatis or Officer Tamera Brown.

Officer McNay was asked by Specialist Ludgatis to sign a Form 17. Officer McNay did not read the form and was not sure what it stated. Officer McNay believes the form was related to incidents that occurred while Officer McNay was on a scheduled off day. Officer McNay was asked only once to sign the form by Specialist Ludgatis. Officer McNay never felt harassed, threatened, pressured, or coerced into signing the Form 17.

The majority of District Four third relief officers were not approached by Specialist Ludgatis and Officer Tamera Brown and asked to sign the Form 17. Those officers that were approached and asked to sign the Form 17 stated they never felt harassed, threatened, pressured, or coerced into signing the Form 17. Officer Gottman and Officer Kay stated they were informed by Officer Tamera Brown and Specialist Ludgatis not to sign the Form 17, and to let the veteran officers address the issues.

Based on the IIS investigation, IIS recommends this portion of the investigation be closed, **EXONERATED.** approved ph

Officer Tamera Brown alleged that on November 16, 2017, Lieutenant Pettis created a hostile work environment by her lack of action related to a shots fired incident in which Lieutenant Pettis did not send third relief officers to assist second relief officers after an officer was shot at.

On November 16, 2017, Lieutenant Pettis was on duty in uniform preparing for third shift roll call. Prior to the start of roll call Lieutenant Pettis heard, via her police radio, a shots fired run involving District Four second shift officers.

There was no "officer needs assistance" broadcasted, and some confusion as to whether the officer was shot at or if the officer heard a shot.

Captain Swingley, two second shift District Four supervisors, and multiple Cincinnati Police Officers responded the scene of the shots fired run. Captain Swingley identified himself as the incident commander and began coordinating resources.

Prior to and during roll call, Lieutenant Pettis attempted several times to have the officers on scene clarify if shots were fired at police. No clear answer was given by the officers involved. It was not until a canine arrived on scene several minutes later that the officers clarified that they were shot at.

Upon confirming that officers were shot at, Lieutenant Pettis advised Emergency Communications Section to implement situational notifications. Captain Swingley instructed Lieutenant Pettis to stand down, and that he would be handling the incident.

Lieutenant Pettis conducted the roll call as normal, and at the end of roll call asked officers if they had anything to add.

At no time before, during, or after roll call did any officer ask to respond to the shots fired run or did Lieutenant Pettis prevent anybody from going to the run.

Based on the IIS investigation, IIS recommends this portion of the investigation be closed,
**EXONERATED.** *approved/sl*

Specialist Ludgatis alleged that on November 22, 2017, and November 24, 2017, Lieutenant
Pettis created a hostile work environment by making humiliating, demeaning, and
unprofessional comments about Specialist Ludgatis in front of fellow officers.

On November 22, 2017 Lieutenant Pettis was on duty in uniform, and conducted third relief
roll call. At the end of roll call Lieutenant Pettis addressed the officers in the roll call.
Lieutenant Pettis addressed the officers concerning the shots fired run on November 16, 2017.

Lieutenant Pettis explained the shots fired incident, then personally singled Specialist Ludgatis
out in front of her fellow third relief officers. Lieutenant Pettis admitted that although other
District Four third relief officers were present, she was speaking directly to Specialist Ludgatis.

Lieutenant Pettis asked Specialist Ludgatis if she had an issue with Lieutenant Pettis and the
shots fired incident on November 16, 2017. Specialist Ludgatis stated she did and gave her
account of what occurred during roll call on November 16, 2017.

Lieutenant Pettis told Specialist Ludgatis several times to "be quiet" and told Specialist
Ludgatis that Lieutenant Pettis "could give two craps about what you think."

Lieutenant Pettis told Specialist Ludgatis several times to be quiet because Lieutenant Pettis
believed Specialist Ludgatis was trying to interrupt her, and made the statement "I don't care
what you think" under her breath.

Lieutenant Pettis stated to Specialist Ludgatis that she "sit on the desk every night, you don't
cover nobody." Specialist Ludgatis felt belittled and humiliated by these comments, and the
way Lieutenant Pettis spoke to her in front of other officers.

Specialist Ludgatis felt she was singled out by Lieutenant Pettis because of the history
between the two of them, stemming from a complaint filed by Lieutenant Pettis against
Specialist Ludgatis in February 2015. Furthermore, Specialist Ludgatis felt Lieutenant Pettis
singled her out because of Specialist Ludgatis' race and gender.

Specialist Ludgatis stated Lieutenant Pettis attempted to make an incident in 2015 a race
issue and believes this is race-related as well, and that Lieutenant Pettis would not have
spoken to her the way she did if Specialist Ludgatis was not a white female. Specialist
Ludgatis did not elaborate on what made her believe this.

Note: *IIS reviewed lineups for District Four third relief, which show that Specialist
Ludgatis is not the only white female assigned to the relief, and was not the
only white female present for roll call on November 22, 2017.*

Lieutenant Pettis stated she singled Specialist Ludgatis out because of the comments
Specialist Ludgatis made about her to Captain Swingley on November 21, 2017. Lieutenant
Pettis did not single Specialist Ludgatis out because of her race or gender.

Case: 1:18-cv-00412-MWM-KLL Doc #: 23 Filed: 02/04/19 Page: 110 of 157 PAGEID #: 406

On November 24, 2017, Lieutenant Pettis was on duty in uniform conducting third relief roll call. At the end of roll call Lieutenant Pettis spoke to the officers and Mr. Bill Tucker, a civilian rider, who was present during the roll call. She addressed the relief to explain what was stated during roll call on November 22, 2017 and the incident on November 16, 2017.

Lieutenant Pettis informed the officers that "everybody in this room besides the sergeant and the civilian rider were two ranks below" her. Lieutenant Pettis also stated that she "did not care if you have 28 years, 28 days or 128 years on," that until the officers get promoted they have "no skin in the game."

Lieutenant Pettis also stated to the officers that she didn't "care about your opinion and I don't care what you have to say."

Sergeant Lynn was the sergeant present in the room with Lieutenant Pettis, and believed the comments were very demeaning and berating to the officers.

Mr. Tucker, the civilian rider, believed the comments made by Lieutenant Pettis were unprofessional and very demeaning towards the officers.

Several of the third relief officers present felt these comments were demeaning towards them. Lieutenant Pettis was transferred to District Four in April 2017. Specialist Ludgatis has never observed Lieutenant Pettis treat officers differently based upon their race or gender, and prior to November 22, 2017 they had no issues and were professional towards each other while assigned to District Four.

Internal Investigations Section interviewed four sergeants and 23 police officers assigned to District Four third relief under the supervision of Lieutenant Pettis. None of the sergeants or officers observed Lieutenant Pettis treat officers differently based upon their race or gender.

Lieutenant Pettis' comments to Specialist Ludgatis and the District Four third relief officers are in violation of Rule 1.06A and 1.03 of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Department, which states:

1.06    A. Members of the department shall always be civil, orderly, and courteous in dealing with the public, subordinates, superiors and associates.

and:

1.03    Members shall exercise the responsibility and authority of the position to which they are assigned in accordance with Department Position Classification/Job Description, Civil Service Classification Specifications, and work rules.

To wit:

City of Cincinnati Administrative Regulation 55, Workplace Behavior Policy

●    Employees are required to conduct themselves in a professional manner at all times. Professional behavior is defined as courteous and respectful treatment. Examples of unprofessional behavior include making disparaging remarks about another.

Based on the IIS investigation, IIS recommends this portion of the investigation against Lieutenant Pettis be closed, SUSTAINED. *approved ℰ/ℋ*

On December 6, 2017, Lieutenant Pettis was ordered by Colonel Eliot K. Isaac, Police Chief, not to go on any radio station regarding the ongoing investigation concerning her hostile work environment complaint. Approximately fifteen minutes after this order was issued, Lieutenant Pettis went on channel 1230 AM, WDBZ, with radio host Lincoln Ware concerning the ongoing investigation.

Lieutenant Pettis' actions are violation of Rule 4.01 of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Department, which states:

4.01    Members of the Department shall promptly obey the legitimate orders of a superior officers and other members acting in a supervisory capacity.

Based on the IIS investigation, IIS recommends this portion of the investigation be closed, SUSTAINED-OTHER. *approved Cℋℒ*

Lieutenant Pettis alleged that on November 26, 2017, Sergeant Hils created a hostile work environment by addressing District Four third relief officers during roll call. While addressing third relief officers, Sergeant Hils revealed information from Lieutenant Pettis' past criminal history and defamed Lieutenant Pettis' character, which undermined Lieutenant Pettis' authority as a relief commander.

On November 26, 2017, at approximately 2145 hours, Sergeant Hils was off duty in plain clothes when he responded to District Four. Sergeant Hils was contacted by Specialist Ludgatis about concerns with improper treatment by Lieutenant Pettis and was seeking advice as to how to properly address these concerns.

Sergeant Hils explained to the officers several remedies regarding their concerns with Lieutenant Pettis. Sergeant Hils explained repeatedly to the officers that if any type of discipline action were taken against Lieutenant Pettis that he, as Fraternal Order of Police Lodge 69 President, would represent Lieutenant Pettis same as any other member of the union.

While speaking with the officers, Sergeant Hils informed them that prior to Lieutenant Pettis becoming a Cincinnati Police Officer he had arrested her. Sergeant Hils detailed the arrest, informing officers that he had to use force and had to "kick her ass" in order to take Lieutenant Pettis into custody.

Sergeant Hils stated to the officers that Lieutenant Pettis was only able to get appointed to the Police Academy when Police Chief Michael Snowden retired and Police Chief Thomas Streicher became chief. Sergeant Hils further stated that Lieutenant Pettis "managed to work her way up and become a lieutenant because she will kick, scream, bitch and yell it was race, sexism, or whatever."

The recording of District Four third relief roll call from November 22, 2017, with the interaction between Lieutenant Pettis and Specialist Ludgatis, was played for Sergeant Hils.

Sergeant Hils explained to the officers to not record supervisors utilizing their issued body worn cameras, but there could be a City of Cincinnati regulation against recording supervisors utilizing any type of electronic device.

Sergeant Hils did state that if the officers are being spoken to improperly he could see how officers might want to record it, but to never utilize the body worn cameras to do so.

Sergeant Hils informed the officers of a similar situation involving Lieutenant Fern, specifically how Lieutenant Fern was treating his subordinates. Sergeant Hils referred to Lieutenant Fern as a "drunk."

Sergeant Hils was explaining to officers the tough job they have to do providing services to the community, and they should not have to deal with being spoken to the way Lieutenant Pettis spoke to Specialist Ludgatis. While speaking about the community Sergeant Hils referred to the community as an "urban ghetto."

Lieutenant Pettis believes Sergeant Hils' comments against her were based on her race, because while speaking to District Four third relief Sergeant Hils referred to the community of Avondale as an "urban ghetto" and referred to Lieutenant Pettis as a "Teflon Don." Lieutenant Pettis' believes being called a "Teflon Don" and referring to Avondale, the neighborhood where Lieutenant Pettis was from, as an "urban ghetto" refers to her as a criminal based upon Lt. Pettis' race.

Sergeant Hils never referred to Lieutenant Pettis as "Teflon" or "Teflon Don." Sergeant Hils did refer to parts of District four as the "ghetto," but does not remember using the term "urban ghetto;" however, stated he could have used it.

Sergeant Hils intended the term "ghetto" or "urban ghetto" to mean a high crime area with a large volume of service calls. Sergeant Hils never meant the statement to be negative against any minority group.

Sergeant Hils' comments regarding Lieutenant Pettis' past criminal history are in violation of Rule 1.07 of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Department, which states:

1.07    Members shall not exhibit or divulge the contents of any criminal record to any person except in the conduct of Department functions or in accordance with the provisions of law.

In addition, Sergeant Hils' comments regarding Lieutenant Pettis are in violation of Rule 1.03 of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Department, which states:

1.03    Members shall exercise the responsibility and authority of the position to which they are assigned in accordance with Department Position Classification/Job Description, Civil Service Classification Specifications, and work rules.

To wit:

City of Cincinnati Administrative Regulation 55, Workplace Behavior Policy

* Employees are required to conduct themselves in a professional manner at all times. Professional behavior is defined as courteous and respectful treatment. Examples of unprofessional behavior include making disparaging remarks about another.

Based on the IIS investigation, IIS recommends this portion of the investigation against Sergeant Hils be closed, **SUSTAINED.** *approved epf*

On December 7, 2017 at 2130 hours, Lieutenant Pettis failed to appear for her scheduled interview with IIS. Lieutenant Pettis failed to notify IIS or District Four supervision that she would not be in attendance. IIS personnel made several attempts to contact Lieutenant Pettis via her cellular phone, to no avail, and through on-duty District Four supervision, who indicated they had not spoken to Lieutenant Pettis. At 2330 hours, all IIS personnel terminated their attempts and secured. A total of $802.81 was charged to the City in overtime costs for IIS personnel from 2100-2330 hours.

Lieutenant Pettis' actions are in violation or Rule 3.01 A. of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Department, which states:

3.01 A. Members shall report for duty at the time and place required by assignment or orders and shall be neatly and properly groomed, as well as physically and mentally fit to perform their duties. They shall be properly equipped and cognizant of information required for the proper performance of duty so that they may immediately assume their duties.

Based on the IIS investigation, IIS recommends this portion of the investigation be closed, **SUSTAINED-OTHER.** *approved epf*

On December 7, 2017 at 2200 hours, Sergeant O'Malley failed to appear for his scheduled interview with IIS. Sergeant O'Malley failed to notify IIS or District Four supervision that he would not be in attendance. IIS personnel made several attempts to contact Sergeant O'Malley via his cellular phone, to no avail, and through on-duty District Four supervision. At 2330 hours, all IIS personnel terminated their attempts and secured. A total of $802.81 was charged to the City in overtime costs for IIS personnel from 2100-2330 hours.

Sergeant O'Malley's actions are in violation or Rule 3.01 A. of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Department, which states:

3.01 A. Members shall report for duty at the time and place required by assignment or orders and shall be neatly and properly groomed, as well as physically and mentally fit to perform their duties. They shall be properly equipped and cognizant of information required for the proper performance of duty so that they may immediately assume their duties.

Based on the IIS investigation, IIS recommends this portion of the investigation be closed, **SUSTAINED-OTHER.** *approved epf*

On November 22, 2017, at approximately 2100 hours, Officer Thomas Defranco, was on duty in uniform and attended District four third relief roll call.

Officer Defranco recorded the roll call utilizing his personal cell phone. Officer Defranco explained this was the only time he recorded a roll call.

Officer Defranco stated he recorded the roll call due to the fact that in the past, when Lieutenant Pettis addressed roll call she was demeaning towards the officers and made officers feel "worthless" on several occasions.

Officer Defranco's actions are in violation of Rule 1.03 of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Department, which states:

1.03    Members shall exercise the responsibility and authority of the position to which they are assigned in accordance with Department Position Classification/Job Description, Civil Service Classification Specifications, and work rules.

To wit:

City of Cincinnati Human Resource Policy Manual Rule 2.17, Recording Devices:

2.17    Employees are not permitted to create audio or video recordings of proceedings, but not limited to, conversations, meetings, and conferences without the express prior approval from the Human Resource Director or all the parties present at the time. Employees are also prohibited from this practice in the field and at locations where they perform their employment duties.

Based on the IIS investigation, IIS recommends this portion of the investigation be closed, **SUSTAINED-OTHER.** *approved C/st*

On November 27, 2017 Officer Brown approached Sergeant Phillips and asked to address roll call regarding Captain Mack wishing to speak with District Four third relief officers. Officer Brown informed the officers that Captain Mack was addressing issues regarding the supervision of third relief by Lieutenant Pettis. Officer Brown explained what issues she was going to address with the Captain and informed officers to speak to the Captain so that the relief's concerns were heard.

Sergeant Phillips played a recording of Officer Brown addressing roll call on November 27, 2017 that she recorded utilizing her personal cellular phone. Sergeant Phillips stated she recorded the comments made by Officer Brown because Sergeant Phillips wanted to have a record of what Officer Brown was saying.

Sergeant Phillips' actions are in violation of Rule 1.03 of the Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Department, which states:

1.03    Members shall exercise the responsibility and authority of the position to which they are assigned in accordance with Department Position Classification/Job Description, Civil Service Classification Specifications, and work rules.

To wit:

City of Cincinnati Human Resource Policy Manual Rule 2.17, Recording Devices:

2.17    Employees are not permitted to create audio or video recordings of proceedings, but
        not limited to, conversations, meetings, and conferences without the express prior
        approval from the Human Resource Director or all the parties present at the time.
        Employees are also prohibited from this practice in the field and at locations where
        they perform their employment duties.

Based on the IIS investigation, IIS recommends this portion of the investigation be closed,
**SUSTAINED-OTHER.** ~approved~

On November 23, 2017, at approximately 0600 hours, Sergeant Kemme arrived at District
Four. Sergeant Kemme was made aware of a recording of roll call from November 22, 2017
of District Four third shift where Lieutenant Pettis addressed roll call. Sergeant Kemme was
sent a copy of the recording via cellular text message to his personal cellular telephone by
Officer Defranco.

Sergeant Kemme was contacted by Mr. Jeff Schare, who informed Sergeant Kemme he was
interested in hearing a recording of the roll call, and heard that Sergeant Kemme had a copy
of it. Sergeant Kemme forwarded the recording to Mr. Schare via either text message or
email. Sergeant Kemme stated he used to work with Mr. Schare when he was employed with
the City of Cincinnati Police Department and was not aware that Mr. Schare was a private
investigator.

