**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

TAMERA BROWN, et al.,                              Case No. 1:18-cv-412
        Plaintiffs,                                          McFarland, J.
                                                             Litkovitz, M.J.
        vs.

CITY OF CINCINNATI, et al.,                        **REPORT AND**
        Defendants.                                **RECOMMENDATION**


        Plaintiffs Tamera Brown and Joy Ludgatis, City of Cincinnati police officers, bring this

action against defendants City of Cincinnati, John Cranley, Danita Pettis, Patrick Duhaney,

Harry Black, Eliot Isaac, and the Sentinel Police Association alleging claims of race and sex

discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§

2000e-2(a), 2000e-3, and state law, as well as claims under 42 U.S.C. § 1981 and § 1983.  (Doc.

23).[1]  This matter is before the Court on defendant Pettis's (in her individual capacity) motion

for judgment on the pleadings (Doc. 37) and plaintiffs' response in opposition (Doc. 43).  This

matter is also before the Court on defendants City of Cincinnati, Cranley, Black, Duhaney, Isaac,

and Pettis's (in her official capacity) motion for judgment on the pleadings (collectively "the

City defendants") (Doc. 38), plaintiffs' response in opposition (Doc. 45), and the City

defendants' reply memorandum (Doc. 47).

**I**.  **Factual Allegations**

        The second amended complaint alleges the following facts.  Plaintiff Tamera Brown is a

white female police officer who has been employed by the City of Cincinnati for over 15 years.

(Second Amended Complaint, Doc. 23 at ¶ 1).  Plaintiff Joy Ludgatis is also a white female

---

[1] On January 3, 2020, the parties filed a stipulation of dismissal of defendant Sentinel Police Association pursuant to Fed. R. Civ. P. 41(a).

police officer and has been employed as a Police Specialist by the City of Cincinnati for over 27 years. (*Id.* at ¶ 2). Plaintiffs were directly supervised by defendant Danita Pettis, an African American female Police Lieutenant, who controlled discipline, work assignments, employee reviews and evaluations, and general working conditions. (*Id.* at ¶ 16). In addition to Pettis, defendants Cranley, Duhaney, Black, and Isaac also had control over discipline, work assignments, employee reviews and evaluations, and general working conditions. (*Id.* at ¶ 17).

### A. 2017 Internal Complaints and Subsequent Investigation

On November 26, 2017, plaintiff Brown filed an internal complaint against Pettis with Captain Martin Mack and defendant Chief Isaac. (*Id.* at ¶ 40; Brown Internal Complaint, Doc. 23 at 42-43[2]). Plaintiff Brown's complaint referenced an incident ten days earlier on November 16, 2017, where Pettis did not release third shift officers in roll call to render assistance to white second shift officers involved in an incident where shots were fired ("shots-fired" incident). (*Id.* at ¶ 41). Plaintiff Brown wrote to Mack and Chief Isaac that she was "personally disturbed" by Pettis's "lack of action." (Doc. 23 at 42). Plaintiff Brown's internal complaint also referenced a later incident during roll call on November 24, 2017 where Pettis's "behavior was so hostile, demeaning, and unprofessional." (Doc. 23 at ¶ 42). According to Brown, Pettis addressed third shift officers during roll call and informed them that she did not care about their opinions and did not care what they had to say. (Doc. 23 at 42). Pettis also commented in plaintiff Ludgatis's absence that Ludgatis had no right to question her command decisions. (*Id.*). Pettis went on a

---

[2] In ruling on a motion for judgment on the pleadings, the Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). *See also Mediacom Southeast LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 399 (6th Cir. 2012). Plaintiffs' second amended complaint includes 130 pages of exhibits with documents such as internal complaints, investigation reports, and Ohio Civil Rights Commission (OCRC) charges. This opinion will reference these documents.

"tirade" about the shots-fired incident and stated that no shots were fired at the second shift officers on November 16, 2017, contrary to Brown's belief. (*Id.*). Plaintiff Brown also wrote that she personally confided in Lt. Christopher Ruehmer about how Pettis handled the shots-fired incident, and he in turn alerted command staff, which sparked an investigation. (*Id.*). Plaintiff Brown wrote that she feared retaliatory actions from Pettis and requested to be removed from Pettis's supervision. (*Id.* at 43). That same day, on November 26, 2017, Sergeant Dan Hils visited District 4 during third shift roll call and advised officers present of their right to file complaints against Pettis for her "unprofessional, abusive, demeaning, and hostile conduct." (Doc. 23 at ¶ 43).

Thereafter, on November 28, 2017, plaintiff Ludgatis also filed an internal complaint, alleging that she was "subjected to humiliating, demeaning, and unprofessional verbal abuse by Pettis." (Doc. 23 at ¶ 44). Plaintiff Ludgatis wrote to Isaac and Mack that Pettis subjected her to a "hostile verbal assault" on November 22, 2017, after Pettis wrongly assumed that Ludgatis, not Brown, complained to command staff about the handling of the shots-fired incident. (Doc. 23 at 45). Ludgatis also wrote that she was the subject of "humiliating, demeaning, and unprofessional verbal abuse" by Pettis on November 22, 2017. Pettis specifically made comments on that day "belittling [Ludgatis's] contributions" as a desk officer and insinuating that she would not risk her personal safety for her fellow officers. (*Id.*). Ludgatis also described the same incident as Brown where Pettis made unprofessional comments in her absence during third shift roll call on November 24, 2017. (*Id.*).

On December 5, 2017, Executive Assistant Chief David Bailey informed Chief Isaac that the Internal Investigations Section (IIS) commenced an investigation due to internal complaints

filed by Pettis[3], Ludgatis, and Brown. (Doc. 23 at 48). Bailey described the purpose of the investigation as follows:

> The incident stems from a decision made by Lieutenant Pettis relative to a firearm discharge situation at 1234 Myrtle Avenue on the evening on November 16, 2017. Based on the information received to date by CPD Administration, that decision received significant and vocalized dissent from several third shift officers. In particular, Police Officers Joy Ludgatis and Tamera Brown expressed extreme dissatisfaction with Lt. Pettis's decision and made numerous negative remarks about Lt. Pettis to other CPD staff on that topic.