Sergeant Kemme's actions are violation of Rule 1.08 of the Manual of Rules and Regulations
and Disciplinary Process for the Cincinnati Police Department, which states:

1.08    Members shall treat official Department business as confidential and shall not
        disclose information concerning department activities when such disclosure would
        hinder the accomplishment of police objectives.

Based on the IIS investigation, IIS recommends this portion of the investigation be closed,
**SUSTAINED-OTHER.** ~approved~

KAW/mjv

## SECTION FIFTEEN - DISCIPLINARY TABLE
**Lieutenant Danita Pettis, District Three**

A    Any Corrective Measure Outline in Rule 9.26, Section A.
B    Written Reprimand
C    Hearing (1-5 days suspension)
D    Hearing (5-7 days suspension)
E    Hearing (7-11 days suspension)
F    Hearing (11 days suspension or more, demotion, or dism
G    Hearing (dismissal)
H    Hearing (suspension without pay)
All time lengths for repeated conduct are based
on a 36-month period unless otherwise stated.

| Failure of Good Behavior | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.01a | A | A | B | C |
| 1.01b | A | B | C | D |
| 1.01c | B | C | D | E |
| 1.01d | C | D | E | F |
| 1.01e | D | E | F | G |
| 1.01f | E | F | G | |
| 1.01g | F | G | | |
| 1.02a (three years) | A/B | B | C | D |
| 1.02b (three years) 3rd/4th | C | D | F | G |
| 1.02b (three years) 1st/2nd | D | E | F | G |
| 1.02b (three years) theft | F | G | | |
| 1.02c (three years) felony | F | G | | |
| 1.02c felony-violation of | G | | | |
| 1.02d felony traffic/criminal | H | | | |
| 1.03 | B | C | D | F |
| 1.04 | A | A/B | B | C |
| 1.05 (negligent | A | B | C | D |
| 1.05 (intentional | D | F | G | |
| 1.06a | A | A | B | C |
| 1.06b | A | B | C | D |
| 1.06c | B | C | D | F |
| 1.06d | D | E | F | |
| 1.07 | B | F | G | |
| 1.08 | B | D | F | G |
| 1.09 | A | B | C | D |
| 1.10a | A | B | C | D |
| 1.10b | B | C | D | F |
| 1.10c | B | D | F | G |
| 1.10d | B | D | F | G |
| 1.11 | A | B | C | D |
| 1.12 | A | B | C | D |
| 1.13 | B | C | D | F |
| 1.13a | F | G | | |
| 1.14 | B | C | D | F |
| 1.15a | A | B | C | D |
| 1.15b | B | C | D | F |
| 1.16a | B | D | F | G |
| 1.16b | B | C | D | F |
| 1.16c | B | C | D | F |
| 1.16d | A | B | C | D |
| 1.17a | C | D | F | G |
| 1.17b | B | C | D | F |
| 1.18 | A | B | C | D |
| 1.19 | E | F | G | |
| 1.20a | A | A | B | C |
| 1.20b | A | A | B | C |
| 1.21 | B | C | D | F |
| 1.22a (verbal abuse) | A | B | C | D |
| 1.22b (physical abuse) | C | D | F | G |
| 1.23a | E | F | G | |
| 1.23b | E | F | G | |
| 1.23c | D | E | G | |
| 1.24 | C | D | F | G |
| 1.25a | B | C | D | F |
| 1.25b | A | B | C | D |
| 1.25c | A | B | C | D |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.26 | A | A | B | C |
| 1.27 | A | A | B | C |
| 1.28 | B | C | D | F |
| 1.29 | A/B | B | C | D |
| 1.3 | C | D | F | G |
| 1.31 | B | C | D | F |
| 1.32 | C | D | F | G |
| 1.33 | A | B | C | D |
| **Section Two - Neglect of** | 1st | 2nd | 3rd | 4th |
| 2.01 | A | B | C | D |
| 2.02 | A | B | C | D |
| 2.03a | A | B | C | D |
| 2.03b | C | D | E | F |
| 2.04 | A/B | B | C | D |
| 2.05 | A | B | C | D |
| 2.06 | A | B | C | D |
| 2.07 | B | C | D | F |
| 2.08 | A/B | B | C | D |
| 2.09 | A/B | B | C | D |
| 2.10 | A/B | B | C | D |
| 2.11 | A/B | B | C | D |
| 2.12 | B | C | D | F |
| 2.13 | B | C | D | F |
| 2.14 | A/B | B | C | D |
| 2.15 | A/B | B | C | D |
| 2.16 | A/B | B | C | D |
| 2.17 | A/B | B | C | D |
| 2.26a | F | G | | |
| 2.26b | F | G | | |
| **Section Three - Attendance** | 1st | 2nd | 3rd | 4th |
| 3.01a | A | A/B | B | C |
| 3.01b | A | A/B | B | C |
| 3.01c | A | A/B | B | C |
| 3.01d | A | A/B | B | C |
| 3.01e | A | A/B | B | C |
| 3.02 | B | C | D | F |
| 3.03 | A/B | B | C | D |
| 3.04 (one year) | A | A | B | C |
| **Section Four -** | 1st | 2nd | 3rd | 4th |
| 4.01 (non-serious) | A/B | B | C | D |
| 4.01 (serious) | C | D | F | G |
| 4.02 | A | B | C | D |
| 4.03 | A/B | B | C | D |
| 4.04 | A | A | B | C |
| 4.05 | F | G | | |
| 4.06 | F | G | | |
| **Section Five - Dishonesty** | 1st | 2nd | 3rd | 4th |
| 5.01 | F | G | | |
| 5.02 | B | C | D | F |
| **Section Six -Substance** | 1st | 2nd | 3rd | 4th |
| 6.01 | C | D | F | G |
| 6.02a | F | G | | |
| 6.02b | D | F | G | |
| 6.03 | B | C | F | G |
| 6.04 | B | C | D | F |
| **Section Seven - Care of** | 1st | 2nd | 3rd | 4th |
| 7.01 | A/B | B | C | D |
| 7.02 (category 1 accidents) | per | curren | guideli | |
| 7.02 (category 2 accidents) | per | curren | guideli | |
| 7.03 | A | A/B | B | C |
| 7.04 | A | B | C | D |
| 7.05 | A | A/B | B | C |
| 7.06 | B | C | D | E |
| 7.07 | B | C | D | F |
| **Section Eight - Uniforms** | 1st | 2nd | 3rd | 4th |
| 8.01 | A | A/B | B | C |
| 8.02a | A | A/B | B | C |
| 8.02b | A | A/B | B | C |
| 8.03 | A | A/B | B | C |
| 8.04a | A | A/B | B | C |
| 8.04b | A | A/B | B | C |

## SECTION FIFTEEN - DISCIPLINARY TABLE
**Sergeant Dan Hils, Chiefs Office**

A — Any Corrective Measure Outline in Rule 9.26, Section A.
B — Written Reprimand
C — Hearing (1-5 days suspension)
D — Hearing (5-7 days suspension)
E — Hearing (7-11 days suspension)
F — Hearing (11 days suspension or more, demotion, or dism
G — Hearing (dismissal)
H — Hearing (suspension without pay)
All time lengths for repeated conduct are based
on a 36-month period unless otherwise stated.

| Failure of Good Behavior | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.01a | A | A | B | C |
| 1.01b | A | B | C | D |
| 1.01c | B | C | D | E |
| 1.01d | C | D | E | F |
| 1.01e | D | E | F | G |
| 1.01f | E | F | G | |
| 1.01g | F | G | | |
| 1.02a (three years) | A/B | B | C | D |
| 1.02b (three years) 3rd/4th | C | D | F | G |
| 1.02b (three years) 1st/2nd | D | E | F | G |
| 1.02b (three years) theft | F | G | | |
| 1.02c (three years) felony | F | G | | |
| 1.02c felony-violation of | G | | | |
| 1.02d felony traffic/criminal | H | | | |
| 1.03 | B | C | D | F |
| 1.04 | A | A/B | B | C |
| 1.05 (negligent | A | B | C | D |
| 1.05 (intentional | D | F | G | |
| 1.06a | A | A | B | C |
| 1.06b | A | B | C | D |
| 1.06c | B | C | D | F |
| 1.06d | D | E | F | |
| 1.07 | B | F | G | |
| 1.08 | B | D | F | G |
| 1.09 | A | B | C | D |
| 1.10a | A | B | C | D |
| 1.10b | B | C | D | F |
| 1.10c | B | D | F | G |
| 1.10d | B | D | F | G |
| 1.11 | A | B | C | D |
| 1.12 | A | B | C | D |
| 1.13 | B | C | D | F |
| 1.13a | F | G | | |
| 1.14 | B | C | D | F |
| 1.15a | A | B | C | D |
| 1.15b | B | C | D | F |
| 1.16a | B | D | F | G |
| 1.16b | B | C | D | F |
| 1.16c | B | C | D | F |
| 1.16d | A | B | C | D |
| 1.17a | C | D | F | G |
| 1.17b | B | C | D | F |
| 1.18 | A | B | C | D |
| 1.19 | E | F | G | |
| 1.20a | A | A | B | C |
| 1.20b | A | A | B | C |
| 1.21 | B | C | D | F |
| 1.22a (verbal abuse) | A | B | C | D |
| 1.22b (physical abuse) | C | D | F | G |
| 1.23a | E | F | G | |
| 1.23b | E | F | G | |
| 1.23c | D | E | G | |
| 1.24 | C | D | F | G |
| 1.25a | B | C | D | F |
| 1.25b | A | B | C | D |
| 1.25c | A | B | C | D |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.26 | A | A | B | C |
| 1.27 | A | A | B | C |
| 1.28 | B | C | D | F |
| 1.29 | A/B | B | C | D |
| 1.3 | C | D | F | G |
| 1.31 | B | C | D | F |
| 1.32 | C | D | F | G |
| 1.33 | A | B | C | D |
| **Section Two - Neglect of** | 1st | 2nd | 3rd | 4th |
| 2.01 | A | B | C | D |
| 2.02 | A | B | C | D |
| 2.03a | A | B | C | D |
| 2.03b | C | D | E | F |
| 2.04 | A/B | B | C | D |
| 2.05 | A | B | C | D |
| 2.06 | A | B | C | D |
| 2.07 | B | C | D | F |
| 2.08 | A/B | B | C | D |
| 2.09 | A/B | B | C | D |
| 2.10 | A/B | B | C | D |
| 2.11 | A/B | B | C | D |
| 2.12 | B | C | D | F |
| 2.13 | B | C | D | F |
| 2.14 | A/B | B | C | D |
| 2.15 | A/B | B | C | D |
| 2.16 | A/B | B | C | D |
| 2.17 | A/B | B | C | D |
| 2.26a | F | G | | |
| 2.26b | F | G | | |
| **Section Three - Attendance** | 1st | 2nd | 3rd | 4th |
| 3.01a | A | A/B | B | C |
| 3.01b | A | A/B | B | C |
| 3.01c | A | A/B | B | C |
| 3.01d | A | A/B | B | C |
| 3.01e | A | A/B | B | C |
| 3.02 | B | C | D | F |
| 3.03 | A/B | B | C | D |
| 3.04 (one year) | A | A | B | C |
| **Section Four -** | 1st | 2nd | 3rd | 4th |
| 4.01 (non-serious) | A/B | B | C | D |
| 4.01 (serious) | C | D | F | G |
| 4.02 | A | B | C | D |
| 4.03 | A/B | B | C | D |
| 4.04 | A | A | B | C |
| 4.05 | F | G | | |
| 4.06 | F | G | | |
| **Section Five - Dishonesty** | 1st | 2nd | 3rd | 4th |
| 5.01 | F | G | | |
| 5.02 | B | C | D | F |
| **Section Six -Substance** | 1st | 2nd | 3rd | 4th |
| 6.01 | C | D | F | G |
| 6.02a | F | G | | |
| 6.02b | D | F | G | |
| 6.03 | B | C | F | G |
| 6.04 | B | C | D | F |
| **Section Seven - Care of** | 1st | 2nd | 3rd | 4th |
| 7.01 | A/B | B | C | D |
| 7.02 (category 1 accidents) | per | curren | guideli | |
| 7.02 (category 2 accidents) | per | curren | guideli | |
| 7.03 | A | A/B | B | C |
| 7.04 | A | B | C | D |
| 7.05 | A | A/B | B | C |
| 7.06 | B | C | D | E |
| 7.07 | B | C | D | E |
| **Section Eight - Uniforms** | 1st | 2nd | 3rd | 4th |
| 8.01 | A | A/B | B | C |
| 8.02a | A | A/B | B | C |
| 8.02b | A | A/B | B | C |
| 8.03 | A | A/B | B | C |
| 8.04a | A | A/B | B | C |
| 8.04b | A | A/B | B | C |

**SECTION FIFTEEN - DISCIPLINARY TABLE**
Sergeant Dan O'Malley, District Four

| A | Any Corrective Measure Outline in Rule 9.26, Section A |
|---|---|
| B | Written Reprimand |
| C | Hearing (1-5 days suspension) |
| D | Hearing (5-7 days suspension) |
| E | Hearing (7-11 days suspension) |
| F | Hearing (11 days suspension or more, demotion, or dism |
| G | Hearing (dismissal) |
| H | Hearing (suspension without pay) |

All time lengths for repeated conduct are based
on a 36-month period unless otherwise stated.

| Failure of Good Behavior | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.01a | A | A | B | C |
| 1.01b | A | B | C | D |
| 1.01c | B | C | D | E |
| 1.01d | C | D | E | F |
| 1.01e | D | E | F | G |
| 1.01f | E | F | G | |
| 1.01g | F | G | | |
| 1.02a (three years) | A/B | B | C | D |
| 1.02b (three years) 3rd/4th | C | D | F | G |
| 1.02b (three years) 1st/2nd | D | E | F | G |
| 1.02b (three years) theft | F | G | | |
| 1.02c (three years) felony | F | G | | |
| 1.02c felony-violation of | G | | | |
| 1.02d felony traffic/criminal | H | | | |
| 1.03 | B | C | D | F |
| 1.04 | A | A/B | B | C |
| 1.05 (negligent | A | B | C | D |
| 1.05 (intentional | D | F | G | |
| 1.06a | A | A | B | C |
| 1.06b | A | B | C | D |
| 1.06c | B | C | D | F |
| 1.06d | D | E | F | |
| 1.07 | B | F | G | |
| 1.08 | B | D | F | G |
| 1.09 | A | B | C | D |
| 1.10a | A | B | C | D |
| 1.10b | B | C | D | F |
| 1.10c | B | D | F | G |
| 1.10d | B | D | F | G |
| 1.11 | A | B | C | D |
| 1.12 | A | B | C | D |
| 1.13 | B | C | D | F |
| 1.13a | F | G | | |
| 1.14 | B | C | D | F |
| 1.15a | A | B | C | D |
| 1.15b | B | C | D | F |
| 1.16a | B | D | F | G |
| 1.16b | B | C | D | F |
| 1.16c | B | C | D | F |
| 1.16d | A | B | C | D |
| 1.17a | C | D | F | G |
| 1.17b | B | C | D | F |
| 1.18 | A | B | C | D |
| 1.19 | E | F | G | |
| 1.20a | A | A | B | C |
| 1.20b | A | A | B | C |
| 1.21 | B | C | D | F |
| 1.22a  (verbal abuse) | A | B | C | D |
| 1.22b  (physical abuse) | C | D | F | G |
| 1.23a | E | F | G | |
| 1.23b | E | F | G | |
| 1.23c | D | E | G | |
| 1.24 | C | D | F | G |
| 1.25a | B | C | D | F |
| 1.25b | A | B | C | D |
| 1.25c | A | B | C | D |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.26 | A | A | B | C |
| 1.27 | A | A | B | C |
| 1.28 | B | C | D | F |
| 1.29 | A/B | B | C | D |
| 1.3 | C | D | F | G |
| 1.31 | B | C | D | F |
| 1.32 | C | D | F | G |
| 1.33 | A | B | C | D |
| **Section Two - Neglect of** | **1st** | **2nd** | **3rd** | **4th** |
| 2.01 | A | B | C | D |
| 2.02 | A | B | C | D |
| 2.03a | A | B | C | D |
| 2.03b | C | D | E | F |
| 2.04 | A/B | B | C | D |
| 2.05 | A | B | C | D |
| 2.06 | A | B | C | D |
| 2.07 | B | C | D | F |
| 2.08 | A/B | B | C | D |
| 2.09 | A/B | B | C | D |
| 2.10 | A/B | B | C | D |
| 2.11 | A/B | B | C | D |
| 2.12 | B | C | D | F |
| 2.13 | B | C | D | F |
| 2.14 | A/B | B | C | D |
| 2.15 | A/B | B | C | D |
| 2.16 | A/B | B | C | D |
| 2.17 | A/B | B | C | D |
| 2.26a | F | G | | |
| 2.26b | F | G | | |
| **Section Three - Attendance** | **1st** | **2nd** | **3rd** | **4th** |
| 3.01a | A | A/B | B | C |
| 3.01b | A | A/B | B | C |
| 3.01c | A | A/B | B | C |
| 3.01d | A | A/B | B | C |
| 3.01e | A | A/B | B | C |
| 3.02 | B | C | D | F |
| 3.03 | A/B | B | C | D |
| 3.04 (one year) | A | A | B | C |
| **Section Four -** | **1st** | **2nd** | **3rd** | **4th** |
| 4.01 (non-serious) | A/B | B | C | D |
| 4.01 (serious) | C | D | F | G |
| 4.02 | A | B | C | D |
| 4.03 | A/B | B | C | D |
| 4.04 | A | A | B | C |
| 4.05 | F | G | | |
| 4.06 | F | G | | |
| **Section Five - Dishonesty** | **1st** | **2nd** | **3rd** | **4th** |
| 5.01 | F | G | | |
| 5.02 | B | C | D | F |
| **Section Six -Substance** | **1st** | **2nd** | **3rd** | **4th** |
| 6.01 | C | D | F | G |
| 6.02a | F | G | | |
| 6.02b | D | F | G | |
| 6.03 | B | C | F | G |
| 6.04 | B | C | D | F |
| **Section Seven - Care of** | **1st** | **2nd** | **3rd** | **4th** |
| 7.01 | A/B | B | C | D |
| 7.02 (category 1 accidents) | per | curren | guideli | |
| 7.02 (category 2 accidents) | per | curren | guideli | |
| 7.03 | A | A/B | B | C |
| 7.04 | A | B | C | D |
| 7.05 | A | A/B | B | C |
| 7.06 | B | C | D | E |
| 7.07 | B | C | D | E |
| **Section Eight - Uniforms** | **1st** | **2nd** | **3rd** | **4th** |
| 8.01 | A | A/B | B | C |
| 8.02a | A | A/B | B | C |
| 8.02b | A | A/B | B | C |
| 8.03 | A | A/B | B | C |
| 8.04a | A | A/B | B | C |
| 8.04b | A | A/B | B | C |