> On the evening of November 22, 2017, Lt. Pettis, in apparent reaction to those comments, made negative and discrediting comments about Officer Ludgatis in the third shift roll call while in the presence of other shift members and supervisors. Lt. Pettis allegedly conducted a similar roll call again on the evening of November 24, 2017, admonishing those critical of her leadership and decision making.

> On November 26, the Fraternal Order of Police President Sergeant Dan Hils intervened and attended the District Four Third Shift roll call to address the incident. During his visit, Sergeant Hils made numerous negative comments about Lieutenant Pettis in personal and professional contexts, and he allegedly urged the shift to continue to question and oppose her leadership. Although the Internal investigation is only in its preliminary stages, the conduct exhibited by CPD personnel Pettis, Hils, Ludgatis, and Brown is deeply disappointing from a management perspective. First of all, as members of a highly regarded police agency, our members should epitomize conflict resolution and problem-solving abilities. Secondly, the conduct involves members at almost each rank of the third shift at District Four, which if allowed to continue, will undoubtedly adversely impact the third shift if not the entire district operation.

> Due to the negative district-wide impact from this very unfortunate chain of events, it is clear that the potential negative consequences of this current confrontational environment must be minimized and any future incidents of this nature must be prevented. In the meantime, District Four must have the opportunity to recover and resume operations at peak efficiency. This can only occur if the three principal parties are transferred out of District Four and separated. It is therefore my recommendation that Lieutenant Danita Pettis, and Police Officers Joy Ludgatis and Tamera Brown be transferred to new assignments immediately, even while the remainder of the Internal investigation proceeds. At the conclusion of the IIS

---

[3] Plaintiffs' second amended complaint does not mention that Pettis also filed an internal complaint and requested an internal investigation on November 28, 2017. However, the investigation documents attached to the second amended complaint show that Pettis filed a complaint about the incident on November 26, 2017, where Lieutenant Dan Hils advised District Four officers during roll call to file hostile work environment complaints against Pettis. (Doc. 23 at 46). Pettis was informed by Sergeant Dan O'Malley and Sergeant Kelvin Lynn, who were present during roll call, that Hils also made inappropriate and unprofessional remarks about Pettis.

investigation, additional administrative actions may be warranted.

(Doc. 23 at 48-49). Plaintiffs were both transferred to other districts and shifts later in December 2017. (Doc. 23 at ¶ 48).[4] According to plaintiffs, a report later generated as a result of the requested investigation found that "Pettis engaged in various misconduct, but the City failed to impose meaningful discipline or otherwise address the continuing racial tensions and hostile environment created by Pettis." (*Id.* at ¶ 50).[5] Investigation documents attached to the second amended complaint show that Ludgatis and Brown were exonerated for allegedly pressuring others to sign complaints against Pettis. (Doc. 23 at 105-08). Pettis was exonerated from allegations made by Brown related to the shots-fired incident but received minor discipline for being discourteous at roll call and incidents related to the investigation. (*Id.* at 108-113).

### B. Charges of Discrimination

In March 2018, plaintiffs filed charges of discrimination with the Ohio Civil Rights Commission ("OCRC"), alleging a hostile work environment based on race and sex, as well as retaliation. (Doc. 23 at 38-41). Plaintiff Brown's charge of discrimination alleges the following factual allegations:

I.      I am Caucasian. I have been subjected to a hostile work environment by my supervisor, Lieutenant Danita Pettis, African American. On November 26, 2017, I filed a formal complaint. On November 28, 2017, LT Pettis filed a complaint against me. On December 16, 2017, I was transferred.

II.     Management was aware of Lieutenant Pettis behavior toward Caucasian female Officers. Management transferred me only after Lieutenant Pettis filed an erroneous complaint against me.

---

[4] Plaintiffs allege that Pettis "formally requested that Brown and Ludgatis be transferred to another district." (Doc. 23 at ¶ 47). Pettis's internal complaint to which plaintiffs refer does not even mention Brown and Ludgatis. Indeed, the documents attached to the second amended complaint show that Chief Bailey recommended the transfer of Pettis, Brown, and Ludgatis at the start of the investigation. "[I]f a factual assertion in the pleadings is inconsistent with a document attached for support, a court is not bound to accept as true the plaintiff's factual allegation." *Croce v. New York Times Co.*, 930 F.3d 787, 792 (6th Cir. 2019) (internal quotation marks omitted). Therefore, the Court rejects plaintiffs' assertion that Pettis requested plaintiffs' transfer to another district.

[5] The Court notes that the investigation documents attached to the second amended complaint do not support this allegation and the Court therefore is not bound to accept it as true. *See Croce*, 930 F.3d at 792.

5

(Doc. 23 at 38). Plaintiff Ludgatis's charge of discrimination alleges the following factual allegations:

I.     On November 22, 2017, and November 24, 2017, I was verbally attacked and subjected to discriminatory treatment by Lt. Danita Pettis (Female) (African American) in the presence of coworkers because of my sex (Female) and race (Caucasian). During my employment, Lt. Danita Pettis has accused me of making derogatory remarks that were found to be untrue by a peer review. I was transferred to another District because of Lt. Pettis's unfounded accusation. On November 28, 2017, I filed a complaint against Lt. Pettis regarding the hostile work environment that was endorsed by coworkers. On December 1, 2017, Lt. Pettis submitted a transfer request in an attempt to have Officer Tamera Brown (Female) (Caucasian) and I reassigned. I am aware that Lt. Pettis filed a complaint regarding insubordinates creating a hostile work environment. On December 10, 2017, Officer Brown and I were transferred to another District.

II.    Management has failed to take corrective action and the discriminatory treatment continues.

(Doc. 23 at 40).

Plaintiffs allege that since the filing of this lawsuit, defendants "have denied [them] the right and opportunity to speak publicly about their allegations of discrimination and disparate treatment based on race and sex." (Doc. 23 at ¶ 57). Pursuant to Cincinnati Police Department policy, plaintiffs submitted requests to Chief Isaac for permission to speak to the media about this lawsuit. (*Id.* at ¶ 58). Chief Isaac allegedly denied plaintiffs' requests without explanation. (*Id.* at ¶ 59). Pettis participated in a press conference with her attorney on June 19, 2018. (*Id.* at ¶ 60)[6]. Plaintiffs also allege that defendant Pettis continues to direct unprofessional comments towards Ludgatis and continues to spread inaccurate information and disparaging remarks about Ludgatis to fellow officers. (*Id.* at ¶¶ 50-51).