**SECTION FIFTEEN - DISCIPLINARY TABLE**
**Police Officer Thomas Defranco, District Four**

A    Any Corrective Measure Outline in Rule 9.26, Section A.
B    Written Reprimand
C    Hearing (1-5 days suspension)
D    Hearing (5-7 days suspension)
E    Hearing (7-11 days suspension)
F    Hearing (11 days suspension or more, demotion, or dismiss
G    Hearing (dismissal)
H    Hearing (suspension without pay)
All time lengths for repeated conduct are based
on a 36-month period unless otherwise stated.

| Failure of Good Behavior | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.01a | A | A | B | C |
| 1.01b | A | B | C | D |
| 1.01c | B | C | D | E |
| 1.01d | C | D | E | F |
| 1.01e | D | E | F | G |
| 1.01f | E | F | G | |
| 1.01g | F | G | | |
| 1.02a (three years) | A/B | B | C | D |
| 1.02b (three years) 3rd/4th | C | D | F | G |
| 1.02b (three years) 1st/2nd | D | E | F | G |
| 1.02b (three years) theft | F | G | | |
| 1.02c (three years) felony | F | G | | |
| 1.02c felony-violation of | G | | | |
| 1.02d felony traffic/criminal | H | | | |
| 1.03 | B | C | D | F |
| 1.04 | A | A/B | B | C |
| 1.05 (negligent | A | B | C | D |
| 1.05 (intentional | D | F | G | |
| 1.06a | A | A | B | C |
| 1.06b | A | B | C | D |
| 1.06c | B | C | D | F |
| 1.06d | D | E | F | |
| 1.07 | B | F | G | |
| 1.08 | B | D | F | G |
| 1.09 | A | B | C | D |
| 1.10a | A | B | C | D |
| 1.10b | B | C | D | F |
| 1.10c | B | D | F | G |
| 1.10d | B | D | F | G |
| 1.11 | A | B | C | D |
| 1.12 | A | B | C | D |
| 1.13 | B | C | D | F |
| 1.13a | F | G | | |
| 1.14 | B | C | D | F |
| 1.15a | A | B | C | D |
| 1.15b | B | C | D | F |
| 1.16a | B | D | F | G |
| 1.16b | B | C | D | F |
| 1.16c | B | C | D | F |
| 1.16d | A | B | C | D |
| 1.17a | C | D | F | G |
| 1.17b | B | C | D | F |
| 1.18 | A | B | C | D |
| 1.19 | E | F | G | |
| 1.20a | A | A | B | C |
| 1.20b | A | A | B | C |
| 1.21 | B | C | D | F |
| 1.22a (verbal abuse) | A | B | C | D |
| 1.22b (physical abuse) | C | D | F | G |
| 1.23a | E | F | G | |
| 1.23b | E | F | G | |
| 1.23c | D | E | G | |
| 1.24 | C | D | F | G |
| 1.25a | B | C | D | F |
| 1.25b | A | B | C | D |
| 1.25c | A | B | C | D |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.26 | A | A | B | C |
| 1.27 | A | A | B | C |
| 1.28 | B | C | D | F |
| 1.29 | A/B | B | C | D |
| 1.3 | C | D | F | G |
| 1.31 | B | C | D | F |
| 1.32 | C | D | F | G |
| 1.33 | A | B | C | D |
| **Section Two - Neglect of** | 1st | 2nd | 3rd | 4th |
| 2.01 | A | B | C | D |
| 2.02 | A | B | C | D |
| 2.03a | A | B | C | D |
| 2.03b | C | D | E | F |
| 2.04 | A/B | B | C | D |
| 2.05 | A | B | C | D |
| 2.06 | A | B | C | D |
| 2.07 | B | C | D | F |
| 2.08 | A/B | B | C | D |
| 2.09 | A/B | B | C | D |
| 2.10 | A/B | B | C | D |
| 2.11 | A/B | B | C | D |
| 2.12 | B | C | D | F |
| 2.13 | B | C | D | F |
| 2.14 | A/B | B | C | D |
| 2.15 | A/B | B | C | D |
| 2.16 | A/B | B | C | D |
| 2.17 | A/B | B | C | D |
| 2.26a | F | G | | |
| 2.26b | F | G | | |
| **Section Three - Attendance** | 1st | 2nd | 3rd | 4th |
| 3.01a | A | A/B | B | C |
| 3.01b | A | A/B | B | C |
| 3.01c | A | A/B | B | C |
| 3.01d | A | A/B | B | C |
| 3.01e | A | A/B | B | C |
| 3.02 | B | C | D | F |
| 3.03 | A/B | B | C | D |
| 3.04 (one year) | A | A | B | C |
| **Section Four -** | 1st | 2nd | 3rd | 4th |
| 4.01 (non-serious) | A/B | B | C | D |
| 4.01 (serious) | C | D | F | G |
| 4.02 | A | B | C | D |
| 4.03 | A/B | B | C | D |
| 4.04 | A | A | B | C |
| 4.05 | F | G | | |
| 4.06 | F | G | | |
| **Section Five - Dishonesty** | 1st | 2nd | 3rd | 4th |
| 5.01 | F | G | | |
| 5.02 | B | C | D | F |
| **Section Six -Substance** | 1st | 2nd | 3rd | 4th |
| 6.01 | C | D | F | G |
| 6.02a | F | G | | |
| 6.02b | D | F | G | |
| 6.03 | B | C | F | G |
| 6.04 | B | C | D | F |
| **Section Seven - Care of** | 1st | 2nd | 3rd | 4th |
| 7.01 | A/B | B | C | D |
| 7.02 (category 1 accidents) | per | curren | guideli | |
| 7.02 (category 2 accidents) | per | curren | guideli | |
| 7.03 | A | A/B | B | C |
| 7.04 | A | B | C | D |
| 7.05 | A | A/B | B | C |
| 7.06 | B | C | D | E |
| 7.07 | B | C | D | E |
| **Section Eight - Uniforms** | 1st | 2nd | 3rd | 4th |
| 8.01 | A | A/B | B | C |
| 8.02a | A | A/B | B | C |
| 8.02b | A | A/B | B | C |
| 8.03 | A | A/B | B | C |
| 8.04a | A | A/B | B | C |
| 8.04b | A | A/B | B | C |

**SECTION FIFTEEN - DISCIPLINARY TABLE**
**Sergeant Michelle Phillips, District Four**

A    Any Corrective Measure Outline in Rule 9.26, Section A.
B    Written Reprimand
C    Hearing (1-5 days suspension)
D    Hearing (5-7 days suspension)
E    Hearing (7-11 days suspension)
F    Hearing (11 days suspension or more, demotion, or dism
G    Hearing (dismissal)
H    Hearing (suspension without pay)
All time lengths for repeated conduct are based
on a 36-month period unless otherwise stated.

| Failure of Good Behavior | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.01a | A | A | B | C |
| 1.01b | A | B | C | D |
| 1.01c | B | C | D | E |
| 1.01d | C | D | E | F |
| 1.01e | D | E | F | G |
| 1.01f | E | F | G | |
| 1.01g | F | G | | |
| 1.02a (three years) | A/B | B | C | D |
| 1.02b (three years) $3^{rd}/4^{th}$ | C | D | F | G |
| 1.02b (three years) $1^{st}/2^{nd}$ | D | E | F | G |
| 1.02b (three years) theft | F | G | | |
| 1.02c (three years) felony | F | G | | |
| 1.02c felony-violation of | G | | | |
| 1.02d felony traffic/criminal | H | | | |
| 1.03 | B | C | D | F |
| 1.04 | A | A/B | B | C |
| 1.05 (negligent) | A | B | C | D |
| 1.05 (intentional | D | F | G | |
| 1.06a | A | A | B | C |
| 1.06b | A | B | C | D |
| 1.06c | B | C | D | F |
| 1.06d | D | E | F | |
| 1.07 | B | F | G | |
| 1.08 | B | D | F | G |
| 1.09 | A | B | C | D |
| 1.10a | A | B | C | D |
| 1.10b | B | C | D | F |
| 1.10c | B | D | F | G |
| 1.10d | B | D | F | G |
| 1.11 | A | B | C | D |
| 1.12 | A | B | C | D |
| 1.13 | B | C | D | F |
| 1.13a | F | G | | |
| 1.14 | B | C | D | F |
| 1.15a | A | B | C | D |
| 1.15b | B | C | D | F |
| 1.16a | B | D | F | G |
| 1.16b | B | C | D | F |
| 1.16c | B | C | D | F |
| 1.16d | A | B | C | D |
| 1.17a | C | D | F | G |
| 1.17b | B | C | D | F |
| 1.18 | A | B | C | D |
| 1.19 | E | F | G | |
| 1.20a | A | A | B | C |
| 1.20b | A | A | B | C |
| 1.21 | B | C | D | F |
| 1.22a (verbal abuse) | A | B | C | D |
| 1.22b (physical abuse) | C | D | F | G |
| 1.23a | E | F | G | |
| 1.23b | E | F | G | |
| 1.23c | D | E | G | |
| 1.24 | C | D | F | G |
| 1.25a | B | C | D | F |
| 1.25b | A | B | C | D |
| 1.25c | A | B | C | D |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.26 | A | A | B | C |
| 1.27 | A | A | B | C |
| 1.28 | B | C | D | F |
| 1.29 | A/B | B | C | D |
| 1.3 | C | D | F | G |
| 1.31 | B | C | D | F |
| 1.32 | C | D | F | G |
| 1.33 | A | B | C | D |
| **Section Two - Neglect of** | 1st | 2nd | 3rd | 4th |
| 2.01 | A | B | C | D |
| 2.02 | A | B | C | D |
| 2.03a | A | B | C | D |
| 2.03b | C | D | E | F |
| 2.04 | A/B | B | C | D |
| 2.05 | A | B | C | D |
| 2.06 | A | B | C | D |
| 2.07 | B | C | D | F |
| 2.08 | A/B | B | C | D |
| 2.09 | A/B | B | C | D |
| 2.10 | A/B | B | C | D |
| 2.11 | A/B | B | C | D |
| 2.12 | B | C | D | F |
| 2.13 | B | C | D | F |
| 2.14 | A/B | B | C | D |
| 2.15 | A/B | B | C | D |
| 2.16 | A/B | B | C | D |
| 2.17 | A/B | B | C | D |
| 2.26a | F | G | | |
| 2.26b | F | G | | |
| **Section Three - Attendance** | 1st | 2nd | 3rd | 4th |
| 3.01a | A | A/B | B | C |
| 3.01b | A | A/B | B | C |
| 3.01c | A | A/B | B | C |
| 3.01d | A | A/B | B | C |
| 3.01e | A | A/B | B | C |
| 3.02 | B | C | D | F |
| 3.03 | A/B | B | C | D |
| 3.04 (one year) | A | A | B | C |
| **Section Four -** | 1st | 2nd | 3rd | 4th |
| 4.01 (non-serious) | A/B | B | C | D |
| 4.01 (serious) | C | D | F | G |
| 4.02 | A | B | C | D |
| 4.03 | A/B | B | C | D |
| 4.04 | A | A | B | C |
| 4.05 | F | G | | |
| 4.06 | F | G | | |
| **Section Five - Dishonesty** | 1st | 2nd | 3rd | 4th |
| 5.01 | F | G | | |
| 5.02 | B | C | D | F |
| **Section Six -Substance** | 1st | 2nd | 3rd | 4th |
| 6.01 | C | D | F | G |
| 6.02a | F | G | | |
| 6.02b | D | F | G | |
| 6.03 | B | C | F | G |
| 6.04 | B | C | D | F |
| **Section Seven - Care of** | 1st | 2nd | 3rd | 4th |
| 7.01 | A/B | B | C | D |
| 7.02 (category 1 accidents) | per | curren | guideli | |
| 7.02 (category 2 accidents) | per | curren | guideli | |
| 7.03 | A | A/B | B | C |
| 7.04 | A | B | C | D |
| 7.05 | A | A/B | B | C |
| 7.06 | B | C | D | E |
| 7.07 | B | C | D | E |
| **Section Eight - Uniforms** | 1st | 2nd | $3^{rc}$ | 4th |
| 8.01 | A | A/B | B | C |
| 8.02a | A | A/B | B | C |
| 8.02b | A | A/B | B | C |
| 8.03 | A | A/B | B | C |
| 8.04a | A | A/B | B | C |
| 8.04b | A | A/B | B | C |

## SECTION FIFTEEN - DISCIPLINARY TABLE
**Sergeant Jay Kemme, District Four**

| | |
|---|---|
| A | Any Corrective Measure Outline in Rule 9.26, Section A. |
| B | Written Reprimand |
| C | Hearing (1-5 days suspension) |
| D | Hearing (5-7 days suspension) |
| E | Hearing (7-11 days suspension) |
| F | Hearing (11 days suspension or more, demotion, or dism |
| G | Hearing (dismissal) |
| H | Hearing (suspension without pay) |

All time lengths for repeated conduct are based
on a 36-month period unless otherwise stated.

| Failure of Good Behavior | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.01a | A | A | B | C |
| 1.01b | A | B | C | D |
| 1.01c | B | C | D | E |
| 1.01d | C | D | E | F |
| 1.01e | D | E | F | G |
| 1.01f | E | F | G | |
| 1.01g | F | G | | |
| 1.02a (three years) | A/B | B | C | D |
| 1.02b (three years) 3rd/4th | C | D | F | G |
| 1.02b (three years) 1st/2nd | D | E | F | G |
| 1.02b (three years) theft | F | G | | |
| 1.02c (three years) felony | F | G | | |
| 1.02c felony-violation of | G | | | |
| 1.02d felony traffic/criminal | H | | | |
| 1.03 | B | C | D | F |
| 1.04 | A | A/B | B | C |
| 1.05 (negligent | A | B | C | D |
| 1.05 (intentional | D | F | G | |
| 1.06a | A | A | B | C |
| 1.06b | A | B | C | D |
| 1.06c | B | C | D | F |
| 1.06d | D | E | F | |
| 1.07 | B | F | G | |
| 1.08 | B | D | F | G |
| 1.09 | A | B | C | D |
| 1.10a | A | B | C | D |
| 1.10b | B | C | D | F |
| 1.10c | B | D | F | G |
| 1.10d | B | D | F | G |
| 1.11 | A | B | C | D |
| 1.12 | A | B | C | D |
| 1.13 | B | C | D | F |
| 1.13a | F | G | | |
| 1.14 | B | C | D | F |
| 1.15a | A | B | C | D |
| 1.15b | B | C | D | F |
| 1.16a | B | D | F | G |
| 1.16b | B | C | D | F |
| 1.16c | B | C | D | F |
| 1.16d | A | B | C | D |
| 1.17a | C | D | F | G |
| 1.17b | B | C | D | F |
| 1.18 | A | B | C | D |
| 1.19 | E | F | G | |
| 1.20a | A | A | B | C |
| 1.20b | A | A | B | C |
| 1.21 | B | C | D | F |
| 1.22a (verbal abuse) | A | B | C | D |
| 1.22b (physical abuse) | C | D | F | G |
| 1.23a | E | F | G | |
| 1.23b | E | F | G | |
| 1.23c | D | E | G | |
| 1.24 | C | D | F | G |
| 1.25a | B | C | D | F |
| 1.25b | A | B | C | D |
| 1.25c | A | B | C | D |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.26 | A | A | B | C |
| 1.27 | A | A | B | C |
| 1.28 | B | C | D | F |
| 1.29 | A/B | B | C | D |
| 1.3 | C | D | F | G |
| 1.31 | B | C | D | F |
| 1.32 | C | D | F | G |
| 1.33 | A | B | C | D |
| **Section Two - Neglect of** | **1st** | **2nd** | **3rd** | **4th** |
| 2.01 | A | B | C | D |
| 2.02 | A | B | C | D |
| 2.03a | A | B | C | D |
| 2.03b | C | D | E | F |
| 2.04 | A/B | B | C | D |
| 2.05 | A | B | C | D |
| 2.06 | A | B | C | D |
| 2.07 | B | C | D | F |
| 2.08 | A/B | B | C | D |
| 2.09 | A/B | B | C | D |
| 2.10 | A/B | B | C | D |
| 2.11 | A/B | B | C | D |
| 2.12 | B | C | D | F |
| 2.13 | B | C | D | F |
| 2.14 | A/B | B | C | D |
| 2.15 | A/B | B | C | D |
| 2.16 | A/B | B | C | D |
| 2.17 | A/B | B | C | D |
| 2.26a | F | G | | |
| 2.26b | F | G | | |
| **Section Three - Attendance** | **1st** | **2nd** | **3rd** | **4th** |
| 3.01a | A | A/B | B | C |
| 3.01b | A | A/B | B | C |
| 3.01c | A | A/B | B | C |
| 3.01d | A | A/B | B | C |
| 3.01e | A | A/B | B | C |
| 3.02 | B | C | D | F |
| 3.03 | A/B | B | C | D |
| 3.04 (one year) | A | A | B | C |
| **Section Four -** | **1st** | **2nd** | **3rd** | **4th** |
| 4.01 (non-serious) | A/B | B | C | D |
| 4.01 (serious) | C | D | F | G |
| 4.02 | A | B | C | D |
| 4.03 | A/B | B | C | D |
| 4.04 | A | A | B | C |
| 4.05 | F | G | | |
| 4.06 | F | G | | |
| **Section Five - Dishonesty** | **1st** | **2nd** | **3rd** | **4th** |
| 5.01 | F | G | | |
| 5.02 | B | C | D | F |
| **Section Six -Substance** | **1st** | **2nd** | **3rd** | **4th** |
| 6.01 | C | D | F | G |
| 6.02a | F | G | | |
| 6.02b | D | F | G | |
| 6.03 | B | C | F | G |
| 6.04 | B | C | D | F |
| **Section Seven - Care of** | **1st** | **2nd** | **3rd** | **4th** |
| 7.01 | A/B | B | C | D |
| 7.02 (category 1 accidents) | per | curren | guideli | |
| 7.02 (category 2 accidents) | per | curren | guideli | |
| 7.03 | A | A/B | B | C |
| 7.04 | A | B | C | D |
| 7.05 | A | A/B | B | C |
| 7.06 | B | C | D | E |
| 7.07 | B | C | D | E |
| **Section Eight - Uniforms** | **1st** | **2nd** | **3rd** | **4th** |
| 8.01 | A | A/B | B | C |
| 8.02a | A | A/B | B | C |
| 8.02b | A | A/B | B | C |
| 8.03 | A | A/B | B | C |
| 8.04a | A | A/B | B | C |
| 8.04b | A | A/B | B | C |