---

[6] Plaintiffs do not allege whether Pettis sought and obtained permission from Chief Isaac.

### C.  Allegations of "Routine Race-Based Discipline"

Plaintiffs' second amended complaint also contains allegations that defendants instituted race-based policies that created a "double standard for officer discipline."  (*Id.* at ¶¶ 35, 61).  According to plaintiffs, Pettis "engaged in conduct as a police officer that, but for her race, would have resulted in discipline and/or criminal charges against her. . . ."  (*Id.* at ¶ 34).

In addition to Pettis, plaintiffs cite other incidents where the implementation of race-based policies created an alleged double standard for discipline.  In one incident, police officer Donte Hill, who is African American, used profane language and made a racially derogatory statement to an arrestee when dispatched for a domestic disturbance on September 26, 2018.  (*Id.* at ¶¶ 62-63).  The comment was recorded on Officer Hill's body camera.  (*Id.* at ¶ 64).  Although there were no citizen complaints filed about Officer Hill's conduct, following a review of his body camera recording, District 3 Sergeant Putnick "requested that P.O. Hill be issued a Notice of Official Reprimand for violating §1.06B of the Cincinnati Police Department Rules and Regulations."  (*Id.* at ¶ 67).  Thereafter, on October 22, 2018, District 3 Captain Broxterman reviewed Sergeant Putnick's recommendation and found that a written reprimand was warranted because he determined that Officer Hill's unprofessional language was excessive.  (*Id.* at ¶ 68).  The next day, the recommended discipline was approved by Captain Neudigate and Chief Isaac.  (*Id.* at ¶ 69).

In a similar incident three months later, Dennis Barnette, a white Cincinnati police officer, made the same racially derogatory comment as Officer Hill while physically arresting a female subject.  That comment was also recorded on body camera.  (*Id.* at ¶¶ 70-71).  Officer Barnette's police powers were immediately suspended and the matter was referred to the IIS for investigation.  (*Id.* at ¶ 72).  An individual in the Cincinnati Police Administration "recalled that

P.O. Hill had merely received an official reprimand for similar conduct." (*Id.* at ¶ 73).  To address the disparity in discipline, defendant Isaac "claimed that the prior approval of P.O. Hill's discipline was an oversight despite being signed off on and approved by Capt. Broxterman, Capt. Neudigate, and Chief Isaac." (*Id.* at ¶ 74).  As a result, on December 27, 2018, Officer Hill's police powers were also suspended and the September 26, 2018 incident was referred to IIS for further investigation. (*Id.* at ¶ 75).

Plaintiffs also allege another incident of "routine uneven imposition of discipline by the Cincinnati Police Department and the City based on race." (*Id.* at ¶ 80).  Plaintiffs state that white police officers, Sergeant Jacob Hicks and Sergeant Eric Schank, complained internally that Lieutenant Joseph Williams routinely referred to white police officers as "white devils." (*Id.*).  Plaintiffs allege that there was an extensive investigation by the IIS, but no discipline was imposed on Lieutenant Williams. (*Id.* at ¶ 81).

## II.  Legal Standard

Courts apply the same analysis to motions for judgment on the pleadings under Rule 12(c) as they apply to motions to dismiss under Fed. R. Civ. P. 12(b)(6).  *See Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 284 (6th Cir. 2010).  "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citation and quotation marks omitted)).  However, the Court need not accept as true legal conclusions or unwarranted factual inferences. *Id.* at 581-82 (citing *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999)).

To withstand a Rule 12(c) motion for judgment on the pleadings, "a complaint must

contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007). "The factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009)). A "legal conclusion couched as a factual allegation" need not be accepted as true, nor are recitations of the elements of a cause of action sufficient. *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## III.  Resolution

### A.  Counts I, II, V– Hostile Work Environment under Title VII, 42 U.S.C. § 1981, and Ohio Rev. Code § 4112.02(A)

Defendant Pettis moves to dismiss plaintiffs' Title VII claims on the basis that she cannot be held liable in her individual capacity under Title VII. (Doc. 37 at 17). Defendant Pettis also argues that plaintiffs have failed to state a hostile work environment claim because they have not alleged that any alleged harassment was based on sex or race, that their work environment was sufficiently hostile, or that defendants' response to their internal complaints was unreasonable. (*Id.* at 18-21). The City defendants move to dismiss plaintiffs' hostile work environment claims for the same reasons. (Doc. 38 at 11-14). The City defendants also argue that plaintiffs failed to timely exhaust their administrative remedies on their Title VII claims prior to filing suit and that some of the claims alleged in the second amended complaint fall outside the scope of their charges of discrimination. (*Id.* at 9-10).

### 1.  Exhaustion of Administrative Remedies

Exhaustion of administrative remedies is a precondition to filing a Title VII lawsuit. *Lockett v. Potter*, 259 F. App'x 784, 786 (6th Cir. 2008) (citing *McFarland v. Henderson*, 307 F.3d 402, 406 (6th Cir. 2002); *Benford v. Frank*, 943 F.2d 609, 612 (6th Cir. 1991)).  As a general rule, a plaintiff must first file a timely charge with the EEOC before pursuing an employment discrimination action under Title VII.  *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010).  *See also Puckett v. Tennessee Eastman Co*., 889 F.2d 1481, 1486 (6th Cir. 1989) (to bring a Title VII action in federal court, a plaintiff must (1) timely file a charge of employment discrimination with the EEOC, and (2) receive and act upon the EEOC's right-to-sue letter) (citing 42 U.S.C. § 2000e-5(f)(1) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798 (1973)).  Title VII provides that the applicable statute of limitations begins to run from the date of "the alleged unlawful employment practice. . . ."  42 U.S.C. § 2000e-5(e)(1).  The Sixth Circuit has explained Title VII's dual statute of limitations as follows:

> Usually, if the alleged discrimination occurred more than 180 prior to the plaintiff's filing of an EEOC charge, claims implicating these actions are barred.  However, if the alleged unlawful practice occurs in a "deferral state," in this case Ohio, which has enacted its own laws prohibiting discrimination in employment, the plaintiff must file suit within 300 days of the alleged discriminatory act.