**CINCINN** EXHIBIT 13

Interdepartmental Correspondence Sheet

Date: 5/24/18

To: Colonel Eliot K. Isaac, Police Chief

From: Police Specialist Joy Ludgatis, District Two

Copies to: Captain Aaron Jones, Lt. Colonel Neudigate, F.O.P. President Daniel Hils

Subject: Continued Discriminatory, Unprofessional and Disrespectful Behavior by Lt. Danita Pettis

On April 23, 2018 during a FOP meeting, which I was not present for, in the presence of 128 members, Lt. Danita Pettis lied about me yet again. She stated that I was transferred in 2015 from CBS to District 4 because I was reprimanded and found guilty of being a racist. P.S. Kathy Harrell (who represented me for my peer review for this reprimand) told the 128 members the truth that the reprimand was reversed and the reason for my transfer was because I stated I did not want to work for Lt. Pettis because I did not trust her. Lt. Pettis then stated the Peer Review panel was selectively picked to be all male whites for my benefit. P.S. Harrell explained how a Peer Review Panel is randomly selected.

On April 24, 2018, while P.S. Harrell was on duty working, Lt. Pettis (while off-duty) showed up to confront Kathy about standing up to her at the FOP meeting the previous night. Lt. Pettis stated again that I was a racist and accused P.S. Harrell of only siding with me because we were friends. She again stated the Peer Review Panel was made up of all male white racists. The argument was disruptive and loud enough for other officers on duty in the district to hear. P.S. Harrell had to demand Lt. Pettis to leave the district so she could do her work.

This pattern of behavior by Lt. Pettis is very disturbing and I question her mental stability. I worry what she is going to say about me next or what she might do. This behavior is bizarre in light of the fact that I have never had a conversation with Lt. Pettis in my entire career, even when I worked for her. Is she really capable of being in a leadership role? Her obsession with me and her continued disparaging remarks about me are poisoning relationships with coworkers and creating a sense of isolation and tension for me. I perceive her hostility toward me only to be because I am female white. She singles out female whites to verbally attack and demean such as P.O. Tamara Brown and P.S. Kathy Harrell who are also female whites. She doesn't treat any of the black or male officers this way. She uses her aggressive and hostile demeanor to intimidate subordinates into silence which allows her to violate department rules and laws of Ohio without fear of repercussions.

The City of Cincinnati Administrative Regulation #55 – Workplace Behavior Policy, clearly states that unprofessional or disrespectful behavior and bullying will not be tolerated. It further states failure to adhere to this policy may result in corrective action up to and including termination.
So I ask you, how many more years of discrimination and harassment do I have to endure at the hands of Lt. Danita Pettis just because I am a female white??
JAL/jal



city of
# CINCINNATI

**Interdepartmental Correspondence Sheet**

Date: October 11, 2018                SGT Hils



EXHIBIT
14

To: Colonel Eliot K. Isaac, Police Chief

From: Sergeant Luke Putnick, District Three

Copies to:

Subject: Request for Official Reprimand – Police Officer Donte Hill

---

On September 26, 2018, District Three Police Officer Donte Hill (P948) was dispatched to 3097 McHenry Avenue for a family trouble (CPD180926000078). During the radio run Officer Hill used excessive profane language fourteen times in an inappropriate way. The way Officer Hill used the profane language was not "Verbal Stunning". Some examples of Officer Hill's language on the radio run are "that got damn alcohol out here got you niggers acting stupid", "because I'm pissed the fuck off that's why". The entire incident can be viewed on Officer Hill's body camera (ETS#2108-240434).

This is Officer Hill's second violation in the last 36 months. The previous instance occurred on August 4th, 2017 (ETS#2017-227589). In this occurrence Officer Hill received counseling, documented via an ESL entry.

1.06B Members of the Department shall avoid the use of coarse, violent, or profane language.

I respectfully request Officer Hill be issued the attached Form 66-S, Notice of Official Reprimand.

LP          10/22/18                10.23.18
10/22/18  Recommend.          APPROVED FOR SERVICE.
Written reprimand is                    PW
Warranted. Unprofessional
language was excessive.                  Approved
                                          EKI
          Capt. F. Brotherman            10/23/1

                                    10/25/18
                                    For service
                                    PFB/CO3

Form 66-S

# City of Cincinnati
## Notice of Official Reprimand

To:    Donte Hill               Employee I.D. Number  26277

Title:  Police Officer        Effective Date of Reprimand  09/26/2018

Department: <u>Police</u>

Organization Code:1310           Penalty Code <u>0</u> <u>8</u>

**Reason Codes**
You are hereby officially reprimanded for the following reason(s):
(Enter up to 3 Codes)

      1               2             3

     07

02 - Incompetency
03 - Inefficiency
04 - Dishonesty
05 - Insubordination
06 - Neglect of Duty
07 - Failure of Good Behavior
08 - Substance Abuse
09 - Excessive Absenteeism
10 - Violation of Civil Service Rules/C.S. Law/Code of Ethics
11 - Other

Explain in Full Reason for Reprimand:
On September 26, 2018, District Three Police Officer Donte Hill (P948) was dispatched to 3097 McHenry Avenue for a family trouble (CPD180926000078). During the radio run Officer Hill used excessive profane language fourteen times in an inappropriate way. The way Officer Hill used the profane language was not "Verbal Stunning". Some examples of Officer Hill's language on the radio run are "that got damn alcohol out here got these niggers acting stupid", "because I'm pissed the fuck off that's why". The entire incident can be viewed on Officer Hill's body camera (ETS#2108-240434).

This is Officer Hill's second violation in the last 36 months. The previous instance occurred on August 4th, 2017 (ETS#2017-227589). In this occurrence Officer Hill received counseling, documented via an ESL entry.

1.06B Members of the Department shall avoid the use of coarse, violent, or profane language.

I respectfully request Officer Hill be issued the attached Form 66-S, Notice of Official Reprimand.

A copy of this notice is being placed on your record. This notice is given to you with the hope you will improve your conduct and performance. If further discussion of your performance will help, I will be glad to meet with you.

Served by Sgt. Luke Putnick         Signed _____

on (date)10/29/18              Title Sergeant

_____    10-29-18    Department: <u>Police</u>

Revised 12/09/10, Replaces 08/02.

EMPLOYEE'S SIGNATURE                    DATE

**To The Employee:** Your signature is requested here only as an indication that you have seen this reprimand. Your signature is not intended to imply that you agree with the reprimand.

Distribution:    Original: Employee
                 Copies after signature: Civil Service; Police Department; Supervisor

Revised 12/09/10, Replaces 08/02.

EXHIBIT

15

*ESL entry*
*for Sgt. Hall*
*for Viol. of 1.06R*

# CINCINNATI POLICE

## JUNCTA JUVANT

# Internal Investigations Section
## Lieutenant Douglas G. Snider, Commander (Acting)

**Case Number:** 17167      **Date Assigned:** 02/09/18

**Investigator:** Sergeant George M. Jason

**Reviewed By:** _____    **Date:** _____

**Approved By:** _____ /ASC    **Date:** 8/2/18

**Submitted to the Police Chief on:** _____

**Approved by the Police Chief on:** _____ 9/4/18

## CINCINNATI POLICE DEPARTMENT
## INTERNAL INVESTIGATIONS SECTION
## CASE #17167

### Introduction:

The Internal Investigations Section (IIS) has completed an investigation of Discrimination based on Race and Retaliation filed by Sergeant Eric Schank, Badge: S858, District One, and Discrimination based on race and sex filed by Sergeant Linda Sellers, Badge: S90, District Two. Sergeant Schank and Sergeant Sellers filed their complaints with the City of Cincinnati Human Resources Department.

Sergeant Schank alleged that on December 3, 2017, Lieutenant Joseph Williams, Badge: L22, District Three, retaliated against him for accusing Sergeant Sellers of submitting inaccurate documents relative to time off by threatening to make his life hell. Sergeant Schank believes this was based on Sergeant Schank's race.

Sergeant Sellers alleged that Sergeant Schank has engaged in behavior that has undermined her effectiveness as a supervisor due to her being an African-American female. Additionally, Sergeant Sellers alleged that Sergeant Kenneth Hall, Badge: S29, District Three, has subjected her to unwelcome statements and gestures sexual in nature.

*Note: At the time Sergeant Schank and Sergeant Sellers filed their complaints, they were both assigned to District Three.*

Lastly, due to filing complaints, Sergeant Sellers believes Lieutenant Williams has retaliated against her by delaying positive entries and making negative entries in her Employee Tracking Solution (ETS) file.

### Interviews:

### Sergeant Eric Schank, Badge: S858, District One

On December 2, 2017, Sergeant Sellers submitted a Form 25S, Cincinnati Police Department-Request for Leave of Absence. The form indicated that Sergeant Sellers, who was to begin her shift at 2100 hours, took the first 90 minutes of her shift off. The form was altered by Sergeant Schank to reflect what he believed to be Sergeant Sellers' actual starting time of 2315 hours. This incident began a series of complaints filed by Sergeant Schank and Sergeant Sellers.

On December 2, 2017, Sergeant Schank was on duty, and in uniform. At approximately 2250, the Emergency Communications Section (ECS), via police radio, called for Sergeant Sellers and received no response. Sergeant Jacob Hicks, Badge: S259, District Three, responded to ECS and stated that he did not know Sergeant Sellers' whereabouts. Sergeant Sellers entered the district at 2317 hours. No one spoke to Sergeant Sellers, to avoid any possible conflict.

A short time later, via telephone, ECS spoke to Sergeant Hicks and inquired if Sergeant Sellers would be available that night. Sergeant Sellers overheard the conclusion of that conversation and inquired about the nature of the call. Sergeant Hicks informed Sergeant Sellers that ECS inquired if she were working tonight. Sergeant Sellers replied, "I'm here now." Sergeant Sellers stated she was on her cellular telephone in the parking lot.

Sergeant Schank stated he adjusted the Form 25S submitted to reflect when Sergeant Sellers arrived for her shift. Sergeant Schank stated that he did not attempt to undermine Sergeant Sellers.

The following morning, Sergeant Schank received a text message from Sergeant Sellers. Due to the nature of the message, Sergeant Schank was upset and decided to take the night off. Sergeant Schank, via personal cellular telephone, contacted Sergeant Christopher Seta, Badge: S968, District Three, to inform him that he would not be responding to work that evening.

While Sergeant Schank spoke to Sergeant Seta, he received a text message from Lieutenant Williams instructing him to report to his office at 1800 hours for a meeting. Sergeant Schank informed Lieutenant Williams that he did not feel he should respond to work because his stomach was churning and he wanted to take the day off. Lieutenant responded, "Next time clear it with me."

Later that evening Sergeant Schank stated he was informed that Sergeant Hall overheard Lieutenant Williams state, "I'm going to get his ass." Sergeant Schank believed this statement was in reference to him. Sergeant Schank did not recall who he spoke to.

Sergeant Schank felt that if one of his subordinates had submitted a fictitious document, he would address the issue with the person who submitted the form, not the individual who brought the matter to his attention. Sergeant Schank believed this demonstrated collusion between Lieutenant Williams and Sergeant Sellers. Sergeant Schank stated all he did was alter a form to reflect the actual time Sergeant Sellers reported for duty. Sergeant Schank believed Lieutenant Williams should have spoken about the matter with Sergeant Sellers.

Sergeant Schank stated there was a brief time prior to December 2, 2017, when things calmed down. Sergeant Hicks filed a hostile work environment complaint with Captain Aaron Jones, Badge: C01, District Two.

*Note: At the time of this incident Captain Jones was assigned to District Three.*

Lieutenant Williams appeared to gain control of the situation, but things returned to the original state following the Form 25S incident.

Sergeant Schank stated the conflict with Sergeant Sellers is experienced by all the sergeants on third relief. This applies to the daily operation of the relief. Sergeant Schank stated that you cannot ask her a question or discus an issue without being informed that you are not her supervisor. Sergeant Schank stated that he had a discussion with Sergeant Sellers regarding daily operation of the relief.

Sergeant Schank stated he has known Sergeant Sellers for a long time. She is the type of person who thinks she knows what she is doing and wants to find her own way. Sergeant Schank stated to her, "The other sergeants have to follow up on your work, and need to know what you are doing so that we are on the same page." Sergeant Sellers was not receptive to this advice. Sergeant Schank told her if she does not want help that's fine, but to not come to him when she screws up.

Sergeant Schank stated after any discussion with Sergeant Sellers, she reported to Lieutenant Williams that she was being mistreated. Sergeant Sellers would spend hours in Lieutenant Williams' office. The other sergeants were not aware of the nature of their meetings.

Sergeant Schank stated he is not aware of any commendation he received that should have been given to Sergeant Sellers.

Sergeant Schank recalled an incident with Officer Roetting. Sergeant Schank stated he was contacted by Officer Roetting via personal cellular telephone. Sergeant Schank was otherwise occupied and did not hear part of the radio broadcast regarding the call for service Officer Roetting was responding to. Sergeant Schank stated his response to Officer Roetting was based on the information Officer Roetting provided.

Sergeant Schank was not aware of the instructions Sergeant Sellers had given to Officer Roetting previously. Sergeant Schank instructed Officer Roetting that upon arrival to the call for service, to take the necessary action. Sergeant Schank stated he did not attempt to undermine Sergeant Sellers.

Sergeant Schank stated his complaint against Lieutenant Williams stemmed from Lieutenant Williams' statement, "I'm going to get his ass."

Sergeant Schank stated he personally heard Lieutenant Williams refer to Sergeant Hicks as, "white devil." This occurred at a cookout at District Three after Lieutenant Williams instructed his wife not to speak to Sergeant Hicks. Lieutenant Williams stated that Sergeant Hicks does not like African-Americans. Sergeant Schank stated Ms. Williams told Lieutenant Williams not to make that statement again, but he continued. Sergeant Schank stated you could tell Lieutenant Williams had an aversion to white supervision. Sergeant Schank felt the dialogue was inappropriate. Sergeant Schank did not inform Lieutenant Williams that the comments were offensive to him.

During a meeting with Sergeant Hicks and Sergeant Seta, Lieutenant Williams stated he would make the sergeants lives a living hell. Sergeant Schank took this at face value. Sergeant Schank had worked with Lieutenant Williams from September 2016 until December 2017. The atmosphere was fine until two to three months following Sergeant Sellers' arrival. Lieutenant Williams changed the way he approached and talked to the sergeants. There was a noticeable difference in how he treated black sergeants and white sergeants. Sergeant Hall and Sergeant Sellers had little or no responsibilities as far as the operation of the relief.

Sergeant Schank stated a conflict arose with the scheduling of officers for robbery cars. Instead of discussing the situation amongst supervisors, Sergeant Sellers relayed misinformation to Lieutenant Williams. Lieutenant Williams accepted Sergeant Sellers account of the situation and dressed Sergeant Schank down when the conflict could have been resolved by better communication with the sergeants.

Sergeant Schank stated after the statement "I'm going to make your lives a living hell," even the simplest communication was tense.

Sergeant Schank believed Lieutenant Williams retaliated against him due to the fact that he brought Sergeant Sellers' improper documentation to his attention.

Sergeant Schank stated he did not harass Sergeant Sellers or attempt to undermine her.

### Sergeant Linda Sellers, Badge: S90, District Two

Sergeant Sellers was on a promotional list for sergeant in September 2016. The promotional list was due to expire on September 6, 2016. Due to a problem with the scoring and certification of an active Lieutenants test and two open Lieutenant positions, the Cincinnati Police Department requested the promotion of two sergeants prior to the active sergeants promotional list expiring.