*Alexander v. Local 496, Laborers' Int'l Union of N. Am*., 177 F.3d 394, 407 (6th Cir. 1999) (citing 42 U.S.C. § 2000e-5(e); *EEOC v. Penton Indus. Pub. Co*., 851 F.2d 835, 837 n.5 (6th Cir. 1988)).  This Court has determined that because Ohio is a deferral jurisdiction, a plaintiff has 300 days to file a discrimination charge with the EEOC as a matter of law.  *See Winkelmann v. Big Lots Stores, Inc.*, No. 1:08-cv-00419, 2009 WL 3788673, at *6 and n. 1 (S.D. Ohio Nov. 10, 2009) (Spiegel, J.).

In this case, plaintiffs' OCRC charges are timely as they were both filed within 300 days

of the unlawful employment practice that they both allege.  On November 26, 2017 and November 28, 2017, respectively, plaintiffs Brown and Ludgatis filed internal complaints with Captain Mack and Chief Isaac, complaining of Pettis's behavior.  (Doc. 23 at ¶¶ 40, 44).  As a result of these internal complaints and a subsequent investigation, plaintiffs allege that the unlawful employment practices culminated on either December 10, 2017 or December 16, 2017,[7] when plaintiffs were transferred to other districts and shifts.  (*Id.* at ¶¶ 47-48).  Plaintiffs had 300 days from these dates, or approximately until October 6, 2018 or October 12, 2018, to file their charges of discrimination.  By filing their charges of discrimination on March 13, 2018 and March 14, 2018, respectively, plaintiffs Brown and Ludgatis exhausted their administrative remedies well within 300 days of the alleged unlawful employment practice.  (Doc. 23 at 38, 40).[8]  Accordingly, plaintiffs have properly exhausted their administrative remedies for their Title VII claims.

### 2. Merits

Title VII provides that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex,

---

[7] Plaintiff Ludgatis alleged in her OCRC charge of discrimination that both she and Officer Brown were transferred to another district on December 10, 2017.  (Doc. 23 at 40).  On the other hand, plaintiff Brown alleged in her OCRC charge that she was transferred on December 16, 2017.  (*Id.* at 38)

[8] The City defendants argue that any allegations about unlawful employment practices alleged in the second amended complaint occurring before May 17, 2017 and May 18, 2017 (i.e., 300 days before plaintiffs filed their charges of discrimination in March 2018) are untimely and fall outside the scope of the facts that plaintiffs alleged in their OCRC charges.  (Doc. 38 at 9-10).  In response, plaintiffs argue that the factual allegations to which defendants refer—-the Consent Decrees that were implemented before this time period—are "claims continuing in nature and therefore fall within the 300 day time period."  (Doc. 45 at 6) (citing Doc. 23 at ¶¶ 18-22).  In reply, the City defendants argue that the continuing violation doctrine asserted by plaintiffs has no application to this case.  (Doc. 47 at 5-6).  As discussed later in this opinion, plaintiffs' reference to the Consent Decrees and any "race-based policies" is too attenuated and far reaching to create a plausible inference that plaintiffs were subjected to a racially hostile work environment in violation of Title VII.  Moreover, while plaintiffs present facts about unfair "race-based" policies in a scattered manner throughout the second amended complaint, the Title VII counts in the second amended complaint cite the facts described in the OCRC charge—plaintiffs' internal complaints against Pettis and their subsequent transfers.  (*See generally* Doc. 23 at ¶¶ 82-97).  Therefore, the Court finds it unnecessary to resolve whether the factual allegations related to the Consent Decrees and alleged "race-based policies" in the second amended complaint fall outside the scope of the OCRC charges.

or national origin[.]"  42 U.S.C. § 2000e–2(a).  Title VII protects employees from discriminatory

hostile or abusive work environments.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)

(citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).  Likewise, 42 U.S.C.

§ 1981, which prohibits intentional racial discrimination by both public and private actors in the

context of contractual relationships, provides a cause of action for racial harassment in the

workplace.  *Jackson v. Quanex Corp.*, 191 F.3d 647, 657-58 (6th Cir. 1999).  Ohio's

antidiscrimination statute also prohibits workplace harassment based on race or sex.  Ohio Rev.

Code § 4112.02(A).  Claims for hostile work environment brought under Ohio Rev. Code §

4112 and 42 U.S.C. § 1981 are analyzed using the same standard as claims brought under Title

VII.  *Smith v. Bd. of Trustees Lakeland Cmty. Coll.*, 746 F. Supp. 2d 877, 893 (N.D. Ohio 2010).

To establish a hostile work environment claim, a plaintiff must show that: (1) she was a

member of the protected class; (2) she was subjected to unwelcome harassment, based on sex or

race; (3) the harassment had the effect of unreasonably interfering with her work performance

and created an objectively intimidating, hostile, or offensive work environment; and (4) there

exists some basis for liability on the part of the employer.  *Warf v. U.S. Dep't of Veterans

Affairs*, 713 F.3d 874, 878 (6th Cir. 2013) (citing *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir.

2008)).  In terms of the third factor, the conduct must be "severe or pervasive enough to create an

environment that a reasonable person would find hostile or abusive and the victim must

subjectively regard that environment as abusive."  *Id.* (quoting *Bowman v. Shawnee State Univ.*,

220 F.3d 456, 463 (6th Cir. 2000)).  In determining whether a work environment is objectively

hostile or abusive, courts consider the totality of the circumstances, including "the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (citing *Harris*, 510 U.S. at 23). Conduct that is "merely offensive" is insufficient to support a hostile work environment claim. *Harris*, 510 U.S. at 21. "[C]omments and harassing acts of a continual nature are more likely to be deemed pervasive." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008). Furthermore, "courts must determine whether the workplace is so permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Grace*, 521 F.3d at 678-79 (quoting *Harris*, 510 U.S. at 23) (internal quotes omitted).