The promotions were approved and the next highest scoring candidates on the sergeants' promotional list were promoted. Sergeant Sellers believed the promotions were based on the Consent Decree, and that due to her status as an African-American female, she should have been considered for promotion.

Sergeant Sellers approached the FOP executive board and informed them of her feelings. This was not an attempt to have any sergeant demoted. Sergeant Schank was one of the two sergeants promoted. There were no changes to those promotions.

Prior to promotion to sergeant, Sergeant Sellers attended supervisors training in January 2017. Sergeant Schank attended the same training. During a break, Sergeant Sellers was approached by Sergeant Schank, who stated he was going to sue the Sentinels Organization and whoever may have caused him to have to pay for an attorney to maintain his promotion to sergeant.

Sergeant Sellers was promoted to sergeant on April 23, 2017, and transferred to District Three, third relief. Upon arrival at District Three, Sergeant Sellers realized Sergeant Schank was assigned to her shift. During her first week at District Three, Sergeant Sellers recalled that whenever Sergeant Schank spoke to her it was in a demeaning and disrespectful manner.

Sergeant Sellers confronted Sergeant Schank and informed him that she was not going to be spoken to in this manner. Sergeant Sellers informed the other sergeants of her issues with Sergeant Schank. The behavior continued.

Sergeant Sellers approached her relief commander, Lieutenant Williams, and explained the difficulty she had with Sergeant Schank's behavior. Lieutenant Williams never followed-up with Sergeant Sellers, but she observed a change in Sergeant Schank's attitude and behavior.

A brief time later some of Sergeant Sellers' paperwork was missing. This missing forms were Form 25S's. Officers began to complain that their time off which they believed was approved was not reflected on the daily lineups. Sergeant Sellers believed this was an attempt to tarnish her work. Sergeant Sellers was unsure of the identity of the responsible party.

Sergeant Sellers made a mental note and made certain that officers viewed her adjusting lineups when they submitted any Form 25S. In an attempt to solve this problem, paperwork was placed where only the sergeants had access to it. The Lieutenant instructed the sergeants to stop this practice and return to the original method.

Another incident occurred a short time later. Sergeant Sellers instructed an officer to complete an incident report which he failed to do. Sergeant Sellers met with the officer in the sergeant's office. During this meeting the officer inform Sergeant Sellers that Sergeant Schank informed him that if he were an officer, he would not complete the report. Sergeant Sellers confronted Sergeant Schank and inquired if this was the case. Sergeant Schank responded that he did not hear everything related to the incident, but he did tell the officer that. Sergeant Sellers made a mental note of it and informed the Lieutenant.

A third incident occurred. Sergeant Sellers was on her way to work, and she was due at 2100 hours; however, Sergeant Sellers was granted the first 90 minutes off. Sergeant Sellers received a telephone call from her mother. Her mother informed her that her aunt may be removed from life support. Sergeant Sellers received this news as she entered the District Three parking lot. Due to the nature of this information Sergeant Sellers remained in her personal vehicle for a moment to collect herself.

Upon entering the sergeant's office, Sergeant Sellers explained to Sergeant Schank and Sergeant Hicks what had occurred. Sergeant Hicks stated ECS attempted to contact Sergeant Sellers, but they could not locate her. Sergeant Sellers inquired, "What did they want? I'm here now." Sergeant Sellers proceeded to adjust the Form 25S to reflect her arrival at 2300 hours rather than 2230 hours. Sergeant Schank informed Sergeant Sellers that she was supposed to be at work at 2230 hours. Again, Sergeant Sellers stated she was there now and inquired if there was something in particular ECS required.

Sergeant Sellers stated she only came to work to finish paperwork regarding an insubordinate officer. Sergeant Sellers met with the officer, completed her paperwork, and secured for the evening.

The next morning Sergeant Sellers stopped at District Three and observed the timekeeper with the lineups from the previous day. Sergeant Sellers reviewed the lineups and noticed that someone changed her starting time from 2300 to 2315 hours.

Sergeant Sellers, via group text message, informed Sergeant Hicks and Sergeant Schank that they are not her supervisor and that they are not to change her start times in the future. Sergeant Sellers informed Lieutenant Williams. Lieutenant Williams planned to have a meeting with Sergeant Schank and Sergeant Sellers, but for unknown reasons the meeting did not occur.

On another date Sergeant Sellers was contacted by an officer who stated he did not want to work 1700 hours to 0300 hours. This particular shift was for a robbery car. This officer worked 2100 to 0700 hours ordinarily. A few days later Sergeant Sellers received a text message from this officer. The officer stated he was ordered to work at 1700 hours by Sergeant Schank. Sergeant Sellers instructed the officer to complete a Form 68P, Overtime and Court Appearance Report.

Upon her return to duty, Sergeant Sellers observed the unapproved Form 68P on her desk. Sergeant Sellers believed that this was another example of Sergeant Schank's attempt to undermine her by making it appear that Sergeant Sellers ordered the officer to work. Sergeant Sellers assumed Sergeant Schank placed the form on her desk.

Sergeant Luke Putnick, Badge: S1, District Three, was promoted and assigned to District Three. Upon Sergeant Putnick's arrived, Sergeant Sellers observed that Sergeant Schank did not speak to him in a demeaning way or correct his work. Based on her observations of Sergeant Schank's interaction with all the other sergeants, she felt it was obvious that Sergeant Schank's issue was with her personally.

Sergeant Sellers questioned her Supervisory Performance Report. The core performance anchor, *Teamwork*, was scored *Needs Improvement*. Lieutenant Williams stated Sergeant Sellers was on an island on her own. Sergeant Sellers felt if she was on her own island, she was put there. Sergeant Sellers, due to efforts to plan activities and to build comradery, believed this mark was lower than she deserved. Additionally, Sergeant Sellers stated Lieutenant Williams could not cite specific examples of her lack of teamwork.

Lastly, Sergeant Sellers did not feel her Supervisory Performance Report reflected Lieutenant's Williams' true observations. The evaluation was based more on comments other supervisors made regarding her. An example was when Lieutenant Andrew Heyob, Badge: L501, District Three, met with Sergeant Sellers and informed her that it was reported that she remains in the district too long.

Sergeant Sellers believed that due to the internal investigation brought by Sergeant Schank's complaint, Lieutenant Williams rated Sergeant Sellers lower to show that he did not show favor toward her. Lieutenant Williams never approached Sergeant Sellers or had a discussion about her deficiencies prior to her performance review.

Sergeant Sellers stated that due to some of the supervisor's lack of answering the police radio, Lieutenant Williams' reassigned supervisor's unit numbers to make sure supervisors were called upon equally. This upset some of the supervisors and brought dissention. Sergeant Sellers never worked with any of the other supervisors prior to her promotion.

Besides the Form 25S, Sergeant Sellers was not aware of any other form of hers altered by Sergeant Schank.

Sergeant Sellers did not feel the environment at District Three was conducive for women. Sergeant Hall was disgruntled due to being sent from second shift to third shift repeatedly. Sergeant Hall was angry, explosive, and would throw objects.

During Sergeant Sellers' meeting with an insubordinate officer, Sergeant Hall interjected and stated to the officer as he held a pen, "You see this? I could just fuck you with this." Sergeant Sellers stated she did not wish to be involved should the officer complain. Sergeant Sellers informed Lieutenant Williams. Sergeant Sellers was not certain if Lieutenant Williams followed up with Sergeant Hall.

Additionally, at another time Sergeant Sellers inquired of Sergeant Hall if Sergeant Putnick completed lineups. Sergeant Hall replied, "You mean Sergeant Fucknick, the one who has the Lieutenant's balls in his mouth?" Sergeant Sellers felt uncomfortable and left the area.

Sergeant Sellers spoke to her husband about this incident, who advised Sergeant Sellers to try to deal with it. Sergeant Sellers stated it was known that Sergeant Hall talked negatively about anyone he did not care for. Upon learning Sergeant Seta had another child, Sergeant Sellers heard Sergeant Hall state, "Oh fuck, we have another midget in the world." Sergeant Sellers approached Lieutenant Williams about these incidents but was not aware if there was any follow up.

Sergeant Sellers was alone in the Neighborhood Liaison Unit (NLU) area of District Three typing a form. Sergeant Hall approached her, placed his hands on her shoulders, and stated, "You do not want to separate yourself." Both the assertion of being deemed separate and together with Sergeant Hall's physical contact made Sergeant Sellers uncomfortable. Sergeant Sellers stated, "Massaging her shoulders is something my husband would do."

Sergeant Sellers stated she froze because she was angry. Sergeant Sellers was overwhelmed because of all she had dealt with due to the language, the fear of retaliation, and at that moment shut down. Sergeant Sellers was not sure if this incident was observed by anyone else.

Sergeant Sellers felt the language used by Sergeant Hall was inappropriate. The language used by Sergeant Hall was confined to the sergeant's office. Sergeant Sellers does recall involvement in a discussion regarding a male dancer, but she did not initiate it. This discussion occurred in the sergeant's office but Sergeants Sellers could not recall how the subject came up.

Sergeant Sellers stated the nicknames given to officers in roll call by Lieutenant Williams were inappropriate. Officers stated that the names were inappropriate, but the practice continued. Sergeant Sellers stated the pictures on display outside the lieutenant's office did not bother her. Sergeant Sellers never complained to Lieutenant Williams that she felt the nicknames were inappropriate.

Sergeant Sellers stated no one approached her with knowledge of another sergeant's attempt to undermine her. Sergeant Sellers felt that Lieutenant Williams was hard on her due to her administrative abilities and expected more of her. This caused Sergeant Sellers to have more responsibilities. Sergeant Sellers stated people saw her in the district at times due to her administrative duties. After Sergeant Schank was transferred, Sergeant Sellers assumed his responsibilities.

Although Sergeant Sellers was allowed to change her hours, it was no more than any other supervisor was allowed. Sergeant Sellers worked out an arrangement to adjust her hours to instruct at the Police Academy. Sergeant Sellers was not aware of what Lieutenant Williams informed the other sergeants regarding her flex time, but Sergeant Sellers would inform whoever the other sergeant was when she had to leave early to accommodate her instruction.

Sergeant Sellers has never been awakened by or been discovered by another officer sleeping on duty. Sergeant Sellers feels that this issue has been created in response to the ongoing internal investigation as an attempt to discredit her.

Sergeant Sellers stated that on one occasion as she was seated in her marked police vehicle in the district parking lot, she was dispatched on a call for service. This was at the end of power shift (0500 hours). Sergeant Sellers flashed the lights of her vehicle to the officers inside waiting to secure. The officers responded by filing outside and Sergeant Sellers continued to the call for service. Sergeant Sellers stated she prefers to physically see each officer as they secure and did not want to get out of her vehicle to reenter the district.

Sergeant Sellers believed that due to her complaint, Lieutenant Williams has retaliated against her. On February 17, 2018, Sergeant Sellers secured with another sergeant early and went home. Lieutenant Williams' policy was to allow sergeants partial time off with approval by a sergeant on duty. Entire shifts off were to be approved by Lieutenant Williams.

On February 17, 2018, Lieutenant Williams was on duty and believed Sergeant Sellers should have informed him that she was leaving. Lieutenant Williams made an instructional Evaluation Supplement Log (ESL) entry into Sergeant Sellers Employee Tracking Solution (ETS). Sergeant Sellers complained to Captain Paul Broxterman, Badge: C23, District Three. After a meeting with Captain Broxterman, the ESL was removed from ETS.

Lieutenant Williams sent Sergeant Sellers several emails regarding training issues including the relief. The training dates were entered in error in the time book. No officers missed training. The officers approached Lieutenant Williams and stated their training was scheduled on their off days. Sergeant Sellers stated this was due to fact that Lieutenant Williams changed their off day group and did not notify her. Sergeant Sellers was responsible for scheduling training at the time.

Further retaliation was demonstrated when Lieutenant Williams informed Sergeant Sellers that in his absence, Lieutenant Heyob would monitor Sergeant Sellers.

## Sergeant Chris Seta, Badge: S968, District Three

On December 2, 2017, Sergeant Sellers submitted a Form 25S. The form indicated that Sergeant Sellers took the first 90 minutes of her shift off. The form was altered by Sergeant Schank to reflect what he believed to be Sergeant Sellers' actual starting time of 2315 hours. This incident began a series of complaints filed by Sergeant Schank and Sergeant Sellers.

Sergeant Seta stated that upon her arrival to District Three as a new supervisor, Sergeant Sellers was dismissive when other Sergeants offered her assistance. Sergeant Sellers stated that her years of experience as an investigator were equal to five years as a supervisor. The other sergeants did not appreciate this statement.

Due to the fact that Sergeant Seta worked more frequently with Sergeant Schank, he heard more concerns from Sergeant Schank regarding Sergeant Sellers then from Sergeant Sellers regarding Sergeant Schank. On one occasion Sergeant Schank stated that due to Sergeant Sellers' attitude, he was not going to offer Sergeant Sellers any further assistance. Sergeant Schank and Sergeant Sellers attempted to avoid one another.

Sergeant Sellers gave Sergeant Seta an example of Sergeant Schank's attempts to undermine her.

On September 21, 2017, Police Officer Michael Roetting, Badge: P210, District Three, was ordered by Sergeant Sellers to respond to a call for service and complete an incident report. Officer Roetting, via cellular telephone, contacted Sergeant Schank regarding the call for service. Sergeant Schank instructed Officer Roetting to respond to the call and to take the necessary action.

As a result of Officer Roetting's investigation and due to lack of his knowledge regarding procedure 12.910, Missing Persons, Officer Roetting failed to complete an incident report. Sergeant Sellers believed this was due to a counter-order issued by Sergeant Schank. Sergeant Sellers did not realize Officer Roetting gave Sergeant Schank partial information. Sergeant Seta believe this was a case of "boss shopping" more than Sergeant Schank undermining Sergeant Sellers.

Sergeant Seta believed Sergeant Sellers had a less than desirable work ethic. Sergeant Seta compared her to an officer who always responds second on calls for service, but he never addressed it with her. There was a two week period that Sergeant Sellers seemed to become more involved with the relief operation, but it lessened when the complaints began. Sergeant Seta stated that he was aware Sergeant Sellers had some personal issues but never discussed them with her.

Sergeant Seta stated Lieutenant Williams allowed sergeants to begin their tour of duty earlier than usual provided there were enough sergeants to cover the late officers. The sergeants were to communicate amongst themselves as to who would begin early.

Sergeant Sellers would begin her tour of duty early without prior discussion with the other sergeants. Additionally, after Sergeant Sellers secured for the evening, Sergeant Seta would be overwhelmed by the amount of work left for the late sergeant due to a lack of assistance from Sergeant Sellers.

Sergeant Seta stated he got along with Sergeant Sellers, but there were incidents that he felt were questionable.

Sergeant Sellers would secure from her tour of duty early from time to time. Sergeant Seta believed that Sergeant Sellers had an arrangement with Lieutenant Williams, that due to her instructing at the Police Academy, she would flex her hours and adjust for her instruction at the Academy.

On November 27, 2017 Sergeant Sellers' rounds reflected that she secured at 0400 hours, but Sergeant Seta stated she secured at approximately 2230 hours. Along with her daily rounds from that shift there was a Form 68P, Overtime and Court Appearance Report. Sergeant Seta stated that he understood that there was an arrangement between Sergeant Sellers and Lieutenant Williams for securing early and making up the time at the Academy, but he believed the Form 68P was odd.

Sergeant Seta believed Sergeant Sellers was shown preferential treatment by Lieutenant Williams. She had no responsibilities that required any considerable time to complete. Additionally, Lieutenant Williams instructed ECS not to dispatch Sergeant Sellers on calls for service that required a supervisor. New supervisors were traditionally sent the bulk of calls for service that require a supervisors' attention. Sergeant Seta, as a new supervisor, did not want to muddy the waters and tried to remain out of the conflict.

Following the events on December 2, 2017, Sergeant Seta believed he was drawn into this conflict when he was directed, along with Sergeant Hicks, to report to Lieutenant Williams' office. Lieutenant Williams was concerned about a key box and wanted to know why the box was not secured properly. Lieutenant Williams transitioned to the topic of Sergeant Sellers. Sergeant Seta believed Sergeant Sellers is what Lieutenant Williams truly wanted to discuss.

Lieutenant Williams ranted about sergeants not getting along. Sergeant Seta believed that this rant should not have been directed at himself and Sergeant Hicks solely. Sergeant Seta thought that Lieutenant Williams should address all of the sergeants with the issues. Sergeant Seta was not working on December 2, 2017. Sergeant Seta did not state his thoughts to Lieutenant Williams.

Sergeant Seta stated that Lieutenant Williams remarked he would make his sergeant's lives hell. While Sergeant Seta believed Lieutenant Williams meant that all the sergeants should get along and work together, although the sergeants with the issues were not present at this meeting. Sergeant Seta believed that by not addressing his concerns with the involved sergeants, Lieutenant Williams was showing preferential treatment to Sergeant Sellers. Sergeant Seta could not recall which supervisors were working that night. Sergeant Seta did not believe Lieutenant Williams' rant was based either race or sex.

Sergeant Seta stated that after the complaints were filed, he did not want to approach the Lieutenant with any issues regarding the operation of the relief. He believed Sergeant Sellers filed her complaint after being made aware of Sergeant Schank's complaint. Sergeant Seta believed that if he brought a situation to Lieutenant's attention, he would be retaliated against. This was exemplified by the Form 25S that Sergeant Sellers completed and that was altered by Sergeant Schank to represent the time Sergeant Sellers actually arrived at work on December 2, 2017.

Sergeant Seta stated the issue was Sergeant Sellers arriving 45 minutes late, submitting a fictitious Form 25S, but became about Sergeant Schank's arrival times with an audit of entry times to District Three.