At the pleading stage, however, a plaintiff who asserts a federal employment discrimination claim is not required to plead facts establishing a prima facie case under Title VII in order to state a claim for relief. *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (citing *Swierkiewicz v. Sorema*, 534 U.S. 506 (2002)). "The prima facie case . . . is an evidentiary standard, not a pleading requirement." *Swierkiewicz*, 534 U.S. at 510. A plaintiff "need allege only (a) the statutory basis for [the] claims, and (b) the factual predicate of those claims, such that the defendants are 'apprise[d] . . . of the [] claims and the grounds upon which they rest.'" *Dickinson v. Zanesville Metro. Hous. Auth.*, 975 F. Supp. 2d 863, 871 (S.D. Ohio 2013) (quoting *Lindsay v. Yates*, 498 F.3d 434, 440 (6th Cir. 2007)). While a plaintiff's complaint need not present detailed factual allegations, "it must allege sufficient factual content from which a court, informed by its judicial experience and common sense, could draw the reasonable inference" that defendants discriminated against her because of her sex or race. *Keys*, 684 F.3d at 610 (quoting *Iqbal*, 556 U.S. at 678, 679).

The Court concludes that plaintiffs have failed to state a plausible claim for relief against

the defendants under Title VII, Ohio Rev. Code § 4112.02(A), and § 1981.  Accepting the allegations in the second amended complaint, internal complaints attached as exhibits, and OCRC charges as true, plaintiffs have not provided sufficient factual content for the Court to reasonably infer that they were subjected to harassment based on their race or sex.  Plaintiffs allege that Pettis subjected them to a "hostile work environment" when she behaved unprofessionally in her handling of the shots-fired incident at third shift roll call on November 16, 2017, by refusing to release officers from roll call to render assistance (Doc. 23, ¶ 41); was "hostile, demeaning, and unprofessional" during third shift roll call on November 24, 2017, resulting in a memo by the entire third shift to the Chief of Police complaining about Pettis's "practices of verbal abuse and emotional intimidation" (Doc. 23, ¶ 42); subjected plaintiff Ludgatis to humiliating, demeaning, and unprofessional verbal abuse (Doc. 23, ¶ 44); made hostile, negative, and discrediting comments about plaintiffs Brown and Ludgatis during third shift roll call on at least two occasions in an angry response to the initiation of an investigation against Pettis (Doc. 23, ¶ 46); and "continues to direct aggressive, hostile, demeaning, abusive, and unprofessional comments towards Ludgatis" and "to spread inaccurate information and disparaging remarks about Ludgatis to fellow officers" (Doc. 23, ¶¶ 51-52).  None of these allegations suggest that Pettis's comments or actions were based on plaintiffs' race or sex, and they do not raise an inference that Pettis comments or actions were motivated by the race or sex of plaintiffs, which is required to state a claim for a hostile work environment under Title VII. *See Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008) ("Title VII does not create a 'general civility code' in the workplace; it forbids racially motivated harassment.") (citing *Faragher*, 524 U.S. at 788); *Barnette v. Dep't of Veterans Affairs*, 153 F.3d 338, 343 (6th Cir. 1998) ("personal conflict does not equate with discriminatory animus"); *Crawford v. Medina*

14

*Gen. Hosp.*, 96 F.3d 830, 836 (6th Cir. 1996) (no actionable age discrimination where "hostility and abusiveness" in workplace "stemmed from a simple clash of personalities" and not age-related discrimination).

The fact that Pettis is African American and plaintiffs are white is not enough to reasonably infer that Pettis's actions and comments were motivated by plaintiffs' race or gender. Plaintiffs' allegations indicate that much of Pettis's alleged verbal abuse was directed towards the entire third shift, meaning all officers were equally subjected to the alleged abuse. While plaintiffs allege that some of Pettis's comments were directed towards plaintiffs specifically, the alleged comments are race and gender neutral, stemming from Pettis's perceived anger at being questioned about her handling of the shots-fired incident and not related to any race- or sex-based animus. Plaintiffs have failed to allege facts from which this Court could reasonably infer that plaintiffs were treated differently by Pettis because of their race or gender or that similarly-situated officers outside of their protected classes were treated more favorably by Pettis. Plaintiffs' amended complaint paints a picture of a tension-filled work environment that was permeated with demeaning, abusive, and unprofessional comments, but it does not suggest that the hostile environment resulting therefrom rises to the level of a cognizable discrimination claim based on plaintiffs' race or sex. There are simply no allegations that Pettis singled out plaintiffs because of their gender or race. Plaintiffs' second amended complaint includes legal conclusions couched as factual allegations that are both speculative and devoid of sex-specific or race-specific references, which are insufficient for the Court to reasonably infer that plaintiffs were discriminated against based on their sex or race. *See Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) (conclusory allegation that defendant was "hostile and intimidating to [plaintiff] personally" was not enough to state a plausible claim for relief for hostile work environment

based on race); *White v. Coventry Health & Life Ins. Co.*, 680 F. App'x 410, 415-16 (6th Cir. 2017) (finding complaint allegations "wholly conclusory" where plaintiff alleged "that 'almost from the very beginning of [her] employment she suffered from harassment, discrimination, intimidation, berating and a hostile work environment,' that she was 'constantly berated' by a supervisor, and that [supervisor] 'degraded and humiliated' her. Such naked assertions add nothing to the complaint's sufficiency.") (citing *Iqbal*, 556 U.S. at 678).

Nor can the Court reasonably infer from the allegations in the internal complaints or OCRC charges attached as exhibits to the second amended complaint that Pettis subjected plaintiffs to unwelcome harassment based on sex or race in violation of Title VII, Ohio Rev. Code § 4112.02, and § 1981. In her internal complaint, plaintiff Brown described Pettis's behavior in response to questioning about the shots-fired incident as unprofessional and an "abuse of rank." (Doc. 23 at 42). Plaintiff Brown also described Pettis's reaction to the December 2017 investigation as "egregiously unprofessional" and "belligerently aggressive." (*Id.*). Plaintiff Brown described Pettis's actions toward fellow officers as verbally and emotionally abusive. (*Id.*). Likewise, plaintiff Ludgatis alleged in her internal complaint that she was subjected to "humiliating, demeaning, and unprofessional verbal abuse" by Pettis. (*Id.* at 45). Pettis went on a "verbal tirade" against Ludgatis and made various comments belittling her contributions as an officer. (*Id.*). Nowhere in these internal complaints do Brown or Ludgatis mention that Pettis harassed them based on their race or sex. Moreover, as defendants point out, the investigation records attached to the second amended complaint show that both Brown and Ludgatis stated that they never observed Pettis treat officers differently based upon their race or gender. (Doc. 23 at 58, 61). Instead, Ludgatis merely "believed" she was belittled by Pettis because of her race and gender and "believed" that Pettis would not have belittled her if

16

she was not a white female.  "[F]actual allegations about discriminatory conduct that are based on nothing more than the plaintiff's belief are 'naked assertions devoid of further factual enhancement' that are insufficient to state a claim."  *El-Hallani v. Huntington Nat. Bank*, 623 F. App'x 730, 735 (6th Cir. 2015) (citing *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678)).