Sergeant Seta does not believe Sergeant Schank or any other supervisor attempted to undermine, talk down to, or demean Sergeant Sellers. Sergeant Schank and Sergeant Hicks felt it was best to avoid Sergeant Sellers as much as possible.

Sergeant Seta stated he would always assist another sergeant, but that he may rethink his approach going forward due to Sergeant Sellers' complaint against Sergeant Hall.

Sergeant Hall stated Sergeant Sellers filed a complaint against him which stated that on February 8, 2018, at approximately 0145 hours, he rubbed her shoulders while she sat alone in the NLU area of District Three. Sergeant Hall stated he was about to secure for the evening, and reached out to Sergeant Sellers because she isolated herself all shift from the other sergeants on duty.

Sergeant Seta stated he did not witness the incident; however, Sergeant Sellers did sit in the NLU area alone for the bulk of the shift. Sergeant Seta stated he almost approached her himself earlier.

Sergeant Hall approached Sergeant Sellers and patted her on the shoulder to get her attention. Sergeant Hall believed she saw him approach her then put her head down. Sergeant Sellers acted startled. This caused Sergeant Seta to watch his own behavior due to Sergeant Sellers' complaints against Sergeant Schank, Sergeant Hall, Lieutenant Williams, Captain Jones, and Sergeant Hicks.

Sergeant Seta did not feel threatened or targeted by Lieutenant Williams.

Sergeant Seta stated he did not hear Lieutenant Williams refer to Sergeant Hicks or any other white officer as the "white devil." Sergeant Seta stated this occurred at a cookout at District Three. Sergeant Seta was not present at the cookout, and the way Sergeant Hicks explained the incident to him was that it occurred in a joking manner.

Sergeant Hicks joked he would contact Lieutenant Williams wife and inform her if Lieutenant Williams was at work or not and Lieutenant Williams would retort back. This was the two "pushing each other's buttons." Sergeant Seta stated that his understanding was that it was not meant to be vindictive, but was "locker room talk."

Sergeant Seta stated Lieutenant Williams has made it difficult to supervise by having an open door policy, allowing officers to approach him over issues the sergeants had previously dealt with.

Sergeant Seta stated when Sergeant Sellers first arrived at District Three he offered to help her with any issue she may have had.

### Sergeant Jacob Hicks, Badge: S259, District Three

On December 2, 2017, Sergeant Sellers submitted a Form 25S, Cincinnati Police Department-Request for Leave of Absence. The form indicated that Sergeant Sellers, who was to begin her shift at 2100 hours, took the first 90 minutes of her shift off. The form was changed by Sergeant Schank to reflect what he believed to be Sergeant Sellers' actual starting time of 2315 hours. This incident began a series of complaints filed by Sergeant Schank and Sergeant Sellers.

Sergeant Hicks was on duty the night of this incident. Sergeant Sellers was scheduled to report for duty at 2230 hours. At approximately 2310 hours, the Channel Three Operator called Sergeant Sellers. Sergeant Sellers did not respond. At approximately 2317 hours, Sergeant Sellers walked into the sergeant's office. Sergeant Hicks had just concluded a telephone conversation with the ECS supervisor. ECS, via telephone, called District Three to inquire about the whereabouts of Sergeant Sellers. Sergeant Hicks informed Sergeant Sellers of the call from ECS.

Sergeant Schank, who was Officer in Charge (OIC), changed Sergeant Sellers' Form 25S to reflect a 2315 hour arrival. There was no discussion about it.

Sergeant Hicks stated that December 2, 2017, was not the first time that this type behavior was displayed by Sergeant Sellers. This was the culmination of a series of coming and going as she pleased.

Sergeant Hicks stated he believed Sergeant Sellers and Lieutenant had a prior arrangement that the other sergeants were not privy to. Sergeant Sellers would not physically secure whether it was in person or via police radio with the other sergeants. No official documentation was made regarding Sergeants Sellers' arrival and departure.

Sergeant Hicks stated partial time off could be granted by another sergeant. Entire days off had been approved by the Lieutenant.

The next morning Sergeant Sellers arrived at District Three and discovered the change in the Form 25 she submitted, and texted Sergeant Hicks and Sergeant Schank. Sergeant Sellers informed them of her displeasure, stated they are not her supervisor, and instructed them never to do that again.

On December 3, 2017, Lieutenant Williams had a meeting with Sergeant Seta and Sergeant Hicks. Lieutenant Williams went on a rant and threatened to make their lives hell if they did not leave it alone. Sergeant Hicks believed Lieutenant Williams meant for all the sergeants to leave Sergeant Sellers alone regarding her time used.

Sergeant Hicks stated Lieutenant Williams has called him "white devil" on several occasions. This began in September 2017. Additionally Lieutenant Williams has several nicknames that are racially infused, such as "pale rider."

Sergeant Hicks stated he felt the nicknames were racially infused and meant to demean Sergeant Hicks, specifically, to put Sergeant Hicks in his place. Sergeant Hicks stated Lieutenant Williams made no effort to conceal this. There was a poster that hangs outside the lieutenant's office that depicts a photograph of officers with their assigned nickname.

*Note: According to the poster Police Officer Richard Christoph, Badge: P620, District Three, is referred to as "pale rider."*

Sergeant Hicks stated the sergeants are treated differently. Sergeant Sellers did not have to respond to the police radio. Sergeant Hicks inquired why and Lieutenant Williams stated that this was due to Sergeant Sellers having problems. This caused discord amongst the other sergeants which went on for months.

Sergeant Sellers was allowed to come to work and not wear her gun belt. Sergeant Sellers was not required to clear reports in RMS. Sergeant Hicks stated he spoke with Captain Jones about this.

Captain Jones stated he would look into it and informed Sergeant Hicks that this is classified as a hostile work environment and this would be handled by the captain. Captain Jones stated, "Lieutenant Williams was told to get his house in order."

Sergeant Hicks stated every other sergeant on the relief was very helpful to Sergeant Sellers. There were obvious deficiencies displayed by Sergeant Sellers that could be attributed to her recent promotion. Sergeant Hicks stated they were all new sergeants and tried to work together.

Sergeant Sellers was not receptive to criticism and stated her experience as an officer prepared her for supervision. Whenever Sergeant Sellers made a mistake, she made excuses.

Lieutenant Williams did not ask anyone to "vouch" for Sergeant Sellers. This is a means of putting a new person on the spot their first day. Sergeant Hicks was not offended but believed from the start Sergeant Sellers had an easier go of it and was treated nicer than the other new sergeants.

Sergeant Hicks believed that Sergeant Sellers review was superior to the other sergeants. Sergeant Hicks stated there were occasions when he was contacted by officers who were waiting to secure. This was a responsibility at times of Sergeant Sellers. The officers informed Sergeant Hicks that Sergeant Sellers was asleep and they did not know how to respond. Sergeant Hicks did not confirm this, but he did see her in a marked police vehicle with her eyes closed. Sergeant Hicks' texted Sergeant Sellers and she responded and secured the officers.

Sergeant Hicks stated he has never attempted to undermine Sergeant Sellers' ability to supervise.

Sergeant Hicks has never changed the work of Sergeant Sellers unless it was to make a correction.

Sergeant Hicks stated he never left the majority of work for Sergeant Sellers.

Sergeant Hicks never instructed Sergeant Sellers to slow down so other Sergeants can get called by the dispatcher.

Sergeant Hicks believed when Lieutenant Williams changed the sergeant's car numbers, it was in attempt to make things easier for Sergeant Sellers. Sergeant Hicks believed this was in retaliation for the other sergeants bringing Sergeant Sellers deficiencies to light.

Following the events after December 2, 2017, none of the sergeants felt they could go to Lieutenant Williams for anything.

### Sergeant Luke Putnick, Badge: S01; District Three

On December 2, 2017, Sergeant Sellers submitted a Form 25S. The form indicated that Sergeant Sellers, who was to begin her shift at 2100 hours, took the first 90 minutes of her shift off. The form was changed by Sergeant Schank to reflect what he believed to be Sergeant Sellers' actual starting time of 2315 hours. This incident began a series of complaints filed by Sergeant Schank and Sergeant Sellers. Sergeant Putnick was not on duty that evening.

Sergeant Putnick worked with Sergeant Sellers one day a week. During those times Sergeant Putnick never heard Sergeant Schank talk down to or attempt to demean Sergeant Sellers. Sergeant Putnick was never talked down to or demeaned by Sergeant Schank.

Sergeant Putnick believes there was a communication problem in general amongst the sergeants. The problem is that new supervisors attempt to take action as opposed to running ideas past other sergeants and communicating actions they have taken. If someone has a responsibility, and someone other than the responsible party makes a change, it should be communicated.

This is exemplified by an instance where Sergeant Sellers had a discussion with an officer regarding beats and the information was not passed along to Sergeant Putnick. Sergeant Putnick stated at the time he was responsible for the time book. Sergeant Putnick informed Sergeant Sellers that permanent beats were not possible at this time due to the influx of new officers and changes that would have to be made. This was not in an effort to undermine anyone. Sergeant Sellers went to Lieutenant Williams on behalf of the officer who requested the permanent beat. The Lieutenant asked Sergeant Putnick why he would not give the officer a permanent beat. Sergeant Putnick expressed his thoughts and Lieutenant Williams agreed.

Sergeant Putnick stated there is some animosity regarding work assigned. This stems specifically from Sergeant Sellers' lack of work. On the one day they worked together, Sergeant Putnick never saw her. She remained in the District and if Sergeant Putnick saw her there it was seated with her gun belt and her vest off. Sergeant Putnick stated to his knowledge, Sergeant Sellers responded to only one robbery in the time were at District Three together.

Sergeant Putnick believed that if Sergeant Sellers remained in the District, she should at least check reports submitted by officers but she didn't. Sergeant Putnick stated some other supervisors do the bare minimum, but they do something. Sergeant Sellers did nothing. Sergeant Putnick did not address it with her because he believed there is nothing you can do with an individual like that. Sergeant Putnick just did his job and moved on.

Sergeant Putnick believed Lieutenant Williams was too easy on Sergeant Sellers and did not understand the reason why, but he was the lieutenant and Sergeant Putnick did not want to become involved. Sergeant Putnick was not aware of any arrangement between Sergeant Sellers and Lieutenant Williams.

Sergeant Putnick believed that if Sergeant Sellers tried and worked, things would have gone easier for her. Additionally, Sergeant Sellers took a lot of time off.

Sergeant Putnick did not approach Lieutenant Williams about his concerns. He shouldered the responsibility and moved on.

Sergeant Putnick has observed Sergeant Sellers sitting in marked vehicle, but could not confirm if she was sleeping.

Sergeant Putnick was unaware of Sergeant Schank's, Sergeant Hicks', and Sergeant Seta's concern regarding retaliation from Lieutenant Williams.

Sergeant Putnick did not hear Lieutenant Williams refer to Sergeant Hicks as "white devil." Sergeant Putnick has heard nicknames used by Lieutenant Williams, but they are no different than any other nicknames he has heard during his career.

Sergeant Putnick does not feel race or sex affects Lieutenant Williams' actions. Sergeant Putnick has not observed Lieutenant Williams treat Sergeant Schank differently due to race.

### Sergeant Stephen Bower, Badge: S43, District Three

On December 2, 2017, Sergeant Sellers submitted a Form 25S, Cincinnati Police Department-Request for Leave of Absence. The form indicated that Sergeant Sellers, who was to begin her shift at 2100 hours, took the first 90 minutes of her shift off. The form was changed by Sergeant Schank to reflect what he believed to be Sergeant Sellers' actual starting time of 2315 hours. This incident began a series of complaints filed by Sergeant Schank and Sergeant Sellers. Sergeant Bower was not on duty that evening.

Sergeant Bower stated he recalled a time that Sergeant Sellers approached him and stated Sergeant Schank had talked down to her. Sergeant Bower informed Sergeant Sellers that he overheard the conversation, and that was how Sergeant Schank always speaks. Sergeant Bower did not think Sergeant Schank was talking down to her nor did he attempt to undermine her. Sergeant Bower stated Sergeant Schank's disposition is the same to everyone, including his family.

Sergeant Bower heard about the Form 25S from December 2, 2017. Sergeant Bower stated if he felt a form was incorrect, he would not sign it, but he would not alter it. Sergeant Bower assists Lieutenant Williams in assigning responsibilities to the other sergeants. Sergeant Sellers had the least amount of responsibilities of all the other sergeants. There was not any favoritism displayed when responsibilities were assigned.

Sergeant Bower stated the current atmosphere is volatile. Everyone is afraid that they will be complained on. Sergeant Sellers' work ethic is terrible. Sergeant Sellers does not check reports completed in RMS. Sergeant Sellers is consistently tardy. Sergeant Sellers secures early often due her instructional commitment at the Police Academy. Sergeant Bower has observed Sergeant Sellers apparently asleep in the rear of the parking lot. Sergeant Bower has tapped on her window to wake her.

Sergeant Bower has seen Form 68P submitted when she appears to secure early. Sergeant Bower is not aware of the arrangement between Sergeant Sellers and Lieutenant Williams.

Sergeant Bower stated that there has not been an environment created by any sergeant which makes it difficult for Sergeant Sellers to supervise. Lieutenant Williams bent over backward to accommodate Sergeant Sellers due to her childcare and other personal issues. He would assist any other supervisor in the same manner. Lieutenant Williams worked one shift to allow Sergeant Bower a night off.

Sergeant Bower was present for Lieutenant Williams' interview with Sergeant Schank. Sergeant Schank heard Lieutenant Williams state he would make the sergeants lives miserable. Sergeant Bower stated this was taken out of context. It was a statement to "knock it off and work together." There was a moment when Lieutenant Williams raised his voice. Sergeant Schank refused to answer a question during the interview by Lieutenant Williams. Lieutenant Williams, in a raised voice, asked Sergeant Schank if he refused to answer his question.

Sergeant Schank alleged Sergeant Sellers is a close subordinate of Lieutenant Williams. Sergeant Sellers has so many personal issues, which include her husband being away at training, and the Lieutenant allowed Sergeant Sellers to switch days off.

Sergeant Bower never heard Lieutenant Williams refer to Sergeant Hicks as, "white devil." Sergeant Bower has never heard any racially derogatory terms used by Lieutenant Williams. Sergeant Bower has pseudo folliculitis. On occasion he reported for duty without shaving due to the irritation. Lieutenant Williams inquired, "You're a black man tonight?" Sergeant Bower laughed and replied, "Yes." This statement was in fun. There is no racially charged atmosphere on the relief. There are no sexual overtones either.

Sergeant Bower stated Sergeant Schank's work ethic could use improvement as well. Lieutenant Williams noticed this and correct Sergeant Schank from time to time. But in no way was Lieutenant Williams demeaning toward Sergeant Schank. Lieutenant Williams informed Sergeant Schank that if he did not want to be on third relief, he would assist in moving him. Lieutenant Williams stated he could not fix issues that he is not aware of.

## Sergeant Kenneth Hall, Badge: S29, District Three

On December 2, 2017, Sergeant Sellers submitted a Form 25S. The form indicated that Sergeant Sellers, who was to begin her shift at 2100 hours, took the first 90 minutes of her shift off. The form was changed by Sergeant Schank to reflect what he believed to be Sergeant Sellers' actual starting time of 2315 hours. This incident began a series of complaints filed by Sergeant Schank and Sergeant Sellers. Sergeant Hall was not on duty that evening.

On February 8, 2018, at approximately 0145 hours, Sergeant Hall was preparing to secure for the night. Sergeant Hall's routine before he leaves is to check out with another supervisor to see if they require anything before he departs.

Sergeant hall observed Sergeant Sellers in the NLU office, approached her and tapped her on the right shoulder. Sergeant Sellers jumped as if she was startled and let out shriek. Sergeant Hall stepped back and stated, "What the fuck?" Sergeant Sellers giggled and stated you just startled me.

Sergeant Hall told Sergeant Sellers she does not want to alienate herself by sitting there alone. Sergeant Hall asked Sergeant Sellers if she needed anything before he left. She replied no, and Sergeant Hall left for the night. Sergeant Hall described the encounter as having approached Sergeant Sellers from the right and tapped Sergeant Sellers on the right shoulder while she was seated at a desk closest to the District Three administrative office.

Sergeant Hall returned to work the next day and spoke with Sergeant Bower.

Sergeant Hall informed Sergeant Bower about what occurred the night before, adding that he should not have said anything due to Sergeant Sellers having called off track leaving him to work alone a week earlier.

Sergeant Hall stated he had been trying to not hold grudges due to all the tension of trying to keep third relief functional lately. That is the only reason he said anything at all to Sergeant Sellers.

Sergeant Hall stated he was contacted by Captain Paul Broxterman, via cellular telephone, regarding the incident that occurred the night before with Sergeant Sellers. Sergeant Sellers stated Sergeant Hall placed his hands on her shoulders in an inappropriate massaging manner. Sergeant Hall has had no contact or conversation with Sergeant Sellers since February 8, 2018. Sergeant Hall had never met Sergeant Sellers prior to her being transferred to District Three as a supervisor.

Sergeant Hall stated neither Sergeant Schank nor any other sergeant attempted to undermine Sergeant Sellers. Anytime Sergeant Sellers made a mistake, she claimed someone was trying to sabotage her. Sergeant Hall stated Sergeant Schank has not undermined Sergeant Sellers in front of subordinates.

Sergeant Hall stated second shift supervisors did not instruct Sergeant Sellers to slow down and let other third shift supervisors answer the radio. Second shift supervisors have complained that they have answered the radio because Sergeant Sellers will not answer the radio. No one has tried to impede Sergeant Sellers' ability to supervise.