Similarly, the facts alleged in Brown and Ludgatis's OCRC charges fail to create a plausible inference that Pettis subjected them to a racially or sexually hostile work environment. Like the second amended complaint and the internal complaints, the OCRC charges describe Pettis's verbal attacks and derogatory remarks in November 2017 but do not contain any specific facts to suggest that these verbal attacks or remarks were made as a result of plaintiffs' race or gender.

In their response in opposition, plaintiffs argue that the second amended complaint is "replete with allegations of [d]efendants' race based policies for hiring, promotion, discipline, and conferring benefits of employment among and upon the ranks of the Cincinnati police department."  (Doc. 45 at 8-9).  Plaintiffs speculate that these "policies" stem from the State and Federal Consent Decrees that the City entered into in 1981 and 1987.  (Doc. 23 at ¶¶ 18-22).[9] Plaintiffs state that these "policies" create a double standard for promotions and discipline for

---

[9] The Court agrees with defendants that plaintiffs do not have standing to challenge the Consent Decrees. "Article III of the Constitution limits the judicial power of the United States to the resolution of 'cases' and controversies,' and 'Article III standing . . . enforces the Constitution's case-or-controversy requirement.'"  *Doe v. DeWine*, 910 F.3d 842, 849 (6th Cir. 2018) (quoting *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 597-98 (2007) (in turn citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)).  To establish Article III standing, a party must meet three requirements.  *Id.*  "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'"  *Id.*  "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.*  Plaintiffs here allege no more than speculative harm from the Consent Decrees.  Therefore, they do not have standing to challenge the terms of the Consent Decree.

various forms of misconduct resulting in an "atmosphere of racial tension" where officers "view everything through a racial prism." (Doc. 45 at 9). Plaintiffs argue that the following "policies" alleged in the second amended complaint suggest a hostile work environment based on race:

- predicate promotions among qualified candidates based solely and exclusively on racial criteria (Second Amended Complaint, Doc. #23 at ¶ 19);
- impose an unconstitutional race-based double standard for discipline, that permissively condones misconduct for certain officers that would subject others to discipline and that confers benefits of employment through preferred detail assignments on some solely based on their race (Second Amended Complaint, Doc. #23, ¶¶ 23-24);
- permits black officers to speak with media outlets to exercise their First Amendment rights while denying the same to white officers (Second Amended Complaint, Doc. 23, ¶ 25);
- permits insubordination and violations of the rules for chain of command by black officers, including specifically Pettis, that would subject others to discipline or termination (Second Amended Complaint, Doc. #23, ¶ 26);
- permits theft in office and fraudulent and excessive claims for overtime compensation by black officers, including specifically Pettis, that would subject others to discipline or termination (Second Amended Complaint, Doc. #23, ¶ 27); and
- creates a hostile work environment by predicating overtime income and benefits on submission to sexual advances made by the chief of police (Second Amended Complaint, Doc. #23, ¶ 28).

(*Id.*).

Plaintiffs seem to argue that these alleged "policies" are enough to state a claim for a hostile work environment based on race. Other than referencing these alleged "policies" throughout the complaint, however, plaintiffs fail to connect the dots on how these policies apply to *them* specifically and how these policies relate to *their* work environment, internal complaints about Pettis in November 2017, and subsequent transfers, all of which form the basis of their Title VII claims. As to the first "policy," plaintiff do not allege that *they* were denied promotions. As to the second "policy," plaintiffs have not alleged that *they* were disciplined more harshly than similarly situated non-white police officers in their work environment with Pettis. Plaintiffs' second amended complaint contains allegations that other white police officers

(i.e. Officer Barnette) were subject to harsher discipline than non-white officers, specifically when making racially derogatory remarks; however, plaintiffs have no basis to allege these facts in support of *their* Title VII claims.  As to the third "policy," any alleged racial disparity between allowing police officers to speak to the media is wholly unrelated to plaintiffs' Title VII claims that Pettis created a racially hostile work environment.  As to the fourth and fifth "policies," plaintiffs do not allege that *they* engaged in insubordination, theft, or fraud and were disciplined more harshly than non-white police officers.  As to the sixth "policy," plaintiffs allege no facts whatsoever that *they* were subjected to a work environment "predicating overtime income and benefits on submission to sexual advances."  Plaintiffs' attempt to connect these alleged race-based "policies" to their work environment with Pettis is too attenuated and far-reaching to allow the Court to plausibly infer that plaintiffs were subject to unwelcome and unlawful racial harassment.

Because the allegations in plaintiffs' second amended complaint lack sufficient factual detail to plausibly infer that plaintiffs were subjected to unwelcome harassment based on their race or gender, plaintiffs' hostile work environment claims under Title VII, 42 U.S.C. § 1981, and Ohio Rev. Code § 4112(A) should be dismissed.

### B.  Counts II, III, and V– Retaliation under Title VII, Ohio Rev. Code § 4112(I), and 42 U.S.C. § 1981

Title VII prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII]. . . ."  42 U.S.C. § 2000e-3(a).  Ohio Rev. Code § 4112.01(I) makes it illegal for "any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section. . . ."  42 U.S.C. § 1981 also applies to retaliation claims.  *Allen v. Ohio Dep't of Job and Family Servs.*, 697 F. Supp. 2d 854, 879 (S.D. Ohio 2010) (citing *CBOCS*

19

*West, Inc. v. Humphries*, 553 U.S. 442 (2008)).  The same analytic framework applies to retaliation claims brought under Title VII, 42 U.S.C. § 1981, and Ohio law.  *See Boxill*, 935 F.3d at 520; *Blackshear v. Interstate Brands Corp.*, 495 F. App'x 613, 617 (6th Cir. 2012).