Sergeant Hall resumed the time book responsibilities. Sergeant Sellers would sit in the office with her gun belt off and work on the time book for an entire shift. Sergeant Hall informed Sergeant Sellers it did not require hours to do the time book. During this time Sergeant Sellers would not answer her police radio. Sergeant Sellers stated she did not have to answer the radio because she was doing everything else. This included folders for instruction at the Police Academy. Sergeant Bower and Sergeant Hall had to redo the time book due to errors made by Sergeant Sellers.

Sergeant Hall stated he and Sergeant Bower had attempted to assist Sergeant Sellers, but the complaint about the incident in the NLU office is an example of how Sergeant Sellers took advantage of the other sergeants and used the situation for her own benefit.

Sergeant Hall has observed Sergeant Sellers asleep and has awakened her before he secured. Sergeant Sellers slept in her marked police vehicle, would awake to secure officers by shining her spotlight, then return to sleep.

Lieutenant Williams allowed Sergeant Sellers to work early, but Sergeant Hall requested she be placed back on the late shift because Sergeant Hall does not want to work her following the complaint. Sergeant Hall believes Sergeant Sellers has filed complaints in an effort to be transferred to another District.

Lieutenant Williams' open door policy has made it difficult to supervise for the sergeants at times. This was not specific to Sergeant Sellers. This was for all supervisors.

Sergeant Hall was aware of the nicknames used by Lieutenant Williams. Sergeant Hall and Sergeant Bower have informed Lieutenant Williams that they would not use nicknames at work. Sergeant Hall stated there were some officers that informed the Lieutenant Williams that they did not care for the nicknames and it ceased for them.

Sergeant Hall stated there was an occasion that he used crude language in Sergeant Sellers' presence. Sergeant Sellers directed Officer Roetting to report to the sergeant's office. Sergeant Sellers inquired why Officer Roetting failed to complete an incident report that she directed him to complete. Officer Roetting failed to answer the question and was being disrespectful toward Sergeant Sellers. Sergeant Hall interjected and informed Officer Roetting, "If you want me to fuck you with this pen, I can do it a hell of lot more than you realize." The profane language was not meant to be sexual in nature. It was analogous with stating, "I will write you up." Sergeant's Hall dialogue was directed toward Officer Roetting.

Sergeant Hall stated that Sergeant Sellers joined in the locker room dialogue. She made a reference to a male officer who was an exotic dancer, placing a stuffed sock in his crotch to appear larger.

Sergeant Hall stated that any type of advice, corrective measure, or information that was given to Sergeant Sellers was done to improve the operation of the relief and to lessen the appearance to officers that there were problems amongst the third shift supervisors.

There has been no malice by anyone, including Sergeant Schank, directed toward Sergeant Sellers.

Sergeant Hall was not aware of any issues with Sergeant Sellers, sexual in nature or otherwise. No one approached Sergeant Hall to alert him of any issues with Sergeant Sellers.

Sergeant Hall stated Sergeant Sellers' first few weeks on the relief were great. She worked hard and was on time. After the third week everything changed. Her work quality changed and Lieutenant Williams reminded Sergeant Hall that he had vouched for Sergeant Sellers.

Sergeant Hall's statements in Sergeant Sellers' presence were not sexual in nature.

Sergeant Hall only tapped Sergeant Sellers on the right shoulder with his right hand.

### Lieutenant Joseph Williams, Badge: L22, District Three

On December 3, 2017, Sergeant Schank stated he was told that Lieutenant Williams stated he was going to make his life a living hell.

Lieutenant Williams has received several new or recently promoted sergeants on his relief. Lieutenant stated he has lucked out as the new supervisors have worked hard and tried to excel. There was a running motto, "Don't disappoint L22." Lieutenant Williams would remind the sergeants of the motto from time to time to get them back on track in the event they made a mistake.

Lieutenant Williams stated that at some point he found himself faced with three brand new sergeants in Sergeant Schank, Sergeant Hicks and Sergeant Sellers. The three did not work well together. The issue was not so much the sergeants as individuals but the lack of ability to work together that led to chaos.

Sergeant Hicks had a quirky personality and Sergeant Schank did not communicate or speak well to his subordinates. His tone was abrupt and rude. On one occasion Lieutenant Williams observed an officer make a request of Sergeant Schank and his response was rude. Lieutenant Williams approached Sergeant Schank following the conversation and informed him the tone was not appropriate. Sergeant Schank seemed oblivious to the statement. Lieutenant instructed Sergeant Schank to monitor this going forward.

Lieutenant Williams documented this conversation on Sergeant Schank's Annual Performance Report. Sergeant Schank requested Lieutenant alter the terminology because he felt the wording would hinder obtaining a new assignment in the future. Lieutenant Williams thought about it and altered the terminology but left the meaning in the body of the writing.

Week after week, when Lieutenant Williams returned from his off days he was met with drama. This group of sergeants seemed to cheer for each other's failure rather than work as a team. In some form of communication, an email or in person, Lieutenant Williams informed the sergeants if they to fail to work together, he would he would make their lives as miserable as they have made his life.

Lieutenant Williams stated he had good sergeants, but the miserable sergeants got everyone riled up. Lieutenant Williams decided to rotate car numbers. This was in an effort to have each of the sergeants feel what it was like to be the junior sergeant on a regular basis. The sergeants were rotated. This rotation was not meant to benefit one sergeant. It was meant to remind each sergeant that they needed to count on each other.

Sergeant Schank stated Lieutenant Williams showed preferential treatment to Sergeant Sellers. Lieutenant Williams stated he allowed Sergeant Sellers to work from her residence while she instructed at the Police Academy. Sergeant Sellers was to keep track of the time she spent at her residence and make up for it by leaving work early at times.

Lieutenant Williams tried to prevent Sergeant Sellers taking her own time off to instruct at the Police Academy. Lieutenant Williams stated that the instructing was spread over two to three weeks, but it did not interfere with the operation of the relief. Lieutenant Williams stated the other supervisors were aware and that if this became a problem, they were to contact him.

Lieutenant Williams stated the board of names was created in good nature. The practice of giving nicknames had gone on for years. If an officer was opposed to a name, no name was given. Some officers anticipated a nickname. This was an effort to build comradery.

Sergeant Hicks was never referred to as "white devil." Supervisors did not receive a name in general. Sergeant Bower did receive the name, "T-Bone." This was because of an automobile accident he was involved in. Lieutenant Williams stated he never used terminology that could be mistaken for "white devil." Sergeant Sellers did not receive a nickname. Lieutenant Williams stated he did not trust that she had that type of humor.

Lieutenant never observed the other sergeants make it difficult for Sergeant Sellers to supervise. Lieutenant Williams stated Sergeant Schank and Sergeant Sellers had a conversation where he spoke to her in the same manner in which he did to an officer. The tone may have been inappropriate. Sergeant Bower attempted to mediate the incident but the situation was never resolved. They continued to bicker.

When Sergeant Sellers arrived, Sergeant Hall took Sergeant Sellers "under his wing." Lieutenant Williams stated on an individual's first day there was a routine for another officer to vouch for them. This was to help establish trust. Sergeant Hall vouched for Sergeant Sellers.

Sergeant Bower aided Sergeant Sellers and she could always contact Lieutenant Williams.

It was reported to Lieutenant Williams that Sergeant Sellers became full of herself and stated her experience as an investigator was equivalent to five years of experience as a supervisor. Lieutenant Williams did not feel the need to address this because in a short time Sergeant Sellers would discover this not to be true.

Lieutenant Williams stated all the sergeants had understood responsibilities. The two most senior sergeants had less responsibility. These sergeants were in charge when Lieutenant was off. Sergeant Sellers was given less responsibility due to the fact that she had officers who required the most supervision. The supervisory duties were rotated constantly. Lieutenant wanted the new supervisors to experience every aspect of supervision. Lieutenant Williams believe that although the new sergeants were a challenge, he could handle it without assistance.

When Sergeant Sellers informed Lieutenant Williams about the Form 25S altered by Sergeant Schank, Lieutenant Williams was on his off days. Sergeant Sellers was instructed to change the form back and that upon his return to duty, Lieutenant Williams would address it. Lieutenant Williams did not instruct Sergeant Sellers to confront Sergeant Hicks and Sergeant Schank via text message.

Although Lieutenant Williams was on his off day, he contacted Sergeant Hicks and Sergeant Schank and informed them there would be no time off and that he was coming in to meet with them. Sergeant Schank stated he was sick and would not be in that evening. Lieutenant Williams attempted to meet with the sergeants on his off days, but each time one or two could not make it in.

When Lieutenant Williams met with Sergeant Schank he was not receptive. Sergeant Schank insisted on having another sergeant present. Sergeant Bower accompanied Sergeant Schank to meet with Lieutenant Williams. Sergeant Schank would not answer Lieutenant Williams' questions. Lieutenant Williams was confused at Sergeant Schank's reaction. Lieutenant Williams stated that he tried to assist all of the sergeants no matter what the issue.

Lieutenant Williams stated Sergeant Schank complained that Lieutenant Williams favored particular sergeants. Sergeant Schank did not seem to recall when Lieutenant Williams allowed Sergeant Schank time off and provided coverage when Sergeant Schank needed to attend to personal business in Florida after a hurricane, or when he was allowed to change off days to attend a vacation with his family.

Lieutenant Williams stated he depended on his sergeants and accommodated them whenever possible. The situation has gotten to a point where he can no longer do that due to the fact that the sergeants have become abusive and have exploited the situation.

Lieutenant Williams stated any discipline or closed door meeting was not based on race. The adjustment to car numbers affected everyone, not just one sergeant. Even the sergeants that acted responsibly were affected.

Lieutenant Williams stated Sergeant Sellers' performance review reflected her time as a new supervisor. Sergeant Sellers received a Meets Standards+ rating. There was confusion as to whether this was Sergeant Sellers' annual or probationary rating period. Lieutenant Williams stated that he rarely rates a new Sergeant above Meets Standards-.

Lieutenant Williams' main criticism was for Sergeant Sellers to work more as a team with her peers to ensure that items did not fall through the gaps. Sergeant Sellers took exception to this; however, to be fair Lieutenant Williams altered the wording just as he adjusted the wording on Sergeant Schank's performance evaluation. Sergeant Sellers accepted and signed the evaluation.

One week later Sergeant Sellers, via text message, contacted Lieutenant Williams and expressed her displeasure with the rating and requested to meet with the captain. In the end Lieutenant Williams stated he felt if he helped out one sergeant he should help out the other.

Lieutenant Williams stated that Sergeant Sellers was good at handling her subordinates. It seemed though that Sergeant Sellers was manipulative with the other sergeants. Sergeant Sellers did not attend roll call in the manner believed appropriate. Sergeant Sellers did not check the Records Management System (RMS) for reports submitted by officers regularly.

Lieutenant Williams believed that Sergeant Sellers observed other sergeants lack of attention to RMS and answering the radio, and she fell into the same pattern. In particular, supervisors from other shifts responded to calls for a third shift supervisor due to Sergeant Sellers' lack of response. The other third shift supervisors had a lack of trust in Sergeant Sellers because of this practice.

Lieutenant Williams stated no one wanted Sergeant Sellers to fail. Sergeant Sellers alienated herself by her behavior and the other sergeants did not want to become involved with complaints. Due to the fact that Sergeant Sellers' husband was away at training and having a special needs child, Lieutenant Williams tried to be patient with Sergeant Sellers.

Lieutenant Williams tried to position Sergeant Sellers, Sergeant Schank, and Sergeant Hicks in off day groups where he could observe what was occurring. Sergeant Schank was transferred to District One, and Sergeant Hicks was transferred to day shift. Sergeant Hall and Sergeant Bower informed Lieutenant Williams that things settled down upon Sergeant Schank and Sergeant Hicks' transfers.

Lieutenant Williams stated he did not retaliate against Sergeant Schank or treat him unfairly based on race.

Lieutenant Williams did not retaliate against Sergeant Sellers due to the complaints she filed or direct sexual comments toward her.

### Additional Information:

The following officers assigned to District Three Third Relief at the time of this incident were interviewed by IIS:

Police Officer Kevin Grubbs, Badge: P888, District Three
Police Officer Donte Hill, Badge: P948, District Three
Police Officer Diane Lauer, Badge: P524, District Three
Police Officer Jennifer Myers, Badge: P927, District Three
Police Officer Michael Roetting, Badge: P210, District Three
Police Officer Mark Wherle, Badge: P865, District Three,
Police Specialist Jeffrey Wieczorkowski, Badge: PS44, District Three.

These officers had no information to add to this investigation.

IIS reviewed the most recent Form 448, Supervisory Performance Report, of the supervisors assigned to District Three Third Relief at the time of the incident. There was nothing unusual derived from the reports.

IIS reviewed the Form 17, Interdepartmental Correspondence Sheet, authored by Colonel Eliot Isaac, Police Chief. Chief Isaac requested to double-fill two sergeant positions by promoting the next two eligible candidates on promotional list #15-00162, which expired on September 6, 2016. These double-fills were established to alleviate any future grievance or legal action due to problems with certifying the current police lieutenant promotional exam. Sergeant Schank was one of the two promoted.

IIS reviewed the New Supervisor Training roster dated January 23, 2017. The roster indicates Sergeant Sellers and Sergeant Schank attended the training together.

IIS reviewed District Three third relief supervisor's rounds submitted November 27, 2017. The rounds reflect Sergeant Sellers secured at 0400.

IIS reviewed 68P's submitted by Sergeant Sellers for November 27, 28, 29, 2017. Sergeant Sellers instructed at the Police Academy on those dates.

IIS noted that at the time of this incident, the most senior sergeant on District Three Third Relief had a promotion date of February 2, 2016. The least senior had a promotion date of July 30, 2017.

IIS reviewed the photographs on display outside the Lieutenant's office. There has not been a complaint filed reference the photographs. IIS removed the photographs at the direction of Captain Kimberly Williams, Badge: C03, Internal Investigations Section.

IIS reviewed two ESL entries in Sergeant Sellers' ETS history authored by Lieutenant Williams. ETS# 2018-233804, entered February 18, 2018, reflects a thank you from Ms. Kimberly Whalen in regards to assistance with an accident provided by Sergeant Sellers. ETS#2018-233408, entered February 20, 2018, is an instructional ESL clarifying time off

protocol for District Three third relief supervisors. The instructional ESL entry was only entered into Sergeant Sellers ETS history.

IIS reviewed the job description for shift commanders and shift sergeants.

Conclusion:

Sergeant Eric Schank alleged that on December 3, 2017, Lieutenant Joseph Williams retaliated against him for accusing Sergeant Linda Sellers of submitting inaccurate documents relative to time off, by threatening to make his life hell. The statement was not made to, or in the presence of, Sergeant Schank. Sergeant Schank believes this was based on race.

On December 2, 2017, Sergeant Sellers submitted a Form 25S, Cincinnati Police Department-Request for Leave of Absence. The form indicated that Sergeant Sellers, who was to begin her shift at 2100 hours, took the first 90 minutes of her shift off. The form was amended by Sergeant Eric Schank to reflect what he believed to be Sergeant Sellers' actual starting time of 2315 hours. This incident began a series of complaints filed by Sergeant Schank and Sergeant Sellers.

The following morning, Sergeant Schank received a text message from Sergeant Sellers. Due to the nature of the message, Sergeant Schank was upset and decided to take the night off. Sergeant Schank, via personal cellular telephone, contacted Sergeant Christopher Seta to inform him that he would not be responding to work that evening.

Later that evening Sergeant Schank was informed that Sergeant Kenneth Hall overheard Lieutenant Williams state, "I'm going to get his ass." Sergeant Schank believed this statement was in reference to him. Sergeant Schank did not recall who he spoke to.

Sergeant Schank felt that if one of his subordinates had submitted a fictitious document, he would address the issue with the person who submitted the form, not the individual who brought the matter to his attention. Sergeant Schank believed this demonstrated collusion between Lieutenant Williams and Sergeant Sellers. Sergeant Schank stated all he did was amend a form to reflect the actual time Sergeant Sellers reported for duty.

Sergeant Schank stated he personally heard Lieutenant Williams refer to Sergeant Jacob Hicks as, "white devil." This occurred at a cookout at District Three after Lieutenant Williams instructed his wife not to speak to Sergeant Hicks. Lieutenant Williams stated Sergeant Hicks does not like African-Americans. Sergeant Schank stated that he could tell Lieutenant Williams had an aversion to white supervision. Sergeant Schank felt the dialogue was inappropriate.

Sergeant Sellers believed that due to the complaint she filed, Lieutenant Williams has retaliated against her by making negative ESL entries in ETS and failing to recognize positive efforts.

Sergeant Seta did not feel threatened or targeted by Lieutenant Williams. Sergeant Seta stated he did not hear Lieutenant Williams refer to Sergeant Hicks or any other white officer

as the "white devil." Sergeant Seta stated this allegedly occurred at a cookout at District Three. Sergeant Seta was not present at the cookout, but the way Sergeant Hicks explained the incident to him was that it occurred in a joking manner.
Sergeant Hicks joked that he would contact Lieutenant Williams' wife and inform her if Lieutenant Williams was at work or not, and Lieutenant Williams would retort back. This was the two "pushing each other's buttons." Sergeant Seta stated that his understanding was that it was not meant to be vindictive. It was "locker room talk."

Sergeant Hicks stated Lieutenant Williams has called him "white devil." This began in September 2017. Additionally Lieutenant Williams has several nicknames that are racially infused, such as "pale rider."