To state a claim for retaliation, a plaintiff must allege that (1) she engaged in protected activity; (2) her exercise of that activity was known by the defendant; (3) the defendant thereafter took an action that was materially adverse to her; and (4) there was a causal connection between the protected activity and the materially adverse action.  *Boxill*, 935 F.3d at 520 (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).  Under Title VII, there are two types of protected activity:  participation in a proceeding with the EEOC and opposition to an apparent Title VII violation.  *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012).  This includes "complaining to anyone (management [or] other employees . . .) about allegedly unlawful practices."  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000).  An employee who complains about a hostile work environment need not actually prove that the employer's alleged misconduct was, in fact, unlawful under Title VII to prevail on a retaliation claim.  *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015).  Nonetheless, the plaintiff must have a reasonable, good faith belief that the defendant has committed an unlawful employment practice to state a claim for retaliation.  *Id.  See also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 269 (2001) (considering whether plaintiff could have reasonably believed that alleged harassment violated Title VII in determining whether plaintiff's retaliation claim was actionable).

Plaintiffs allege that they engaged in protected activity by filing internal complaints with the police department and participating in the subsequent investigation.  (Doc. 23 at ¶ 96, Doc. 45 at 13).  While internal complaints are generally protected conduct, plaintiffs have failed to

allege that they were retaliated against as a result of opposing unlawful discrimination in these internal complaints. "Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate that discrimination occurred because of sex, race, national origin, or some other protected class." *Longs v. Ford Motor Co.*, 647 F. Supp. 2d 919, 932-33 (W.D. Tenn. 2009) (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (citations omitted)). Complaining about harassment in general terms "without indicating a connection to a protected class or providing facts sufficient to create that inference" is insufficient to constitute statutorily protected activity under Title VII. *Id.* (citing *Offutt v. Warren County Reg'l Jail*, 109 F. App'x 740, 743 (6th Cir. 2004) (finding no protected activity under Title VII where employee "never indicated that her opposition was based on Title VII"); *Mikols v. Reed City Power Line Supply Co.*, No. 1:07-cv-84, 2008 WL 2696915, at *6 (W.D. Mich. July 1, 2008) (finding no protected activity where employee's general comments about "treating people equitably" did not "inform the employer that gender discrimination" was employee's concern); *Johnson v. Potter*, No. 07-2665, 2009 WL 368366, at *9 (W.D. Tenn. Feb. 12, 2009) (finding no protected activity where "there is no evidence in the record to reflect that [employee] complained to [employer] about unlawful discrimination on the basis of a protected characteristic")). Accepting the allegations in the second amended complaint and the allegations in the internal complaints as true, no reasonable person would believe that the incidents complained of in plaintiffs' internal complaints constituted an unlawful racially or sexually hostile work environment in violation of Title VII. As explained above, both Brown and Ludgatis's internal complaints contain allegations that Pettis's behavior was often humiliating, demeaning, verbally abusive, and unprofessional, especially after officers questioned her command decisions about the shots-fired incident. (*See*

21

Doc. 23 at ¶¶ 42-43, 45).  However, both complaints fail to reference any discrimination based

on sex or race and are therefore insufficient to constitute opposition to an unlawful employment

practice.  Because plaintiffs do not allege that they engaged in protected activity, defendants'

motion to dismiss plaintiffs' retaliation claims under Title VII, 42 U.S.C. § 1981, and Ohio Rev.

Code § 4112(I) should be granted.

### C.  Count IV—First Amendment Claims

Finally, Defendants move to dismiss plaintiffs' First Amendment claims brought under §

42 U.S.C. 1983.  Plaintiffs allege that defendants retaliated against them in violation of their First

Amendment rights by transferring them to another district after they "engaged in constitutionally

protected free speech and conduct when they complained about the aggressive, hostile,

demeaning, abusive, and unprofessional conduct of Pettis."  (Doc. 23 at ¶¶ 109, 111).  Plaintiffs

also allege that defendants violated their First Amendment rights by denying their requests to

speak with various media outlets regarding this litigation.  (*Id.* at ¶ 113).

"[T]he First Amendment protects a public employee's right, in certain circumstances, to

speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417

(2006).  A plaintiff must establish three elements to prevail on a claim of retaliation under the

First Amendment: (1) she engaged in speech that was protected under the First Amendment; (2)

she suffered an adverse employment action that would deter an individual of "ordinary firmness"

from engaging in the action; and (3) the adverse action was at least partially motivated by the

plaintiff's exercise of her constitutional right.  *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*,

605 F.3d 345, 348 (6th Cir. 2010) (citations omitted); *Evans-Marshall v. Bd. of Educ.*, 624 F.3d

332, 337 (6th Cir. 2010) (citations omitted).

Whether a plaintiff's speech is protected under the First Amendment is a question of law.

*Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 464 (6th Cir. 2017); *Fox*, 605 F.3d at 350-51 (citations omitted). Speech by a government employee is protected under the First Amendment only if the speech was made "as a citizen," while addressing "a matter of public concern." *Savage v. Gee*, 665 F.3d 732, 738-39 (6th Cir. 2012) (quoting *Connick v. Myers*, 461 U.S. 138, 146-47 (1983); *Fox*, 605 F.3d at 349). A government employee's speech is made "as a citizen" and is protected under the First Amendment only when the speech is not made "pursuant to [the employee's] duties." *Garcetti*, 547 U.S. at 421. *See also Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Alomari v. Ohio Dept. of Pub. Safety*, 626 F. App'x 558, 567 (6th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 421).

The first prong of the inquiry as applied here is whether plaintiffs' speech was made "as citizens" or was made "pursuant to their official duties" as City of Cincinnati police officers. *See Weisbarth*, 499 F.3d at 542 (quoting *Garcetti*, 547 U.S. at 421). To determine whether speech was made pursuant to the employee's official duties, the Court considers the "content and context" of the speech. *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 540 (6th Cir. 2012) (citing *Fox*, 605 F.3d at 348). The Sixth Circuit has identified a number of factors that are relevant to this determination, including "the impetus for [the plaintiff's] speech, the setting of her speech, the speech's audience, and its general subject matter." *Id.* (quoting *Weisbarth*, 499 F.3d at 546). *See also Holbrook v. Dumas*, 658 F. App'x 280, 288 (6th Cir. 2016). If the plaintiff's speech clearly owed its existence to her responsibilities as a government employee, then her speech was pursuant to her official duties and was not speech made as a citizen.