Sergeant Hicks stated he felt the nicknames were racially infused and meant to demean Sergeant Hicks and specifically, to put Sergeant Hicks in his place. Sergeant Hicks stated Lieutenant Williams made no effort to conceal this. There was a poster with the assigned nicknames that hung outside the Lieutenant's office.

Sergeant Hicks believed when Lieutenant Williams changed the sergeant's car numbers, it was in attempt to make things easier for Sergeant Sellers. Sergeant Hicks believed this was in retaliation for the other sergeants bringing Sergeant Sellers deficiencies to light.

Sergeant Putnick did not hear Lieutenant Williams refer to Sergeant Hicks as "white devil." Sergeant Putnick has heard nicknames used by Lieutenant Williams, but they are no different than any other nicknames he has heard during his career.

Sergeant Putnick does not feel race or sex effects Lieutenant Williams' actions. Sergeant Putnick has not observed Lieutenant Williams treat Sergeant Schank differently due to race.

Sergeant Bower never heard Lieutenant Williams refer to Sergeant Hicks as "white devil." Sergeant Bower has never heard any racially derogatory terms used by Lieutenant Williams. Sergeant Bower has pseudo folliculitis. On occasion he reported for duty without shaving due to the irritation. Lieutenant Williams inquired, "You're a black man tonight?" Sergeant Bower laughed and replied, "Yes." This statement was in fun, and there is no racially charged atmosphere on the relief.

Sergeant Bower stated Sergeant Schank's work ethic could use improvement as well. Lieutenant Williams noticed this and corrected Sergeant Schank from time to time. But in no way was Lieutenant Williams demeaning toward Sergeant Schank.

Sergeant Hall stated Lieutenant Williams' open door policy has made it difficult to supervise for the sergeants at time. This was for all supervisors.

Sergeant Hall stated there were some officers that informed the Lieutenant Williams that they did not care for the nicknames he gave them, and there use ceased for them.

Lieutenant Williams stated he did not retaliate against Sergeant Schank or treat him unfairly based on race.

Based on the IIS investigation and interviews, IIS recommends this portion of this investigation be closed, NOT-SUSTAINED. *approved ck*
Sergeant Linda Sellers alleged that Sergeant Eric Schank has engaged in behavior that has undermined her effectiveness as a supervisor due to her being an African-American female.

Sergeant Sellers was on a promotional list for Sergeant in September 2016. The promotional list expired on September 6, 2016. Due to a problem with the scoring and certification of an active Lieutenant's test and two open Lieutenant positions, the Cincinnati Police Department requested the promotion of two sergeants prior to the active sergeants promotional list expiring.

The promotions were approved and the next highest scoring candidates on the sergeants' promotional list were promoted. Sergeant Sellers believed the promotions were based on the Consent Decree, and that due to her status as an African-American female, she should have been considered for promotion.

Sergeant Sellers approached the FOP executive board and informed them of her feelings. This was not an attempt to have any sergeant demoted. Sergeant Schank was one of the two sergeants promoted. There were no alterations to the those promotions.

Prior to promotion to sergeant, Sergeant Sellers attended supervisors training in January 2017. Sergeant Schank attended the same training. During a break, Sergeant Sellers was approached by Sergeant Schank, who stated he was going to sue the Sentinels Organization and whoever may have caused him to have to pay for an attorney to maintain his promotion to sergeant.

Sergeant Sellers was promoted to sergeant on April 23, 2017, and transferred to District Three, third relief. Upon arrival at District Three, Sergeant Sellers realized Sergeant Schank was assigned to her shift. During her first week at District Three, Sergeant Sellers recalled that whenever Sergeant Schank spoke to her it was in a demeaning and disrespectful manner.

Sergeant Sellers confronted Sergeant Schank and let him know that she was not going to be spoken to in this manner. Sergeant Sellers informed the other sergeants of her issues with Sergeant Schank. The behavior continued.

Sergeant Sellers approached her relief commander, Lieutenant Joseph Williams, and explained the difficulty she had with Sergeant Schank's behavior.

A brief time later some of Sergeant Seller's paperwork went missing. This missing forms were Form 25S's.

On September 21, 2017, Sergeant Sellers instructed an officer to complete an incident report which he failed to do. Sergeant Sellers met with the officer in the Sergeant's office. During this meeting the officer inform Sergeant Sellers that Sergeant Schank informed him that if he were an officer, he would not complete the report. Sergeant Sellers confronted

Sergeant Schank and inquired if this was the case. Sergeant Schank responded that he did not hear everything related to the incident but he did tell the officer that.

On December 2, 2017, Sergeant Sellers was on her way to work, and was due in at 2100 hours; however, Sergeant Sellers was granted the first 90 minutes off. Sergeant Sellers proceeded to adjust the Form 25S to reflect her arrival at 2300 hours rather than 2230 hours. Sergeant Schank informed Sergeant Sellers that she was supposed to be at work at 2230 hours.

The next morning Sergeant Sellers stopped at District Three and observed the timekeeper with the lineups from the previous day. Sergeant Sellers reviewed the lineups and noticed that someone changed her starting time from 2300 to 2315 hours. Sergeant Sellers, via group text message, informed Sergeant Hicks and Sergeant Schank that they are not her supervisor and that they are not to change her start times in the future. Sergeant Sellers informed Lieutenant Williams.

On another date, Sergeant Sellers was contacted by an officer who stated he did not want to work 1700 hours to 0300 hours. This particular shift was for a robbery detail. This officer worked 2100 to 0700 hours ordinarily. A few days later Sergeant Sellers received a text message from this officer. The officer stated he was ordered to work at 1700 hours by Sergeant Schank. Sergeant Sellers instructed the officer to complete a Form 68P, Overtime and Court Appearance Report.

Upon her return to duty, Sergeant Sellers, observed the unapproved Form 68P on her desk. Sergeant Sellers believed that this was another example of Sergeant Schank's attempt to undermine her by making it appear that Sergeant Sellers ordered the officer to work.

Based on her observations of Sergeant Schank's interaction with all the other sergeants, she felt it was obvious that Sergeant Schank's issue was with her personally.

Sergeant Schank stated that on December 2, 2017, he adjusted the Form 25S submitted to reflect when Sergeant Sellers arrived for her shift. Sergeant Schank stated that he did not attempt to undermine Sergeant Sellers.

On September 21, 2017, Sergeant Schank stated he was not aware of the instruction Sergeant Sellers had given to Officer Roetting previously. Sergeant Schank instructed Officer Roetting that upon arrival to the call for service, take the necessary action. Sergeant Schank stated he did not attempt to undermine Sergeant Sellers.

Sergeant Seta stated Sergeant Sellers did not realize Officer Roetting gave Sergeant Schank partial information. Sergeant Seta believe this was a case of "boss shopping" more than Sergeant Schank undermining Sergeant Sellers.

Sergeant Seta does not believe Sergeant Schank or any other supervisor attempted to undermine, talk down to, or demean Sergeant Sellers.

Sergeant Hicks stated every sergeant on the relief were very helpful to Sergeant Sellers. There were obvious deficiencies displayed by Sergeant Sellers that could be attributed to her recent promotion. Sergeant Sellers was not receptive to criticism and stated her experience as an officer prepared her for supervision. Whenever Sergeant Sellers made a mistake, she made excuses.

Sergeant Putnick stated he worked with Sergeant Sellers one day a week. During those times Sergeant Putnick never heard Sergeant Schank talk down to or attempt to demean Sergeant Sellers.

Sergeant Bower stated he recalled a time that Sergeant Sellers approached him and stated Sergeant Schank had talked down to her. Sergeant Bower informed Sergeant Sellers that he overheard the conversation and that was how Sergeant Schank speaks. Sergeant Bower did not think he was talking down to her nor did he attempt to undermine her.

Sergeant Hall stated neither Sergeant Schank nor any other sergeant attempted to undermine Sergeant Sellers. Anytime Sergeant Sellers made a mistake, she stated someone was trying to sabotage her. Sergeant Hall stated Sergeant Schank has not undermined Sergeant Sellers in front of subordinates

Based on the IIS investigation and interviews, IIS recommends this portion of this investigation be closed, **NOT-SUSTAINED**. _approved_ C/Sgt

Sergeant Sellers alleged that Lieutenant Joseph Williams has retaliated against her by delaying positive entries and making negative entries in her Employee Tracking Solution (ETS) file.

Further retaliation was demonstrated when Lieutenant Williams informed Sergeant Sellers that in his absence, Lieutenant Heyob would monitor Sergeant Sellers.

IIS reviewed two ESL entries in Sergeant Sellers ETS history entered by Lieutenant Williams. ETS# 2018-233804 entered February 18, 2018, reflects a thank you from Ms. Kimberly Whalen in regards to assistance with an accident provided by Sergeant Sellers. ETS# 2018-233408 entered February 20, 2018, is an instructional ESL clarifying time off protocol for District Three third relief supervisors.

Lieutenant Williams did not enter any negative (counseling) ESL's for Sergeant Sellers.

Based on the IIS investigation and interviews, IIS recommends this portion of this investigation be closed, **UNFOUNDED**. _approved_ c/lt

Sergeant Sellers alleged that Sergeant Kenneth Hall, Badge: S29, District Three, has subjected her to unwelcome statements and gestures, sexual in nature.

On September 21, 2017, during a meeting with an Officer Michael Roetting, Sergeant Hall interjected and stated to the officer as he held a pen, "You see this? I could just fuck you

with this." Sergeant Sellers stated she did not wish to be involved should the officer complain. Sergeant Sellers found these statements inappropriate and offensive. Sergeant Sellers did not take the meaning sexually.

Additionally, at another time Sergeant Sellers inquired of Sergeant Hall if Sergeant Putnick completed lineups. Sergeant Hall replied, "You mean Sergeant Fucknick, the one who has the Lieutenant's balls in his mouth?" Sergeant Sellers felt uncomfortable and left the area.

Another time, Sergeant Sellers heard Sergeant Hall state, upon learning of Sergeant Seta having another child, "Oh fuck, we have another midget in the world." Sergeant Sellers felt this language was inappropriate

On February 8, 2018, Sergeant Sellers was alone in the Neighborhood Liaison Unit (NLU) area of District Three typing a form. Sergeant Hall approached her, placed his hands on her shoulders, and stated "You do not want to separate yourself." Both the assertion of being deemed separate and Sergeant Hall's physical contact made Sergeant Sellers uncomfortable, and she stated massaging her shoulders is something her husband would do.

Sergeant Hall stated there was an occasion that he used crude language in Sergeant Sellers' presence. Sergeant Sellers directed Officer Roetting to report to the sergeant's office. Sergeant Sellers inquired why Officer Roetting failed to complete an incident report that she directed him to complete.

Officer Roetting failed to answer the question and was being disrespectful toward Sergeant Sellers. Sergeant Hall interjected and informed Officer Roetting, "If you want me to fuck you with this pen, I can do it a hell of lot more than you realize." The profane language was not meant to be sexual in nature. It was analogous with stating, "I will write you up." Sergeant's Hall dialogue was directed toward Officer Roetting.

Sergeant Hall's stated his statements in Sergeant Sellers' presence were not meant to be sexual in nature.

Sergeant Hall states that he only tapped Sergeant Sellers on the right shoulder with his right hand. He did not massage her.

Sergeant Hall's actions are in violation of Rule 1.06B of the of the Cincinnati Police Department's Manual of Rules and Regulations and Disciplinary Process, which states:

B. Members of the Department shall avoid the use of coarse, violent, or profane language.

Based on the IIS investigation and interviews, IIS recommends this portion of this investigation be closed, **SUSTAINED**.

*Approved E Rd*

DGS/gmj

## SECTION FIFTEEN - DISCIPLINARY TABLE

Sergeant Kenneth Hall, Badge: S29, District Three

| | |
|---|---|
| A | Any Corrective Measure Outline in Rule 9.26, Section A. |
| B | Written Reprimand |
| C | Hearing (1-5 days suspension) |
| D | Hearing (5-7 days suspension) |
| E | Hearing (7-11 days suspension) |
| F | Hearing (11 days suspension or more, demotion, or dismiss |
| G | Hearing (dismissal) |
| H | Hearing (suspension without pay) |

All time lengths for repeated conduct are based
on a 36-month period unless otherwise stated.

| Failure of Good Behavior | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.01a | A | A | B | C |
| 1.01b | A | B | C | D |
| 1.01c | B | C | D | E |
| 1.01d | C | D | E | F |
| 1.01e | D | E | F | G |
| 1.01f | E | F | G | |
| 1.01g | F | G | | |
| 1.02a (three years) | A/B | B | C | D |
| 1.02h (three years) 3rd/4th | C | D | F | G |
| 1.02h (three years) 1st/2nd | D | E | F | G |
| 1.02b (three years) theft | F | G | | |
| 1.02c (three years) felony | F | G | | |
| 1.02c felony-violation of | G | | | |
| 1.02d felony traffic/criminal law | H | | | |
| 1.03 | B | C | D | F |
| 1.04 | A | A/B | B | C |
| 1.05 (negligent circumstances) | A | B | C | D |
| 1.05 (intentional | D | F | G | |
| 1.06a | A | A | B | C |
| 1.06b | A | B | C | D |
| 1.06c | B | C | D | F |
| 1.06d | D | E | F | |
| 1.07 | B | F | G | |
| 1.08 | B | D | F | G |
| 1.09 | A | B | C | D |
| 1.10a | A | B | C | D |
| 1.10b | B | C | D | F |
| 1.10c | B | D | F | G |
| 1.10d | B | D | F | G |
| 1.11 | A | B | C | D |
| 1.12 | A | B | C | D |
| 1.13 | B | C | D | F |
| 1.13a | F | G | | |
| 1.14 | B | C | D | F |
| 1.15a | A | B | C | D |
| 1.15b | B | C | D | F |
| 1.16a | B | D | F | G |
| 1.16b | B | C | D | F |
| 1.16c | B | C | D | F |
| 1.16d | A | B | C | D |
| 1.17a | C | D | F | G |
| 1.17b | B | C | D | F |
| 1.18 | A | B | C | D |
| 1.19 | E | F | G | |
| 1.20a | A | A | B | C |
| 1.20b | A | A | B | C |
| 1.21 | B | C | D | F |
| 1.22a  (verbal abuse) | A | B | C | D |
| 1.22b  (physical abuse) | C | D | F | G |
| 1.23a | E | F | G | |
| 1.23b | E | F | G | |
| 1.23c | D | E | G | |
| 1.24 | C | D | F | G |
| 1.25a | B | C | D | F |
| 1.25b | A | B | C | D |
| 1.25c | A | B | C | D |

| | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1.26 | A | A | B | C |
| 1.27 | A | A | B | C |
| 1.28 | B | C | D | F |
| 1.29 | A/B | B | C | D |
| 1.3 | C | D | F | G |
| 1.31 | B | C | D | F |
| 1.32 | C | D | F | G |
| 1.33 | A | B | C | D |
| **Section Two - Neglect of** | 1st | 2nd | 3rd | 4th |
| 2.01 | A | B | C | D |
| 2.02 | A | B | C | D |
| 2.03a | A | B | C | D |
| 2.03b | C | D | E | F |
| 2.04 | A/B | B | C | D |
| 2.05 | A | B | C | D |
| 2.06 | A | B | C | D |
| 2.07 | B | C | D | F |
| 2.08 | A/B | B | C | D |
| 2.09 | A/B | B | C | D |
| 2.10 | A/B | B | C | D |
| 2.11 | A/B | B | C | D |
| 2.12 | B | C | D | F |
| 2.13 | B | C | D | F |
| 2.14 | A/B | B | C | D |
| 2.15 | A/B | B | C | D |
| 2.16 | A/B | B | C | D |
| 2.17 | A/B | B | C | D |
| 2.26a | F | G | | |
| 2.26b | F | G | | |
| **Section Three - Attendance** | 1st | 2nd | 3rd | 4th |
| 3.01a | A | A/B | B | C |
| 3.01b | A | A/B | B | C |
| 3.01c | A | A/B | B | C |
| 3.01d | A | A/B | B | C |
| 3.01e | A | A/B | B | C |
| 3.02 | B | C | D | F |
| 3.03 | A/B | B | C | D |
| 3.04 (one year) | A | A | B | C |
| **Section Four -** | 1st | 2nd | 3rd | 4th |
| 4.01 (non-serious) | A/B | B | C | D |
| 4.01 (serious) | C | D | F | G |
| 4.02 | A | B | C | D |
| 4.03 | A/B | B | C | D |
| 4.04 | A | A | B | C |
| 4.05 | F | G | | |
| 4.06 | F | G | | |
| **Section Five - Dishonesty** | 1st | 2nd | 3rd | 4th |
| 5.01 | F | G | | |
| 5.02 | B | C | D | F |
| **Section Six -Substance** | 1st | 2nd | 3rd | 4th |
| 6.01 | C | D | F | G |
| 6.02a | F | G | | |
| 6.02b | D | F | G | |
| 6.03 | B | C | F | G |
| 6.04 | B | C | D | F |
| **Section Seven - Care of** | 1st | 2nd | 3rd | 4th |
| 7.01 | A/B | B | C | D |
| 7.02 (category 1 accidents) | per | curren | guideli | |
| 7.02 (category 2 accidents) | per | curren | guideli | |
| 7.03 | A | A/B | B | C |
| 7.04 | A | B | C | D |
| 7.05 | A | A/B | B | C |
| 7.06 | B | C | D | E |
| 7.07 | B | C | D | E |
| **Section Eight - Uniforms and** | 1st | 2nd | 3rd | 4th |
| 8.01 | A | A/B | B | C |
| 8.02a | A | A/B | B | C |
| 8.02b | A | A/B | B | C |
| 8.03 | A | A/B | B | C |
| 8.04a | A | A/B | B | C |
| 8.04b | A | A/B | B | C |