*Holbrook,* 658 F. App'x at 289 (citing *Garcetti,* 547 U.S. at 421-22; *Alomari,* 626 F. App'x at 567-68; *Keeling v. Coffee Cty., Tenn.*, 541 F. App'x 522, 528 (6th Cir. 2013); *Weisbarth,* 499 F.3d at 544).

Plaintiffs' speech in this case—i.e., filing internal complaints about Pettis's conduct and behavior with Chief Isaac and Captain Mack—occurred pursuant to their official duties as City of Cincinnati police officers and not as private citizens. The Sixth Circuit has routinely found that complaints made to supervisors do not "receive constitutional protection because the speaker acted as an employee in voicing those concerns and not as a 'private citizen.'" *Crawford v. Columbus State Cmty. Coll.*, 196 F. Supp. 3d 766, 775 (S.D. Ohio 2016) (collecting cases). For example, in *Haynes v. City of Circleville, Ohio,* 474 F. 3d 357 (6th Cir. 2007), a police officer complained to his superior officer about financial cutbacks and changes to the canine-unit training program. The Sixth Circuit explained that the fact that the police officer only communicated with his supervisor indicated that he was "speaking 'in [his] official capacity as a public employee contributing to the formation and execution of official policy[.]'" *Haynes,* 474 F.3d at 364 (quoting *Mills v. City of Evansville*, 452 F.3d 646, 648 (7th Cir. 2006) (holding that a police sergeant's speech was not protected under *Garcetti* where the sergeant was "on duty, in uniform, and engaged in discussion with her superiors."). Here, the context of plaintiffs' speech was directed up the chain-of-command to Chief Isaac and Captain Mack and involved intra-department conflicts with Pettis, including her command decisions in relation to the shots-fired incident. Moreover, both plaintiffs voiced their complaints on "City of Cincinnati Interdepartmental Correspondence Sheet" letterhead. (Doc. 23 at 42-43, 45). These facts therefore suggest that plaintiffs' speech was clearly speech made pursuant to plaintiffs' employment as city police officers. *See e.g.*, *Thompson v. City of Greensburg*, No. 1:11-cv-

24

00195, 2012 WL 1202437, at *4 (W.D. Ky. Apr. 10, 2012) (holding that a police officer voicing concerns to the Chief of Police and Mayor regarding the storage of evidence did not engage in protected speech as it was "made up the chain-of-command" and involved internal police procedures).  Plaintiffs have failed to allege any facts or cite any authority suggesting that their speech was made as private citizens.

Moreover, the content of plaintiffs' internal complaints does not address matters of public concern.  While it is well-settled that a public employee's complaints of gender and race discrimination in the workplace qualify as protected speech under the First Amendment, *see Boxill*, 935 F.3d at 518, as explained above, plaintiffs did not allege in their internal complaints that they were subjected to a hostile work environment based on sex or race.  Plaintiffs' internal complaints about Pettis's "aggressive, hostile, demeaning, abusive, and unprofessional conduct" do not qualify as protected speech under the First Amendment because they cannot be characterized as touching upon matters of public concern.  Federal courts have "long been instructed not to 'constitutionalize the employee grievance' so as to avoid 'compromis[ing] the proper functioning of government offices.'"  *Naghtin v. Montague Fire Dist. Bd.*, 674 F. App'x 475, 479-80 (6th Cir. 2016) (quoting *Connick*, 461 U.S. at 154; *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004)).  The Sixth Circuit has held that "mere allegations of managerial incompetence do not amount to constitutionally protected speech."  *Id.* (citing *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir. 1988)).  Similarly, the Sixth Circuit has held that disputed personnel decisions do not touch upon matters of public concern.  *Id.* at 480 (citing *Brown v. City of Trenton*, 867 F.2d 318 (6th Cir. 1989)).  Moreover, employee complaints about a supervisor's "alleged unprofessional conduct" that "threatens the effective operation of a public office" amount to employment disputes and not matters of public concern protected by the First

Amendment. *Dibrito v. City of St. Joseph*, 675 F. App'x 593, 598 (6th Cir. 2017). Here, plaintiffs' internal complaints about Pettis's unprofessional conduct fall in line with these Sixth Circuit cases holding that public sector employment disputes are not matters of public concern protected by the First Amendment.

Plaintiffs' other alleged protected speech—speaking publicly about the lawsuit—fails for the same reasons. Even assuming that plaintiffs requested to speak to the media as private citizens and were denied the ability to do so, the content of their speech—i.e., departmental conflicts with Pettis—was not a matter of public concern for the reasons stated above.[10] Accordingly, because plaintiffs' speech in either instance is not protected under the First Amendment, plaintiffs' First Amendment claims should be dismissed.[11]

## IV. Conclusion

Based on the foregoing, it is **RECOMMENDED** that:

1.  Defendant Pettis's motion for judgment on the pleadings (Doc. 37) be **GRANTED**.

2.  The City defendants' motion for judgment on the pleadings (Doc. 38) be **GRANTED**.

3.  This case be **CLOSED** on the docket of this Court.

Date:   7/15/2020

Karen L. Litkovitz
United States Magistrate Judge

---

[10] To the extent that plaintiffs attempt to couch Fourteenth Amendment Equal Protection claims into their First Amendment claims (i.e., an alleged racial disparity on granting requests to speak to the media), the Court declines to consider these claims. Plaintiffs have not specifically alleged any Equal Protection claims in the second amended complaint, nor have they developed any arguments on these alleged claims in their opposition briefings. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

[11] As plaintiffs' second amended complaint fails to state a claim for relief as discussed above, the Court need not address whether defendants Cranley, Pettis, Duhaney, Black, and Isaac can be held personally liable under the federal and state law claims raised by plaintiffs. Likewise, the Court declines to address whether defendants are entitled to qualified immunity because plaintiffs have not plausibly alleged a First Amendment violation. (Doc. 37 at 28, Doc. 38 at 16).

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

TAMERA BROWN, et al.,                              Case No. 1:18-cv-412
        Plaintiffs,                                        McFarland, J.
                                                           Litkovitz, M.J.
        vs.

CITY OF CINCINNATI, et al.,
        Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

27